UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN GRANDE,<br><br>    Plaintiff,<br><br>v.<br><br>HARTFORD BOARD OF EDUCATION; LESLIE TORRES-RODRIGUEZ, in her individual capacity and her official capacity as Superintendent of Hartford Public Schools; EDWARD WILSON, JR., in his individual capacity and his official capacity as Staff Attorney/Executive Director of Internal Investigations and Security of Hartford Public Schools; and, TRACY AVICOLLI, in her individual capacity and her official capacity as Director of Arts and Wellness for Hartford Public Schools,<br><br>    Defendants. | **Case No. 3:24-cv-00010**<br><br>**COMPLAINT**<br><br>January 3, 2024 |

AND NOW comes Plaintiff John Grande, by and through his undersigned attorneys, and states the following claim for relief against Defendants Hartford Board of Education; Leslie Torres-Rodriguez, in her individual capacity and her official capacity as Superintendent of Hartford Public Schools; Edward Wilson, Jr., in his individual capacity and his official capacity as Staff Attorney/Executive Director of Internal Investigations and Security of Hartford Public Schools; and Tracy Avicolli, in her individual capacity and her official capacity as Director of Arts and Wellness for Hartford Public Schools, and avers as follows:

## SUMMARY OF THE CASE

1. This case is about a public school system's retaliatory discipline of a teacher because he spoke out against the school board and its superintendent's agenda to push and mandate certain

beliefs and opinions and punish teachers like him for contrary views—a textbook violation of his First Amendment rights.

2. The Supreme Court of the United States has long recognized: "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]'" *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

3. The constitutional right to free speech bears special importance when public employees comment on matters related to their employment. *Id.* at 240.

4. Indeed, the Supreme Court stated over half a century ago that, "[t]eachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968).

5. Plaintiff John Grande ("Mr. Grande") has spent his professional life educating a diverse body of students as a teacher employed by the Hartford Board of Education (the "Board").

6. However, when Mr. Grande expressed his feelings about his employer's presentation on white privilege and use of resources to advance critical race theory, the Board launched a prosecution against Mr. Grande simply because his opinion differed from that of the Board, its Superintendent, and other administrators.

7. That prosecution culminated in a show trial, where Mr. Grande faced fabricated evidence with representation from a union that ultimately abandoned him and supported the very presentation at issue.

8. When the dust settled, Mr. Grande was left with a letter of reprimand in his file, carrying the Board's imminent threat of termination should he speak out against the Board, its administrators, or its policies again.

9. As a result of the Board's and its administrators' unconstitutional conduct, Mr. Grande has suffered substantial injury and damage, both personally and professionally. He thus seeks compensatory and nominal damages against all Defendants, and punitive damages against the administrators, for the violation of his First and Fourteenth Amendment rights, as well as attorneys' fees and costs.

## JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States of America, including the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of Mr. Grande's rights, privileges, and immunities under the Constitution of the United States, and particularly the First and Fourteenth Amendments.

11. This Court has jurisdiction over Mr. Grande's claims under 28 U.S.C. § 1331—because the claims arise under the United States Constitution—and 28 U.S.C. § 1343—because he seeks relief under 42 U.S.C. § 1983.

12. This action is an actual controversy in which Mr. Grande seeks a declaration of his rights under the Constitution of the United States. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court may declare Mr. Grande's rights and grant further necessary and proper relief, including injunctive relief pursuant to Federal Rule of Civil Procedure 65.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b), because all parties are domiciled in Connecticut. Additionally, all of the events giving rise to this action occurred in Connecticut.

## PARTIES

14. Plaintiff John Grande is an adult individual who is a citizen of the United States of America and employed as a physical education teacher by the Board.

15. Defendant Board is a public school district, d/b/a Hartford Public Schools, and a local government entity located and doing business in the city of Hartford, Connecticut. *See* Conn. Gen. Stat. Ann. §§ 10-240–241.

16. Defendant Leslie Torres-Rodriguez ("Torres-Rodriguez" or the "Superintendent") is the Superintendent of Hartford Public Schools, and is responsible for, among other things, establishment and oversight of the Board's organizational goals, policies and procedures, and the supervision of the Board's staff and employees. She is sued in her individual and official capacities.

17. Defendant Edward Wilson, Jr. ("Wilson") is the Staff Attorney/Executive Director of Internal Investigations and Security of Hartford Public Schools, and is responsible for, among other things, oversight and control of investigations and prosecutions of Board employees for allegations of misconduct and legal analysis of the Board's and its administrators' or employees' actions. He is sued in his individual and official capacities.

18. Defendant Tracy Avicolli ("Avicolli") is the Director of Arts and Wellness for Hartford Public Schools, and is responsible for, among other things, oversight of physical education, health, art, and music educational programs and implementation of the Superintendent's policies. She is sued in her individual and official capacities.

## FACTUAL ALLEGATIONS

19. Mr. Grande has been teaching for approximately 36 years. He has spent the past 35 years educating and serving the students of Hartford as a physical education teacher.

20. During his long career employed by the Board, Mr. Grande has taught and interacted with a diverse body of students.

4

21. Mr. Grande has never had any issues with teaching or working with students that identify as any race, ethnicity, nationality, gender, sexuality, or religion different than his own.

### The Board's Privilege Presentation

22. During the coronavirus pandemic, on October 28, 2020, Mr. Grande and other Board personnel were required to participate in a "Professional Development (PD) session focused on race and privilege" that took place via a Zoom presentation and meeting, facilitated by Avicolli (the "Privilege Presentation"). A true and accurate copy of the slides presented during the Privilege Presentation are attached hereto as "Exhibit A."

23. According to the Board, the purpose of the Privilege Presentation was to educate the participants on the issue of privilege (including racial, gender, religious, and other proposed forms of social privilege), so school personnel could "explore [their] own identity and privilege to better understand how [they] relate to [their] students in order to increase engagement and collaboration." Ex. A at 4.

24. Mr. Grande noticed that the statements posed in the Privilege Presentation related to supposed "examples of privilege" were strategically worded in a way that would prompt a "yes" response from someone like Mr. Grande, who identifies as a straight, white, Christian male, and required him to shade in a section of his "identity wheel." Ex. A.

25. Based on those prompts, Mr. Grande believed that the Privilege Presentation targeted a certain class of people, including him, and was an exercise in critical race theory, rather than one aimed at improving the education of students.

26. Mr. Grande also found the presentation to be hypocritical because although it included a section based on "ability" privilege, Mr. Grande had previously dealt with a situation where he had been mocked and mistreated by a former Hartford Public Schools principal for his own hearing limitations.

5

27.     Ironically, the Board had been made aware of that prior mistreatment yet did nothing to help Mr. Grande.

### The Breakout Discussion and Mr. Grande's Protected Speech

28.     At the conclusion of the main session, the participants were divided into virtual "breakout" groups to further discuss the Privilege Presentation.

29.     The Privilege Presentation's discussion slides informed the participants that it is "OK to feel discomfort," "[y]ou do not have to share[,]" and to be prepared to "[a]gree to disagree respectfully." Ex. A at 20.

30.     Mr. Grande and other participants acknowledged that the breakout session was quiet and awkward from the start, with little participation.

31.     To break the awkward silence, and in response to a question of how the Privilege Presentation made the participants feel, Mr. Grande said, "I was just man-bashed and white-shamed. I'm gonna sit here quietly."

32.     Another participant stated, "I have nothing to apologize for. I've worked hard for everything I have."

33.     Mr. Grande agreed with that sentiment and added, "I've been teaching in this system for 32 years and I've never had to sit through something like this. All I know are minority kids."

34.     At some point, Avicolli entered the virtual breakout group room and made some statements, but left shortly thereafter.

35.     In further discussion, Mr. Grande also stated: "I'm not buying into this white-bashing BS."

36.     At no point did Mr. Grande use any explicit or profane words.

37.     Moreover, his comments sparked no reaction, and no disruption during the breakout group meeting itself.

6

38.    Indeed, multiple individuals from the group could not even remember what Mr. Grande had said.

### The Critical Race Theory and DEI Policies of the Superintendent and Board

39.    Following the Privilege Presentation and breakout group discussion, the Board had Mr. Grande complete a survey.

40.    In response to the question of what Mr. Grande found enjoyable or valuable, he submitted a response that noted or questioned the training's relation to "art, music, or PE/health" and stated that it was "part of the Superintendent's agenda to advance her career."

41.    Specifically, Mr. Grande's reference to the Superintendent's agenda was to what he deemed to be the advancement and support of critical race theory in Hartford Public Schools.

42.    The Superintendent's focus on critical race theory and diversity, equity, and inclusion (DEI) principles have been a hallmark of her career, and she has used those issues to rise to her position with Hartford Public Schools and to gain recognition as a champion of those principles.

43.    Over the last several years, the Superintendent, with the backing and approval of the Board, has instituted or enforced policies, procedures, and customs to advance critical race theory in Hartford Public Schools, and to force employees like Mr. Grande to acquiesce to that theory.

44.    For example, the Board's Administration Policy on Professional Development states: "All administrators should be exposed to professional growth opportunities and educational practices that address ways to foster intellectual achievement, excellence, diversity, and equity in the school community." A true and correct copy of the Board's Administration Policy on Professional Development is attached hereto as "Exhibit B."

45.    That policy further requires that: "Professional development programs should be developed to assist and alert participants to issues related to the impact of racial, ethnic, and gender bias in the classroom, in the schools, and in the broader community." Ex. B.

46. In furtherance of that policy and other customs and procedures of the Board, the Superintendent and Avicolli created and/or mandated the Privilege Presentation and forced employees like Mr. Grande to attend it, because they "believe it is critical for everyone to reflect on privilege in this way in order to use our individual and collective privilege(s) for equity and social justice." Ex. A at 8.

47. Therefore, the Board, in concert with its administrators, has promulgated and enforced policies, practices, customs, and procedures that favor certain viewpoints and opinions regarding race and race relations, important matters of public concern, over others.

48. When Mr. Grande expressed his differing viewpoint and opinion on that subject and critical race theory in general, the Board and its administrators immediately launched a proverbial witch hunt in an effort to embarrass and punish him.

### Avicolli's Targeting of Mr. Grande and the Board's Investigation

49. On November 10, 2020, Avicolli sent an email to all of the participants in the breakout group discussion, except for Mr. Grande. A true and correct copy of that email is attached hereto as "Exhibit C."

50. Therein, Avicolli accused Mr. Grande of "inappropriate and aggressive comments" during the breakout discussion. She further stated that she was "extremely upset and saddened by this behavior, not only because of the comments themselves, but because that teacher created an unsafe and hostile environment for you[.]" Ex. C.

51. Avicolli also informed the other breakout group discussion participants that Mr. Grande was under investigation, and that they may be contacted by an investigator. Ex. C.

52. The Board did not inform Mr. Grande of this investigation until months later.

53. The so-called investigation was conducted in or around January to March of 2021 and included the collection of alleged statements from the breakout group discussion participants.

54. Mr. Grande spoke with the investigator but did not review or attest to a statement.

55. Nevertheless, the investigator drafted a statement that she attributed to Mr. Grande and placed in the investigation file, as if it came directly from Mr. Grande.

56. Out of the seven alleged statements from other participants in the Privilege Presentation breakout discussion, only two indicated any disagreement or offense taken to anything that was said during the breakout discussion.

57. Those two statements are strikingly similar in content, while the other statements contain different recollections and details.

58. On information and belief, these two individuals were coached by and/or conferred with Avicolli and/or other Board administrators or employees prior to providing their statements.

59. Just days after these alleged statements were taken, on January 29, 2021, Avicolli sent an email to the investigator with screenshots of what she claimed to be Mr. Grande's survey responses related to the Privilege Presentation and breakout group discussion. A true and correct copy of this email is attached hereto as "Exhibit D."

60. However, the screenshot includes a response that was not provided by Mr. Grande.

61. Specifically, a response that appears in a different font and color than that of the rest of the survey states: "Talking about white privilege is part of the superintendent's personal agenda and I find it absolutely disgusting that this is the focus." Ex. D.

62. Mr. Grande did not make that statement or include it in his survey response.

63. Nevertheless, Avicolli provided the statement to the investigator and attributed it to Mr. Grande.

64. On information and belief, Avicolli is a personal friend of the Superintendent.

65. Avicolli attributed the statement to Mr. Grande with the intent to harm him or with reckless indifference and callous disregard to his rights, and intentionally manipulated or otherwise

9

altered his response to make it appear as if he made that statement because of her relationship with and loyalty to the Superintendent.

66. Avicolli acted in concert with or at the direction of the Superintendent.

67. Avicolli and the Superintendent desired to punish or otherwise harm Mr. Grande for his actual survey response regarding the "Superintendent's personal agenda to advance her career" and/or his criticism and disagreement with the Privilege Presentation, and the Board's systemic advancement of critical race theory.

68. Avicolli repeatedly emailed the investigator for updates on the "John Grande case" that Avicolli did not want "to be forgotten." True and correct copies of these emails are attached hereto as "Exhibit E." These actions further demonstrate her desire to punish Mr. Grande for his expressions of opinion related to the Privilege Presentation and critical race theory in Hartford Public Schools.

69. During the investigation, Avicolli related to Mr. Grande that he was under investigation and subject to discipline because of (1) what he said during the breakout group discussion, (2) his body language when he said it, *i.e.*, crossing his arms and false accusations of eye rolling, and (3) his survey response regarding the Superintendent.

70. At that time, Mr. Grande was not aware that Avicolli had provided the investigator with the survey response that Avicolli falsely attributed to Mr. Grande.

**Mr. Grande's Leave of Absence and the Board's Pre-Disciplinary Meeting**

71. The stress of the investigation and allegations caused Mr. Grande to suffer from bouts of PTSD related to previous mistreatment and persecution by the Board regarding his hearing impairment, and the retaliatory actions of a previous principal.

72. The Board's and its employees' renewed attacks on his character and professionalism caused Mr. Grande severe mental anguish and pain, including physical manifestations.

73. The Board's and its employees' actions also caused Mr. Grande such distress that he took approximately nine sick days off from work when he knew that the Board had scheduled professional development programs based on race and/or critical race theory.

74. Eventually, as a result of this hostile work environment, Mr. Grande had to take an extended leave of absence from work from April 5, 2021, through the end of that school year, June 16, 2021.

75. Mr. Grande also asked the Board for internal harassment complaint forms to halt or remedy this situation, and despite being assured that he would receive them, he never did. Twelve weeks later, Mr. Grande finally got the forms for himself when he reached out directly to the Board's human resources department.

76. Upon his return to school the next academic year, the Board conducted a pre-disciplinary meeting with Mr. Grande on October 18, 2021.

77. At that meeting, Wilson informed Mr. Grande that he was accused of using vulgar language, and that the only reason the investigation had evolved to that point was because others felt uncomfortable due to Mr. Grande's comments during the breakout group discussion.

78. When Mr. Grande cited the Board's employee handbook provision affirming his rights and guarantees to "freedom of speech as provided under the First Amendment of the United States Constitution and applicable case law" and assurance that "[n]o employee of the Hartford Public Schools will be subject of disciplinary action or retaliatory action of any kind as a result of the exercise of his or her free speech rights[,]" Wilson only quipped that vulgarities are not part of free speech.

79. Mr. Grande also pointed out that during another professional development meeting about two months prior to the Privilege Presentation, another Board employee blurted out the expletive, "shut the fuck up," directed at Avicolli.

11

80. Although Avicolli acknowledged the other employee's expletive at the time, on information and belief the Board did not subject that individual to any investigation or discipline for that speech.

81. Thus, the Board's investigation of Mr. Grande was clearly predicated on its and/or its administrators', such as the Superintendent's, Avicolli's, and/or Wilson's, dislike of Mr. Grande's opinion regarding the Board's use of resources to advance critical race theory.

82. After the pre-disciplinary meeting, Mr. Grande submitted a written statement.

### The Letter of Reprimand and Threat of Termination

83. On December 10, 2021, the Board issued Mr. Grande a Letter of Reprimand (the "Letter") which accused him of engaging in "inappropriate and unprofessional conduct" and making "inappropriate and unprofessional comments." A true and correct copy of the Letter is attached hereto as "Exhibit F."

84. The Letter explicitly instructed Mr. Grande, "Employee behavior that does not reflect **positive social values** will have a negative influence on students and fellow employees and is unacceptable." Ex. F (emphasis added).

85. The Letter ultimately threatened Mr. Grande with potential future punishment for similar incidents, warning that "any future failure to follow expected standards of conduct will not be tolerated. Please be aware that any **future misconduct may subject you to further disciplinary action, up to and including termination**." Ex. F (emphasis added).

86. In addition to the Letter's formal reprimand placed in Mr. Grande's file for future reference, the Board forced Mr. Grande to take "Sensitivity Awareness" training, which he promptly completed. Ex. F.

87. Notably, the Board issued the Letter on its own letterhead, as well as the letterheads of the Superintendent and Wilson. Wilson did not sign the Letter, but his signature block appears at the end of it. Ex. F.

88. After receiving the Board's Letter, Mr. Grande asked his exclusive representative, the Hartford Federation of Teachers ("HFT"), to file a grievance on his behalf.

89. While HFT did file Mr. Grande's grievance and initially provided him with some representation, it refused to take his grievance to arbitration, where it would have been adjudged by an independent third party, only because he was not a dues-paying union member.

90. In so doing, HFT violated its duty of fair representation to Mr. Grande, and prevented the merits of his grievance from ever reaching arbitration.

91. However, on information and belief, HFT and its officials had worked closely with the Board and its officials to either create, approve, or otherwise consent to the professional development training and the Privilege Presentation that ultimately led to the Board's written reprimand against Mr. Grande.

92. Therefore, the Board left Mr. Grande with a mandatory, exclusive representative that also disagreed with his opinions, supported the advancement of critical race theory by the Board, and refused to help him when he needed them the most.

93. In proceedings before the Connecticut State Board of Labor Relations related to HFT's violations under state labor law, the Board refused to negotiate with Mr. Grande, or remove the Letter from his employment file.

94. Ultimately in those proceedings, HFT was found to have unlawfully interfered with Mr. Grande's right to refrain from union activity and purposely discriminated against him by refusing to take his grievance to arbitration and adjudicate it on its merits.

95. The Board, the Superintendent, Avicolli, and Wilson were motivated by evil motive or intent, or acted with reckless or callous indifference to Mr. Grande's constitutional rights, when they purposely restricted Mr. Grande's right to freedom of speech, including to speak out against policies and programs that he finds objectionable, and when they sought to punish and/or retaliate against Mr. Grande for expressing his opinions, or for failing to hold or express the opinions they prefer, and to deter him from doing so in the future.

96. In other words, the Defendants have unabashedly violated Mr. Grande's rights in several respects, by mandating him to hold or develop certain beliefs and opinions, retaliating against and punishing him when he expresses contrary beliefs and opinions, and threatening him with further discipline and loss of employment should he not hold certain beliefs and opinions or speak out against them in any manner.

97. As a result, Mr. Grande suffered from severe mental anguish and distress due to the Board's investigation and condemnation, along with the actions of the Superintendent, Wilson, and Avicolli.

98. That strife caused Mr. Grande to lose extensive amounts of his PTO when he called off work to avoid professional development trainings and eventually took an extended leave of absence from work.

99. Additionally, Mr. Grande suffered and endured public and personal humiliation and damages to his reputation and character at the hands of the Defendants, and lost wages for the time he had to spend completing sensitivity training.

## CLAIMS FOR RELIEF

### COUNT ONE
(Retaliation in Violation of the First Amendment)

100. Plaintiff re-alleges and incorporates by reference all allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

101. "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

102. A First Amendment retaliation claim brought under 42 U.S.C. § 1983 requires the plaintiff to show that (1) he engaged in protected speech under *Pickering/Garcetti*, (2) the government's retaliatory conduct adversely affected that speech, and (3) the speech was at least a "substantial or motivating factor in the adverse employment action." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d. Cir. 2013) (cleaned up).

103. Defendants, acting under color of state law, retaliated against Mr. Grande, and violated his First Amendment rights by prosecuting an investigation against him, fabricating evidence used against him, issuing the Letter reprimanding him, forcing him to take sensitivity training, and threatening him with termination, due to his protected speech regarding the Board's policies and advancement of critical race theory.

104. Defendants violated Mr. Grande's First Amendment rights by undertaking actions designed to deter him from ever expressing a viewpoint different from that of Defendants, on the threat of additional investigations, proceedings, and even termination.

105. There is no state interest, compelling or otherwise, justifying Defendants' retaliatory actions against Mr. Grande.

106. Defendants, by prosecuting, punishing, and threatening termination, have deprived and are depriving Mr. Grande of his First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

107. Defendants were aware of and informed of Mr. Grande's constitutional rights to express opinions different from their own, and therefore were motivated by evil motive or intent, or

acted with reckless or callous indifference to Mr. Grande's constitutional rights, when they violated, misrepresented, and interfered with his constitutional rights.

108. Mr. Grande is in imminent danger of and has suffered irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

109. If not enjoined by this Court, Defendants and/or their agents will continue to effect the aforementioned deprivations and abridgments of Plaintiff's constitutional rights, thereby causing further irreparable harm, damage, and injury for which there is no adequate remedy at law.

110. As a direct result of Defendants' concerted actions, Mr. Grande has suffered monetary damages and other harm.

## COUNT TWO
(Compelled Speech in Violation of the First Amendment)

111. Plaintiff re-alleges and incorporates by reference all allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

112. The Supreme Court of the United States has declared, with regard to the First Amendment prohibition on compelling speech that, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

113. Accordingly, "when government directly regulates speech by mandating that persons explicitly agree with government policy on a particular matter, it plainly violates the First Amendment." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 170 (2d Cir. 2020) (cleaned up).

114. The First Amendment protects Mr. Grande from being forced to support or otherwise agree with Defendants' policies and actions as a condition of employment.

16

115. Defendants, acting under color of state law, forced Mr. Grande to take part in the Privilege Presentation and voice or otherwise pledge his support for their advancement of critical race theory and opinions regarding racial privilege because, in Defendants' own words, "it is critical for everyone to reflect on privilege in this way in order to use our individual and collective privilege(s) for equity and social justice." Ex. A at 8.

116. Defendants also sought to force Mr. Grande to voice or otherwise pledge his support of their advancement of critical race theory and opinions regarding racial privilege, by prosecuting an investigation against him, fabricating evidence used against him, issuing the Letter reprimanding him, forcing him to take sensitivity training, and threatening him with termination, all because he expressed an opinion and viewpoint different from Defendants' own.

117. There is no state interest, compelling or otherwise, justifying Defendants' requirement that individuals, "use [their] individual and collective privilege(s) for equity and social justice" or "reflect positive social values" by refraining from expressing their disagreement with Defendants' advancement and funding of critical race theory professional development.

118. Defendants, by forcing Mr. Grande to refrain from any speech that they disagree with, deprived and are depriving Mr. Grande of his First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

119. Defendants, by prescribing the speech and views they deem acceptable for Mr. Grande to express, upon risk of employment consequences in the future, deprived and are depriving Mr. Grande of his First Amendment rights to free speech and association, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

120. Defendants were aware of and informed of Mr. Grande's constitutional rights to express opinions different from their own, and therefore were motivated by evil motive or intent, or

17

acted with reckless or callous indifference to Mr. Grande's constitutional rights, when they violated, misrepresented, and interfered with his constitutional rights.

121. Mr. Grande is in imminent danger of and has suffered irreparable harm, damage, and injury inherent in the violation of First and Fourteenth Amendment rights, for which there is no adequate remedy at law.

122. If not enjoined by this Court, Defendants and/or their agents will continue to effect the aforementioned deprivations and abridgments of Plaintiff's constitutional rights, thereby causing further irreparable harm, damage, and injury for which there is no adequate remedy at law.

123. As a direct result of Defendants' concerted actions, Mr. Grande has suffered monetary damages and other harm.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Grande prays that this Court order the following relief:

A. **Declaratory:** A judgment based upon the actual, current, and *bona fide* controversy between the parties as to the legal relations among them, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, declaring:

    i. that all Defendants retaliated against Mr. Grande in violation of his rights under the First and Fourteenth Amendments to the Constitution of the United States;

    ii. that Defendants' practice of requiring support of and/or punishing disagreement with their policies on race and in advancement of critical race theory violates Mr. Grande's rights under the First and Fourteenth Amendments to the Constitution of the United States; and,

    iii. that the Board's Administration Policy on Professional Development, on its face and as applied, violates Mr. Grande's rights under the First and Fourteenth Amendments to the Constitution of the United States.

    B.    **Injunctive:** A permanent injunction:

        i.    enjoining Defendants, their officers, employees, agents, attorneys, and all others acting in concert with them, from:

            a.    engaging in any of the activities listed in Part A above, which the Court declares unconstitutional; or

            b.    enforcing the Board's Administration Policy on Professional Development or any substantially similar provision promulgated by the Board that requires Mr. Grande to participate in and support the Board's viewpoint on matters of public concern;

        ii.    requiring Defendants, their officers, employees, agents, attorneys, and all others acting in concert with them, to:

            a.    retract the December 10, 2021, Letter of Reprimand against Mr. Grande and remove it from his employment file;

            b.    expunge the Board's Administration Policy on Professional Development; and,

            c.    restore to Mr. Grande all lost PTO.

    C.    **Monetary:** A judgment awarding Mr. Grande nominal and compensatory damages against all Defendants and punitive damages against Defendants Torres-Rodriguez, Wilson, and Avicolli, for the injuries sustained as a result of Defendants' unlawful interference with and deprivation of his constitutional and civil rights, plus interest thereon, and such amounts as principles of justice and compensation warrant.

    D.    **Attorneys' Fees and Costs:** A judgment awarding Mr. Grande costs and reasonable attorneys' fees under 42 U.S.C. § 1988; and

    E.    **Other:** Such other and further relief as the Court may deem just and proper.

Dated: January 3, 2024						Respectfully submitted,

*/s/ Craig C. Fishbein, Esq.*
Craig C. Fishbein, Esq. CT25142
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
Facsimile: 203.294.1396
Email: ccf@fishbeinlaw.com

Nathan J. McGrath*
Email: njmcgrath@fairnesscenter.org
Logan M. Hetherington*
Email: lmhetherington@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600B
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001
Facsimile: 717.307.3424

*Attorneys for Plaintiff*

*motion for admission *pro hac vice* to be filed

20