# EXHIBIT A

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                    Job Date:7/30/2024

```
 1            UNITED  STATES  DISTRICT  COURT
              DISTRICT  OF  CONNECTICUT
 2

 3

 4

        - - - - - - - - - - - - - -X
 5   JOHN GRANDE,                   )
            Plaintiff,              )
 6                                  )
     vs.                            )CIVIL ACTION NO.:
 7                                  )3:24-cv-00010-JAM
     HARTFORD BOARD OF EDUCATION,   )
 8          ET AL                   )
            Defendants.             )
 9   - - - - - - - - - - - - -  X

10

11

12

13        DEPOSITION OF: JOHN GRANDE
          DATE:   JULY 30, 2024
14        HELD AT:  JACKSON LEWIS P.C. 90
          STATEHOUSE SQUARE, HARTFORD, CT.
15

16

17

18

19
     Reporter:   JOHN C. BRANDON, RPR, LSR #0002
20               BRANDON LEGAL TECH LLC
                 37 Pinnacle Mountain Road
21               Simsbury, CT 06070

22

23

24

25
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                          Job Date:7/30/2024

```
 1    yes.

 2        Q    Now, who is your employer right now?

 3        A    Hartford Board of Ed.

 4        Q    Do you know when you receive a pay stub

 5    does that come from the Hartford Board of Ed or

 6    does it come from the City of Hartford?

 7        A    Hartford Board of Ed.

 8        Q    Okay.  And has that been the same employer

 9    since 1989?

10        A    Yes.

11        Q    I'm going to mark an exhibit.

12

13                (Defendant's exhibit one,

14                Superintendent's Statements,

15                marked for identification)

16

17        Q    (By Ms. Strange)  Thank you.  I'm going to

18    ask you to look at what's been marked as

19    defendant's exhibit one, and tell me if you know

20    what that is, if you recognize that document?

21        A    No, but I don't remember looking at it.

22        Q    Okay.  Take a moment and tell me just in

23    general what this document appears to be?

24        A    Excuse me, I do recognize it.  I looked at

25    it quick at the top.  I do recognize it.
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                                Job Date:7/30/2024

```
 1   complaint be filed on your behalf?

 2       A    Yes.

 3       Q    Did you review it before it was filed?

 4       A    Yes.

 5       Q    And did you agree with the contents of

 6   this complaint?

 7       A    Yes.

 8       Q    I'll direct your attention to page five,

 9   paragraph 22.  Were you required on October 28th,

10   2020 to participate in a professional development

11   session focused on race and privilege?

12       A    Yes.  I signed up for it.

13       Q    Okay.  It says you and other personnel

14   were required to participate.  Who else was

15   required to participate?

16       A    That was for the entire unified arts

17   department.

18       Q    Is this similar to the other professional

19   development programs where part of your job was

20   to participate in the program?

21       A    It was something that was offered that we

22   sign up for.  I'm not sure I understand your

23   question.

24       Q    Sure.  You say here you were required, you

25   were required to participate.  Is this one of
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande

Job Date:7/30/2024

```
 1   on your iPad?

 2       A    Yes.

 3       Q    So what do you mean stopped participating?

 4       A    The part where you shade in the pie chart.

 5       Q    If you go to page two, there's reference

 6   to the level of student engagement in remote

 7   classes.

 8            Were you teaching remote physical

 9   education classes when this presentation was

10   given?

11       A    I was doing remote with the kids, yes.

12       Q    Okay.  Was there an issue in the school

13   district with engagement in remote classes?

14       A    I don't remember.

15       Q    Did you have any issues in students

16   engaging in your remote classes?

17       A    No.

18       Q    How does a student engage in a physical

19   education class remotely?

20       A    Well, they show up for class, you give

21   them an assignment or activity to do.  It

22   included a warm-up and an activity, and you'll

23   talk to them, you'll explain to them, and then

24   you'll give them time to do it, come back and

25   meet, and that's the class.
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                    Job Date: 7/30/2024

```
 1      Q    Do you know whether students are doing it
 2  when you tell them to do it?
 3      A    Only if they keep themselves on the
 4  screen.
 5      Q    So did you do anything to figure, try and
 6  figure out if your students were engaged in your
 7  classes?
 8      A    I was just there with them on my screen.
 9      Q    Would you agree that it's easier to
10  disengage when you're remote?
11      A    I'm sure it is.
12      Q    Okay.  And on a scale of one to five what
13  was the level of student engagement in your
14  remote classes?
15      A    Based on the kids who showed up?  I don't
16  know, the kids who showed up for the class?
17      Q    Let me ask it this way:  Were you having
18  problems with kids showing up for class?
19      A    Not many showed up.
20      Q    Okay.  For the kids who did not show up,
21  would you agree there was a lack of engagement
22  there?
23      A    Yes.
24      Q    All right.  Why were kids not showing up?
25      A    They probably didn't have somebody at home
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                                 Job Date:7/30/2024

```
 1   that had them get on there.  I really don't know.
 2       Q    Would there be other reasons that kids
 3   during Covid did not show up to classes?
 4       A    On the Zoom?
 5       Q    Yes.
 6       A    There could be.
 7       Q    Did you ever try to find out why kids
 8   weren't showing up for classes?
 9       A    No.  I don't believe so.
10       Q    Would you agree that, for example, a child
11   from a poor home may have a hard time even
12   getting a computer to show up for class?
13       A    No, because they were all given laptops or
14   iPads.
15       Q    And was that they were all given iPads by
16   the school?
17       A    Yes.
18       Q    Did the school give them Internet access
19   too?
20       A    I believe so, if they didn't have it.
21       Q    So the school had Internet access put in
22   at their home?
23       A    I don't know.
24       Q    Do you know whether students didn't show
25   up because there are things going on in their
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                    Job Date: 7/30/2024

1   home they might not want people to see?

2       A   I don't know.

3       Q   Do you know whether students didn't show

4   up because they were embarrassed by their houses?

5       A   I can't answer that.

6       Q   So, do you agree that was a problem with

7   student engagement when they weren't even showing

8   up for the remote classes?

9       A   If they are not showing up for class

10  there's a problem with engagement.

11      Q   Okay.  Did you create opportunities for

12  students to collaborate in your remote classes so

13  they'd be more engaged?

14      A   I don't remember what activities I came up

15  with.  But sometimes I partnered them up.

16      Q   When you say partnered them up, you'd have

17  them partner up on Zoom?

18      A   With each other, yes.  Talk to each other.

19      Q   For the ones that you partnered up would

20  those just be the students who were actually

21  going to the class?

22      A   Yes.

23      Q   Okay.  Could you do anything about the

24  students that weren't going to class?

25      A   I took attendance, I believe, and I think

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                    Job Date:7/30/2024

```
 1      Q    Okay.  All right.  So on the presentation

 2   that we, the professional development

 3   presentation that we just talked about on October

 4   28th, 2020, would they see that you were

 5   participating?

 6      A    Yes.

 7      Q    Okay.  And you participated start to

 8   finish, the whole program?

 9      A    Yes.

10      Q    And that was part of your job duties?

11      A    Our responsibilities or requirements I

12   would say.

13      Q    Following the professional development

14   session did you provide any feedback?

15      A    For this one in October?

16      Q    Yes.

17      A    We were broken up into smaller groups, and

18   asked for our feelings on it.

19      Q    Okay.  Who was in your smaller group?

20      A    There were a combination of teachers from

21   unified arts.

22      Q    Do you remember which teachers were there?

23      A    Yes.

24      Q    Who were the teachers?

25      A    Um, Catherine Barr, Karen Dugan, Ed
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                    Job Date: 7/30/2024

```
 1    Sutcliffe, Claudia Portil, Tim Keene, Eric
 2    Soucie, a guy named Mike, I forgot his last name.
 3    It begins with a P.
 4         Q    Was it Ponsicorvo (phonetic)?
 5         A    That sounds correct.
 6         Q    Was he a music teacher?
 7         A    Yes.
 8         Q    Anybody else?
 9         A    There was another guy there by the name of
10    Dennis.
11         Q    Do you know Dennis's last name?
12         A    No.
13         Q    So there's a total of nine people
14    including you?
15         A    Yes.
16         Q    Okay.  Was that session in a breakout
17    room?
18         A    Yes.
19         Q    What do you recall about that session?
20         A    It started off quiet.  And I opened it up
21    by saying that I just got man bashed and white
22    shamed, but I'm going to sit there quietly.
23         Q    So you opened this session.  And what did
24    you specifically say?
25         A    I said I just got man bashed and white
```

1    that document in front of you, exhibit three?

2        A    The questions asked, yes.

3        Q    Okay.  When you made that comment on the

4    Zoom call was Catherine Barr on that Zoom call?

5        A    Yes.

6        Q    Who is Catherine Barr?

7        A    A former music teacher.

8        Q    What's her race?

9        A    White.

10       Q    Were you friends with Catherine Barr?

11       A    No.

12       Q    Okay.  Do you know whether she complained

13   about the comment that you made?

14       A    I found out she did.

15       Q    What was her complaint?

16       A    She accused me of making a statement

17   saying that I'm not buying into this white

18   bashing bullshit.

19       Q    When did she make that statement?

20       A    I saw an e-mail from her that afternoon.

21   It was dated that afternoon or that day.

22       Q    When did you see the e-mail?

23       A    A couple of weeks ago.

24       Q    Did you in fact say in that Zoom -- strike

25   that.  Can you go back to exhibit two, please,

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                                    Job Date:7/30/2024

```
 1    the complaint.  Page six.
 2            Did you -- I want to confirm paragraph 31.
 3    Did you say I was just man bashed and white
 4    shamed.  I'm going to sit here quietly?
 5        A    Yes.
 6        Q    Looking at paragraph 35, did you also say,
 7    quote, I'm not buying into that white bashing BS?
 8        A    Yes, at the end of the meeting.
 9        Q    So when she said that you said you're not
10    buying into this white bashing BS, that's exactly
11    what you said, correct?
12        A    I said BS.
13        Q    Were you mad when you said that?
14        A    No.
15        Q    You say in paragraph 37 that your comments
16    sparked no reaction during the breakout group
17    meeting, but your comments did spark reactions
18    afterwards, correct?
19        A    Where are you looking?
20        Q    I'm sorry, paragraph 37 of the complaint.
21    On the bottom of page six.
22        A    Okay.
23        Q    Did your comments spark any reaction
24    during the breakout group meeting?
25        A    Which comments are you referring to?
```

```
 1    the room when you made any of the comments that

 2    you made?

 3        A    No.  I don't think so.

 4        Q    Okay.  Then when did you make your, was

 5    your last comment I'm not buying into this white

 6    bashing BS?

 7        A    Right around the end when it was, that

 8    breakout room was ending.

 9        Q    Did you make any other comments?

10        A    I think I had a little discussion with

11    Mike, because Mike had about the same amount of

12    years as I had.

13            And I said something like, you know, kind

14    of unfortunate people that have so much less

15    experience than we do, if any, are telling us how

16    we should be dealing with these kids, and we've

17    been doing it for decades.

18        Q    Okay.  Is that something that you

19    resented, that people with less experience were

20    trying to tell you how to deal with kids?

21        A    I think a lot of teachers -- yes.

22        Q    Did you say anything else in this breakout

23    session?

24        A    I believe that's it.

25        Q    Did anyone else say anything?
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                                    Job Date:7/30/2024

```
 1      A    There was other discussions going on.   I
 2   can't remember.
 3      Q    Do you remember being told, do you
 4   remember any discussion before you went into that
 5   breakout room as to the norms that were going to
 6   occur in this breakout room?
 7      A    I believe the norms were listed in the
 8   exhibit.
 9      Q    Was one of the norms to assume positive
10   intentions?
11              MR. HETHERINGTON:  Are we looking at
12   something?
13      Q    (By Ms. Strange)  I'm just asking if he
14   remembers.  We can look at something, but --
15      A    I believe so, yes.
16      Q    Do you recall being told you didn't have
17   to share if you don't feel comfortable doing
18   this?
19      A    Yes.
20      Q    Do you recall being told to agree to
21   disagree respectfully?
22      A    It was listed on there, yes.
23      Q    Okay.  So did you know when you were in
24   this breakout room that you did not have to say
25   anything at all?
```

John Grande                                                                    Job Date:7/30/2024

```
 1     A    That's what the -- that's what it said on
 2   the form.
 3     Q    Okay.  Well, you say that's what it said
 4   on the form.  When you were in the breakout room
 5   did you know that you could have just said
 6   nothing?
 7     A    Yes.
 8     Q    So you chose to make comments, correct?
 9     A    I was asked to discuss how did this
10   activity make you feel.
11     Q    And you voluntarily chose to answer that,
12   correct?
13     A    Yes.
14     Q    Did all participants answer it?
15     A    I don't believe all of them did.
16     Q    Do you know whether, who is Erin Dugan?
17     A    A former theater teacher.
18     Q    Were you friends with Erin Dugan?
19     A    No.
20     Q    What was her race?
21     A    White.
22     Q    Do you know whether Erin Dugan complained
23   about your conduct in the Zoom room?
24     A    She wrote a statement against me.
25     Q    When you say she wrote a statement against
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                        Job Date: 7/30/2024

```
 1      Q    Okay.  What do you base that on?
 2      A    I'm not there to teach kids about race or
 3  blaming other races.  I'm there to teach them to
 4  be active, a little bit about skills and sports.
 5  As a PE teacher I don't interject race.
 6      Q    Before you went to this training is it
 7  your testimony that you never had any other DEI
 8  training?
 9      A    I'm going to -- yes.
10      Q    Were you at all sensitive to DEI issues
11  when this happened in October of 2020?
12      A    What do you mean by sensitive?
13      Q    You know what DEI is, right?
14      A    I didn't back then, and I do now.
15      Q    What is DEI?
16      A    Diversity, equity and inclusion is what
17  it's called.
18      Q    So in October of 2020 were you supportive
19  of DEI efforts in teacher training?
20      A    I'm not supportive of DEI, CRT, or any of
21  that.
22      Q    Okay.  Now, did you participate in an
23  internal investigation?
24      A    Yes.
25      Q    How did that come about?
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                                          Job Date: 7/30/2024

1    Q    Okay.  When you went into the

2    investigation, you were never going to accept any

3    responsibility for those comments, correct?

4    A    What responsibility did I need to accept?

5    I said I said it.

6    Q    Okay.  And to this day you don't see how

7    that could be offensive to anyone sitting in that

8    Zoom call?

9    A    If you ask somebody on their feelings

10   about something it's their personal opinion, and

11   I answered it honestly.

12   Q    The Board of Education has policies that

13   require you to engage professionally with your

14   colleagues, correct?

15   A    I'd have to re-look in there, but I think

16   so.

17   Q    Okay.  Do you try as a teacher to be a

18   role model to students?

19   A    I am a role model to students.

20   Q    Do you try not to swear in front of

21   students?

22   A    I don't swear in front of students.

23   Q    Do you try not to swear in front of your

24   colleagues?

25   A    I didn't swear.

John Grande                                                                 Job Date:7/30/2024

```
 1     A    On this incident?

 2     Q    No, before this incident?

 3     A    There was an investigation, yes.

 4     Q    What investigation?

 5     A    Well, there was a counseling letter issued

 6  18 years ago.

 7     Q    Were you involved in an investigation

 8  around that?

 9     A    The board investigated it.

10     Q    Okay.  What's your understanding, is it

11  important to be honest in an internal

12  investigation?

13     A    Yes.

14     Q    Okay.  Is it important to answer questions

15  honestly?

16     A    Yes.

17     Q    Okay.  Did Suhail Aponte contact you about

18  conducting an investigation?

19     A    For this?

20     Q    Yes.

21     A    Yes.

22     Q    Okay.  When was that?

23     A    Middle of January, I think.

24     Q    All right.  What did she say to you?

25     A    She just said they received a -- she
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al
John Grande                                                                 Job Date:7/30/2024

```
 1    received a notification that they conducted an

 2    investigation.  It's in the e-mail.

 3        Q    Okay.  Did you meet with Suhail Aponte?

 4        A    On Zoom.

 5        Q    Okay.  And what did she tell you?

 6        A    At the meeting or in an e-mail?

 7        Q    At the meeting.

 8        A    She just conducted an investigation, asked

 9    me questions.

10        Q    Did she tell you that you were being

11    accused of creating a hostile work environment?

12        A    I believe so.

13        Q    Okay.  Did she tell you anything else?

14        A    She just asked me questions, and then I

15    asked her a question at the end.

16        Q    What was your question?

17        A    I said before I leave that meeting I'd

18    like to know what exactly it is that I did that

19    led to this investigation.

20        Q    How did she respond?

21        A    She paused, looked in her notes, and she

22    said that I said the words bullshit, I crossed my

23    arms, and I rolled my eyes.

24            And those three things bundled up were me

25    creating a hostile work environment.
```

```
 1       Q    Do you remember telling Suhail Aponte that
 2  you thought she was just doing her job?
 3       A    Yes.
 4       Q    All right.  Do you believe that that's
 5  what she was doing?
 6       A    Yes.
 7       Q    Do you still believe that as we sit here
 8  today?
 9       A    Yes.
10       Q    At some point did Ed Wilson get involved
11  in the investigation?
12       A    In October.
13       Q    Okay.  And who is Ed Wilson?
14       A    I believe he's in charge of investigations
15  at the board.
16       Q    Okay.  Did you know him before October
17  when he got involved in this?
18       A    No.
19       Q    Okay.  Was he, in October was he in charge
20  of this investigation?
21       A    I believe so.
22       Q    Okay.  And, similarly was he just doing
23  his job when he met with you?
24       A    I believe so.
25       Q    Okay.  So, when did you meet with Ed
```

```
 1   Wilson?
 2       A    October of '21.
 3       Q    Was that for a pre-disciplinary hearing?
 4       A    Yes.
 5       Q    And was that part of his job to
 6   investigate you and hold a pre-disciplinary
 7   hearing?
 8       A    Yes.
 9       Q    What do you recall about the
10   pre-disciplinary hearing?
11       A    Just asked me what happened.  I told him
12   what happened.  Asked me questions and I answered
13   them.
14       Q    All right.
15
16             (Defendant's exhibit 7, letter dated
17             October 19, 2021, marked for
18             identification)
19
20       Q    (By Ms. Strange)  I'll show you what's
21   been marked as exhibit seven.  Take a look at
22   this exhibit and let me know if you recognize it?
23       A    Yes.
24       Q    What is this exhibit?
25       A    This was my account of the meeting with
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                    Job Date: 7/30/2024

```
 1   was hypocritical.  Why do you say that?

 2       A   One of my questions I believe said I have

 3   never been mocked because of a disability,

 4   something to that effect.

 5       Q   And why do you think that was

 6   hypocritical?

 7       A   Because I had a former administrator mock

 8   my disability.

 9       Q   When was that?

10       A   2016.

11       Q   So was there anything in the privileged

12   presentation that you thought was meant to mock

13   your disability?

14       A   No.  I just thought it was a hypocritical

15   statement.

16       Q   Now, you say in the third paragraph, while

17   in a small group it was so silent you could hear

18   crickets.  Is that your reference to the breakout

19   section of the meeting?

20       A   Yes.

21       Q   How long was that section?

22       A   Excuse me?

23       Q   How long did that section go for?

24       A   I'm not sure.

25       Q   And you said before that Tracy Avicolli
```

John Grande                                                              Job Date:7/30/2024

```
 1    came into that session.  Did she come in through
 2    the Zoom?
 3        A    Yes, she entered the room through Zoom.
 4        Q    So did you see her enter the room?
 5        A    Yes.
 6        Q    What was her role in regard to the
 7    training and the breakout section?
 8        A    I believe she was a facilitator.
 9        Q    And, was that part of her job duties?
10        A    I'm not sure.
11        Q    What were her job duties?
12        A    I'm not sure.
13        Q    Okay.  Did she oversee the school that you
14    were in?
15        A    I wouldn't say that's accurate, no.
16        Q    Was she the Director of Arts and Wellness
17    for the Hartford Public Schools?
18        A    Yes.
19        Q    Did you have interactions with her in her
20    role as Director of Arts and Wellness for the
21    Hartford Public Schools?
22        A    When you say interactions what do you
23    mean?
24        Q    Did you work with her at all?
25        A    I can't say I worked with her.
```

John Grande                                                                    Job Date: 7/30/2024

```
 1    when she was interviewed.

 2        Q    And who took this statement?

 3        A    I believe Suhail Aponte.

 4        Q    Okay.  Based on the statement is it fair

 5    to say that Catherine Barr said that you said I'm

 6    not buying into this white bashing bullshit?

 7                    MR. HETHERINGTON:  Objection to form.

 8                    THE WITNESS:  This is what she states

 9    that I said.

10        Q    (By Ms. Strange)  Okay.  And do you agree

11    with this statement?

12        A    No.

13        Q    Is this because you didn't say it?  Is it

14    your testimony that you said BS?

15        A    Yes.

16        Q    Okay.  And what does BS stand for?

17        A    Stands for a few things.

18        Q    What's your understanding as to what it

19    typically stands for?

20        A    I think universally when somebody says

21    that's BS it would stand for bullshit.

22        Q    Do you know whether Catherine Barr

23    reported that the comment was very disturbing?

24        A    I would question about what's disturbing

25    about an abbreviation for two consonants.
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                        Job Date:7/30/2024

1    Q    Okay.  Looking at the document Bates

2    numbered 641 at the end, is this an e-mail dated

3    October 28th at three, does that appear to be an

4    e-mail dated October 28th at 3:10 p.m.?

5    A    Yes.

6    Q    Okay.  And does this appear to be an

7    e-mail from Catherine Barr to Tracy Avicolli?

8    A    Yes.

9    Q    Looking at this e-mail does it appear that

10   Catherine is complaining about a pretty terrible

11   interaction at the start of the breakout session?

12   A    That's what it says.

13   Q    Do you remember what time of day the

14   breakout session was?

15   A    Not exactly.

16   Q    Do you remember whether it was morning on

17   afternoon?

18   A    Well, I think it began in the morning,

19   maybe ran into early afternoon.  I don't

20   remember.

21   Q    Does it appear that Catherine Barr sent an

22   e-mail to Tracy Avicolli on the day of the

23   training?

24   A    Yes.

25   Q    Complaining about the interaction?

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                          Job Date:7/30/2024

```
 1      A    Yes.

 2      Q    Okay.  And does she specifically complain

 3 about what she said you said in the training?

 4      A    Yes.

 5      Q    Okay.  Do you have any notes of what you

 6 said at the training?

 7      A    No.

 8      Q    So your memory of the breakout session, of

 9 what you said about the breakout session, is that

10 all just based on your memory of what you said?

11      A    Yes.

12      Q    Does it appear that she wrote within hours

13 of the training that you said, quote, I'm not

14 buying this white bashing bullshit?

15      A    That's what it says here.

16      Q    Okay.  Do you know Catherine Barr at all?

17      A    No.

18      Q    All right.  Did you, had you ever had a

19 conversation with her before?

20      A    No.

21      Q    Going down to the bottom it says I'm

22 hoping something can be done about this, and

23 thank you for being a person that I feel I can

24 talk to about these matters.

25           Does that appear to be Catherine
```

```
 1   into Ed Wilson on a relay.
 2          Tracy Avicolli, Madeline Negron, Ed
 3   Wilson.
 4          There is no evidence to back up this
 5   statement on this date.  They came up with that
 6   document on a screen shot three months later.
 7     Q    With the same wording, though, that they
 8   had in October?
 9     A    The same fabricated wording.
10     Q    Okay.
11
12             (Defendant's exhibit 11, statement of
13             Erin Dugan, marked for
14             identification)
15
16     Q    (By Ms. Strange)  I show you what's been
17   marked as exhibit 11.  What is that statement?
18     A    This is Erin Dugan's statement during the
19   investigation.
20     Q    All right.  Who is Erin Dugan?
21     A    Erin Dugan is a former theater teacher, I
22   believe.
23     Q    And do you know whether Erin Dugan said
24   that you said I don't know about you guys, but
25   I'm not buying into this white bashing bullshit?
```

```
 1      A    What's the question again?

 2      Q    Do you know whether that's what she said

 3   about your comments?

 4      A    That's what she wrote about me.

 5      Q    Do you know she said you were very

 6   dismissive?

 7      A    She wrote that.

 8      Q    Okay.  Do you have any reason to believe

 9   that she didn't feel that way?

10      A    I don't know.  You'll have to ask her.

11      Q    She also said the breakout room was very

12   uncomfortable.  Do you know why she felt that

13   way?

14      A    I don't know that.

15      Q    Okay.  Do you have any reason to doubt

16   that she made that statement?

17      A    Anybody could put anything in writing, and

18   how can I say it didn't happen?  They put it in

19   writing, but this is not true.

20

21                (Defendant's exhibit 12, statement of

22                Abigail Sutcliffe, marked for

23                identification)

24

25      Q    (By Ms. Strange)  All right.  Let me show
```

```
 1    you what's been marked as exhibit 12.  Do you
 2    recognize that document?
 3        A    Yes.
 4        Q    What is this document?
 5        A    This is Abbie Sutcliffe's statement.
 6        Q    Do you know Abbie Sutcliffe?
 7        A    Yes.
 8        Q    And do you know whether she said that you
 9    said I don't understand.  No one is going to make
10    me feel bad for being a white male?
11        A    That's her statement.
12        Q    Okay.  Did you say that?
13        A    No.
14        Q    Okay.  Do you know whether she said that
15    the mood, this shifted the mood and the tone in
16    the breakout room?
17        A    That's what she said.
18        Q    Do you have any reason to believe she
19    didn't say that?
20        A    This is her statement.  Of course she said
21    it.
22        Q    Okay.  Did you intend to shift the mood
23    and the tone in the breakout room with your
24    statement?
25        A    I don't believe I did.
```

John Grande v. Hartford Board of Education, Leslie Torres-Rodriguez, et al

John Grande                                                          Job Date:7/30/2024

```
 1              C E R T I F I C A T E

 2        I, JOHN C. BRANDON, a Notary Public duly

 3   commissioned and qualified in and for the State

 4   of Connecticut, do hereby certify that pursuant

 5   to notice there came before me on the 30th day of

 6   July, 2024 the following-named person to wit:

 7   John Grande, who was by me duly sworn to

 8   testify to the truth and nothing but the truth;

 9   that he was thereupon carefully examined upon his

10   oath and his examination reduced to writing by

11   me; that this deposition is a true record of

12   the testimony given by the witness.

13        I further certify that I am neither

14   attorney nor counsel for nor related to nor

15   employed by any of the parties to the action in

16   which this deposition is taken, and further that

17   I am not a relative or employee of any attorney

18   or counsel employed by the parties hereto, or

19   financially interested in this action.

20        IN WITNESS THEREOF, I have hereunto set my

21   hand this 4th day of August, 2024.

22
      John Brandon
23

24   John C. Brandon, RPR and Notary Public
     My Commission Expires:
25   January 31, 2026
```

# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF CONNECTICUT

3

4

5    Case No. 3:24-cv-00010-JAM

6    -----------------------------------x

7    JOHN GRANDE,

8                    Plaintiff,

9        -versus-

10   HARTFORD BOARD OF EDUCATION, ET AL.,

11                   Defendants.

12   -----------------------------------x

13

14          DEPOSITION OF EDWARD WILSON JR.

15

16    Taken pursuant to the Federal Rules of Civil

17   Procedure, at the Hilton Garden Inn, 1181 Barnes Road,

18   Wallingford, Connecticut, before Vicki S. McManus, a

19   Licensed Shorthand Reporter and a Notary Public in and

20   for the State of Connecticut, on Wednesday,

21   November 13, 2024, at 9:05 a.m.

22

23

24

25

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                    Job Date:11/13/2024

```
 1    other version of that, those other versions would be

 2    copies?  So any signed documents would be contained in

 3    that file?

 4        A    Correct.

 5        Q    Okay.  And prior to eight months ago, when was

 6    the last time you gave a deposition before that?

 7        A    That might have been the only time I've actually

 8    been deposed.  I've taken depositions.

 9        Q    Okay.  When you say you've taken depositions,

10    that is as an attorney?

11        A    Correct.

12        Q    So what do you do presently for work?

13        A    I'm a staff attorney for Hartford Public Schools.

14        Q    And how long have you been the staff attorney for

15    Hartford Public Schools?

16        A    Since September of 2019.

17        Q    And as staff attorney for Hartford Public

18    Schools, what are your job duties?

19        A    So I'm also the executive director of internal

20    investigations and security.

21             As staff attorney, I advise on legal matters

22    across the district.  I advise on policy.  I manage

23    outside litigation.  I also conduct superintendent

24    level grievance hearings.  I do discipline for the

25    district, superintendent level discipline.
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.

Job Date:11/13/2024

```
1      Q    Okay.  And how many deputy superintendents were
2   there in 2020?
3      A    Just one.
4      Q    Okay.  And is it fair to say that the structure
5   is superintendent at the top and then the deputy
6   superintendent and then what we have sort of pieced
7   together what is shown as EW2?
8      A    Correct.  But there will be other -- there's
9   other parts of a school district too.  You just have
10  two here.  So he had a line of maybe seven or eight
11  direct reports, like a chief of operations, a chief of
12  schools.  You are capturing two parts of the operation
13  here.
14     Q    Yes.  Yes.  Understood.  And those other
15  divisions report to the deputy and the deputy reports
16  to the super?
17     A    Correct.
18     Q    Okay.  I'm showing you a document.  Do you
19  recognize that to be the affirmative action policy as
20  well as the nondiscrimination policy for the district?
21     A    Can I look through the document?
22     Q    Absolutely.
23     A    Can you repeat your question please?
24     Q    Sure.  Do you recognize that to be the
25  affirmative action and the nondiscrimination policies
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                              Job Date:11/13/2024

```
 1   for the district?
 2        A    Yes.
 3        Q    So we will mark that as EW3.
 4                   (Plaintiff's Exhibit EW3 marked for
 5                   identification.)
 6   BY MR. FISHBEIN:
 7        Q    Now, on the first page of what's been marked as
 8   EW3, there is a -- in the -- I guess you would call it
 9   the second paragraph, it says:  The Board of Education
10   requests an annual report from the superintendent
11   concerning the extent to which the above-mentioned
12   affirmative action program goals are being achieved.
13             Do you see that?
14        A    I do.
15        Q    Is that report done?
16        A    I don't know.
17        Q    Okay.  Would that -- if that report was done --
18   well, have you ever been asked in the context and role
19   as an investigator -- well, no.  I take that back.
20             Are there any other attorneys that work for the
21   district?
22        A    I guess I'm having a hard time with that
23   question.  That are employed by the district, like get
24   paid by the district?
25        Q    Yes.  On a day-to-day basis, that are, you know,
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                Job Date:11/13/2024

```
 1    made changes in policy, how do we implement training
 2    for a school district, making sure our Title IX
 3    coordinators are trained, that our investigators are
 4    properly trained.  That's high-level roles that we
 5    expect of our Title IX coordinator.
 6           We also have a deputy Title IX coordinator.  Our
 7    school district serves approximately 40 schools in our
 8    district.
 9    Q    Understood.
10    A    It's a big school district.  Then we have
11    Title IX coordinators in buildings.
12    Q    Okay.
13    A    So if there is a student-on-student issue, that
14    would start with the Title IX identified staff in the
15    building, depending on the severity of the situation.
16    Q    Yes.  I'm trying to get to that line.
17    A    Okay.
18    Q    So the severity of the situation you've
19    identified a few times.  I'm just trying to get to the
20    line -- let's just get to the punch line.
21           Does your office sometimes investigate
22    student-on-student complaints?
23    A    Not student-on-student.
24    Q    Okay.  Who investigates severe student-on-student
25    complaints?
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                    Job Date:11/13/2024

```
 1              (Plaintiff's Exhibit EW6 marked for

 2              identification.)

 3   BY MR. FISHBEIN:

 4     Q    And the email that -- starting at the back, the

 5   Catherine Barr email dated October 28th, is it fair to

 6   say that that is the complaint that initiated the

 7   disciplinary action?

 8     A    Well, it looks like this is -- it's an email to a

 9   director in regards to something that happened in a

10   breakout room.  I'm unclear as I'm testifying here

11   today whether there was other simultaneous complaints

12   made.  But I would say that that was a complaint that

13   began an investigation -- that began an investigatory

14   process.

15     Q    Okay.  And you indicated that it was an email to

16   a director.  What director was that?

17     A    Tracy Avicolli.

18     Q    So you are talking -- and we are looking at the

19   bottom of page 2 where the Catherine Barr starts

20   October -- on October 28 at 3:10 p.m.  Is that what you

21   are looking at?

22     A    Yes.  Yes.

23     Q    Okay.  Can you indicate where it shows that that

24   was sent to Tracy Avicolli?

25     A    Well, it says --
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                Job Date:11/13/2024

```
 1    There's just a lot that goes on in the school district.

 2    I can't tell you what the context of the conversation

 3    was.

 4         I can tell you the only reason I'd be sending

 5    that email is because I want to make sure I'm

 6    consistently solving for what is in front of me.

 7    Q    When did you start with the district in 2019?

 8    A    September.

 9    Q    So at the time of the email that we are looking

10    at or the email chain that we are looking at that's

11    marked as EW6, you've been with the district for a year

12    and a couple months; is that fair to say?

13    A    That's fair.

14    Q    And what were you told about Mr. Grande when you

15    became employed by the district?

16    A    Absolutely nothing.

17    Q    Okay.  And what was your impression of Mr. Grande

18    when -- in October of 2020?

19    A    I had not met him in October of 2020.

20    Q    Okay.  But had anybody talked to you about him?

21    A    No.

22    Q    I'm showing you another series of emails.  And I

23    think you'll recognize the Catherine Barr email is at

24    the bottom once again.  It's the same email chain.

25         Do you recognize this series of emails?
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                    Job Date:11/13/2024

```
 1    statements, is what I would have relied on.
 2        Q    The other statement that you were just referring
 3    to, that statement was signed by Mr. Grande?
 4        A    I'd have to look at it.
 5        Q    Okay.  Now, after your investigator concludes
 6    their investigation, what happens to the -- generally,
 7    what happens to the case?
 8        A    So I would review the file.
 9        Q    In all cases that one of your investigator
10    investigates?
11        A    Correct.  If they complete an investigation and
12    produce a file, I review the file.
13        Q    Okay.  And what do you do next?
14        A    Then I make a determination as to what we are
15    going to do with the file.
16            Now, typically that decision's made either with
17    the investigator or I will make it independently.  So
18    we have -- we have labor cadences in which we talk
19    about files.  Then I also review the file and then I
20    make a determination as to whether or not we are going
21    to schedule what we call a predisciplinary meeting.
22        Q    Okay.  So that is in the general.  What happened
23    in this case?
24        A    So Miss Aponte would have produced a file.  I
25    reviewed the file.  And then I determined there should
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.

Job Date:11/13/2024

```
 1    be a predisciplinary meeting.  And then I would give
 2    the file to my secretary and then she would start the
 3    process of scheduling the meeting.
 4        Q    I just -- you seem to be talking in the general.
 5    Were you talking specifically on this file?
 6        A    Correct.
 7        Q    Okay.  So you received Suhail's investigative
 8    report and you made a determination yourself as to
 9    whether or not discipline should occur?
10        A    I made a determination that I was going to
11    conduct a meeting with Mr. Grande.
12        Q    Okay.
13        A    I had not resolved the issue of discipline.
14              (Plaintiff's Exhibit EW12 marked for
15              identification.)
16    BY MR. FISHBEIN:
17        Q    Sir, do you recognize that to be Suhail's
18    investigation summary?
19        A    Yes.
20        Q    Okay.  And that would have been part of what she
21    tendered to you as being her investigation or
22    concluding her investigation?
23        A    Correct.
24        Q    Okay.  And that's dated March 15 of 2021.  And it
25    does reference statements.
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                Job Date:11/13/2024

```
 1   Catherine Barr makes a complaint and series of events
 2   happens.  There is responses, right?  There is
 3   responses in the session, there is responses in the
 4   wake of the complaint.  I'm just trying to figure
 5   out -- you said Mr. Grande's responses.  Which ones are
 6   you talking about?
 7              MS. STRANGE:  Objection.  You can
 8         answer, but it's a very confusing question.
 9   BY MR. FISHBEIN:
10     Q    No.  Which responses are you talking about?
11     A    Did I rely on?
12     Q    Yes.
13     A    So I would rely on the contents of the entire
14   file, that contains the exchanges that you showed me
15   earlier, the statements, the exercise, the statement
16   that Mr. Grande would have produced.  I think he
17   produced more than one; I would have reviewed both of
18   those statements.  I met with Mr. Grande, so I would
19   have considered what he shared out in the
20   predisciplinary meeting.  Any additional context that
21   he wanted to share or anyone else wanted to share.  I
22   would have considered all of those factors.
23     Q    Okay.  And what determination did you make as to
24   whether or not improper language was utilized by
25   Mr. Grande during the breakout session?
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                          Job Date:11/13/2024

```
 1      A    Can I review my letter?

 2      Q    Sure.

 3      A    I'm sorry, can you repeat question?

 4      Q    Sure.  What determination did you make as to

 5   Mr. Grande using improper language during the breakout

 6   session?

 7      A    So there was a concern that he used vulgarity

 8   during the session.

 9      Q    Okay.  What finding did you make as a result of

10   your review with regard to vulgarity?

11      A    I found that he used vulgarity.

12      Q    Okay.  What vulgarity did you specifically find

13   that he used?

14      A    I believe the term was "bullshit."

15      Q    Okay.  And what was the basis of that

16   determination?

17      A    It's contained in the statements.

18      Q    Okay.  How many statements?

19      A    Multiple statements.

20      Q    More than three?

21      A    Definitely two.

22      Q    Okay.  And why would you make that determination

23   when Suhail Aponte did not?

24      A    Suhail Aponte didn't make any determinations.

25      Q    Okay.  She made a summary as to her
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.

Job Date:11/13/2024

```
 1   pretty confident that I shared out that I myself took
 2   it.  I know we had a conversation about the intent.
 3          At that -- at that particular time, we had
 4   students either being taught remotely, based on COVID.
 5   We had, I mean, a national issue with student
 6   engagement and how to engage students in learning.  The
 7   exercise explored privilege over a lot of different
 8   areas, race only being one of them.  With, my
 9   understanding, one of the intents there was recognizing
10   how we show up, with the hope that that makes us have
11   more insight to properly show up for students based on
12   things that they might be going through and exploring
13   or confronting in their lives.  So I would have high
14   level shared that or some form of that kind of
15   conversation with Mr. Grande, with the hope to have
16   kind of like an interaction with him about what his
17   thoughts on the exercise was in light of the climate
18   that we are in.
19          And I do recall Mr. Grande -- pretty confident he
20   shared it wasn't relevant to what he does.  I don't
21   think he had too much of a response to what -- to
22   anything I was sharing out about student engagement.
23   Just not something that he thought he should have to
24   partake in.  And then I would say the conversation kind
25   of graduated into how he expressed himself among his
```

Edward Wilson, Jr.

Job Date:11/13/2024

1    Mr. Grande used the word "bullshit" during the breakout

2    session in their statements, would you still have

3    rendered discipline?

4        A    So there is also the component of this as to not

5    necessarily what he said, but how he communicated out

6    during that breakout session, which impacted the

7    training session.

8        Q    So I take it that your answer is that you would

9    have rendered discipline anyway?

10            MS. STRANGE:   Objection.

11   BY MR. FISHBEIN:

12       Q    You can answer.

13            MS. STRANGE:   He did answer.   You want

14       him to answer the same question?

15            MR. FISHBEIN:   Well, he didn't answer it

16       yes or no.   That's the --

17            MS. STRANGE:   He doesn't have to.

18            MR. FISHBEIN:   Understood.

19   BY MR. FISHBEIN:

20       Q    Are you the sole person that made the

21   determination whether or not to discipline Mr. Grande?

22       A    Yes.

23       Q    You were not directed by any individual?

24       A    That's correct.

25

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                                    Job Date:11/13/2024

```
 1   discussion.

 2        I have supervision structures and I have a

 3   biweekly labor meeting where we discuss all our cases.

 4   So it's quite conceivable that we discussed the case in

 5   one of those structures.

 6     Q    And did you ever discuss the Grande matter with

 7   any of your superiors?

 8     A    No.

 9     Q    Now, as part of your discipline, you ordered

10   Mr. Grande to take sensitivity awareness training.  Do

11   you know if Mr. Grande ever completed that?

12     A    He completed it.

13            (Plaintiff's Exhibit EW16 marked for

14            identification.)

15   BY MR. FISHBEIN:

16     Q    I'm showing you an email from Mr. Grande,

17   apparently to you.  He inquired what if he didn't

18   complete it.  Did you ever respond to that email?

19     A    I don't recall.

20     Q    Would there be a reason why you wouldn't?  Do you

21   recall --

22     A    There shouldn't be -- we are in the business of

23   responding to our emails.  So emails should be

24   responded to in 24 or 48 hours.

25            So I -- as I'm testifying, I don't recall if I
```

Edward Wilson, Jr.                                                                      Job Date:11/13/2024

```
 1      Q    Okay.  So why would you send it to the school --
 2   handle at the school level if no substantiation was
 3   made?
 4      A    Your question kind of assumes I do like a full
 5   investigation before something might go to a school.
 6           So we have a school district of approximately 40
 7   schools, 35 hundred employees.  There could --
 8   something going back to the school could go back to the
 9   school as soon as I see it, could go back to a school
10   after I've looked into it for a period of time.  There
11   is a couple different ways something goes back to a
12   school.
13           So just because something goes back to a school
14   doesn't mean that anything shook out with what the
15   school looked into.
16      Q    But nonetheless every case that we have here was
17   assigned to an investigator.  There was -- I guess I
18   can assume, since it was assigned, there was an
19   investigation.
20      A    No.
21      Q    No.  We sort of talked about that before.
22           The next one going down -- we dealt with dumb and
23   stupid -- it says alleged to have made inappropriate
24   comment to student.  And that, once again, was at Fox.
25   It's a teacher.  Do you recall that case?
```

John Grande v. Hartford Board of Education, et al

Edward Wilson, Jr.                                              Job Date:11/13/2024

```
 1              C E R T I F I C A T E

 2       I hereby certify that I am a Notary Public in and for

 3    the State of Connecticut duly commissioned and

 4    qualified to administer oaths.

 5       I further certify that the deponent named in the

 6    foregoing deposition was by me duly sworn and thereupon

 7    testified as appears in the foregoing deposition; that

 8    said deposition was taken by me stenographically in the

 9    presence of counsel and transcribed by means of

10    computer-aided transcription by the undersigned, and

11    the foregoing is a true and accurate transcript of the

12    testimony.

13       I further certify that I am neither of counsel nor

14    attorney to either of the parties to said suit, nor of

15    either counsel in said suit, nor related to or employed

16    by any of the parties or counsel to said suit, nor am I

17    interested in the outcome of said cause.

18       Witness my hand and seal as Notary Public this

19    25th of November, 2024.

20

21

22
```



```
23                Vicki S. McManus
                  NOTARY PUBLIC
24

25    My commission expires:  February 2027
```

# EXHIBIT C

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                    Job Date:11/14/2024

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF CONNECTICUT

 3

 4

 5    Case No. 3:24-cv-00010-JAM

 6    -----------------------------------x

 7    JOHN GRANDE,

 8                  Plaintiff,

 9       -versus-

10    HARTFORD BOARD OF EDUCATION, ET AL.,

11                  Defendants.

12    -----------------------------------x

13

14            DEPOSITION OF TRACY AVICOLLI

15

16       Taken pursuant to the Federal Rules of Civil

17    Procedure, at the Hilton Garden Inn, 1181 Barnes Road,

18    Wallingford, Connecticut, before Vicki S. McManus, a

19    Licensed Shorthand Reporter and a Notary Public in and

20    for the State of Connecticut, on Thursday,

21    November 14, 2024, at 9:09 a.m.

22

23

24

25
```

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                          Job Date:11/14/2024

```
 1      A    Assistant superintendent of teaching and
 2   learning.
 3      Q    And that's the only person that you report to --
 4      A    Correct.
 5      Q    -- in your current position?
 6           How many people are underneath you; in other
 7   words, how many people report to you?
 8      A    I have 13 people on my team.
 9      Q    Okay.  And what do they do?
10      A    I have one assistant director, and then the other
11   13, curriculum specialists and instructional coaches.
12      Q    What does your assistant do?
13      A    She provides -- we work very closely together, so
14   we do the similar -- we do similar work.
15      Q    What is her name?
16      A    Her name is Vanessa Cruz.
17      Q    Before that position, did you have another
18   position --
19      A    I did.
20      Q    -- at Hartford?  What was that?
21      A    Director of Arts and Wellness.
22      Q    We are going to turn back to that.  But before we
23   get there, I just kind of want to quickly go over...
24           When did you come to Hartford Public Schools?
25      A    2016.
```

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                                    Job Date:11/14/2024

```
 1      Q    What was the position you took at that time?

 2      A    The Director of Arts and Wellness.

 3      Q    So before you came to Hartford Public Schools,

 4   where were you working?

 5      A    EASTCONN.

 6      Q    What is EASTCONN?

 7      A    It is a regional education service center,

 8   basically a district, and I was a school principal.

 9      Q    How long were you there?

10      A    Two and a half years.

11      Q    As a principal for two and a half years?

12      A    Yes.

13      Q    And where were you before that?

14      A    I worked for CREC as a music teacher.

15      Q    What is correct?

16      A    Same.  District educational service center.

17      Q    CREC, is that like an acronym?

18      A    Yes.

19      Q    What does it stand for?

20      A    Capital Region Education Council.

21      Q    Any other employment before that?

22      A    Before that, I worked for, actually,

23   Hartford Hospital.  I was a teacher at the

24   Grace Webb School, which is a specialized school that

25   Hartford Hospital runs.
```

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                          Job Date:11/14/2024

```
 1      Q    And you said you were an art teacher, right?

 2      A    Music.

 3      Q    Music, sorry.  My apologies, music teacher.  Did

 4   you ever serve in any role as a phys ed teacher?

 5      A    No.

 6      Q    So now I kind of want to turn to more the meat of

 7   this case and what happened.  How did all this get

 8   started?

 9              MS. STRANGE:  Objection to the form,

10         but --

11      A    Yeah, can you rephrase the question please?

12   BY MR. HETHERINGTON:

13      Q    Sure.  So we are here with a case about

14   John Grande and discipline he received regarding

15   comments made at a professional development session.

16   What do you know about that professional development

17   session?

18      A    It was a professional learning session that we

19   did in 2020.

20      Q    And is it one that you oversaw?

21      A    Yes.

22      Q    Did you create that professional development

23   session?

24      A    Some of it.

25      Q    And you said it happened in 2020, correct?
```

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                                                  Job Date:11/14/2024

1          You mentioned earlier that you created some of

2     it; is that correct?  Am I recalling that right?

3          A    Yes.

4          Q    Do you recall:  What was the basis of this

5     presentation; in other words, where did it come from?

6          A    When you say where did it come from, can you

7     rephrase that?

8          Q    Like you didn't create the whole thing out of

9     thin air, correct?

10         A    Uh-huh.

11         Q    Where did you get the idea for the presentation?

12         A    So during our previous -- either during our

13    previous PL session or just previously, I had sent a

14    survey to our teachers asking about their perception of

15    student collaboration in their remote classes.  And

16    there was some information there that warranted some

17    more learning on how to increase student engagement in

18    remote classes, as this time was very difficult for our

19    students.  And so as a way to do that, there was --

20    this training was a piece of that, on how we can better

21    relate to our students in an environment that was very

22    challenging.

23                   (Plaintiff's Exhibit TA15 marked for

24                   identification.)

25

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                          Job Date:11/14/2024

```
 1    believe that you --
 2        A    Oh, this is the one -- that was the one that I
 3    used.
 4        Q    There you go.  That's what I'm trying to get at.
 5        A    I understand.  Yes, this is one of the ones that
 6    I used.  That this is the original, yes, that was done
 7    with our ELA department, and this is the one I used as
 8    the template for, then, to create our own.
 9        Q    Okay.  Thank you.  Sorry for the confusion.
10        A    Yes, that is correct.  You are right.
11        Q    So where exactly did this come from?
12        A    Did this come from?
13        Q    Yes.
14        A    This came from my colleague, Khary Fletcher, who
15    used to be our Director of Humanities, and our
16    English/Language Arts Department had just done this
17    exact training with our English teachers in our middle
18    and high schools and it had gone very well and so based
19    on their feedback and experience with their teachers in
20    Hartford Public Schools, I was intrigued and I really
21    liked the content and so that was why I chose this.
22    Yes.
23        Q    Got you.  So then this wasn't the first time, as
24    far as you know, that this presentation was given to
25    Hartford teachers?
```

Tracy Avicolli                                                      Job Date:11/14/2024

```
 1      A    To a group of Hartford teachers, yes.

 2      Q    Yes, okay.  And did you make alterations to it?

 3      A    Yes.  Some.

 4      Q    Do you recall what you changed?

 5      A    I put -- I added -- I think I took out the image

 6  analysis just because of time.  I inserted our context

 7  in terms of our data around student engagement and

 8  remote classes in physical education and other

 9  Unified Arts classes, and then -- that's all I can

10  remember off the top of my head.

11      Q    Did anyone help you with making those

12  alterations?

13      A    No.

14                (Plaintiff's Exhibit TA16 marked for

15                identification.)

16  BY MR. HETHERINGTON:

17      Q    All right.  So now we are on to TA16.  And this

18  is the one that was attached to the complaint.

19      A    Okay.

20      Q    Do you recognize this one?

21      A    Yes.

22      Q    Is this the one that you -- I don't want to say

23  created, but --

24      A    Yes, that I --

25      Q    -- altered --
```

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                    Job Date:11/14/2024

```
 1      Q    And continuing to look at 16, the one that you
 2  gave, if you turn to -- I think it's page 3.
 3      A    Yup.
 4      Q    What is this?
 5      A    This is our instructional vision for our
 6  district.
 7      Q    And who -- where does this come from?
 8      A    This comes from our strategic plan for Hartford
 9  Public Schools.
10      Q    Do you know who puts together that strategic
11  plan?
12      A    Our superintendent, and this specific work from
13  our instructional vision was mostly led by
14  Madeline Negron.
15      Q    Did the superintendent know you were giving this
16  professional development session?
17      A    No.
18      Q    If you turn to the next page.  Do you know if you
19  added anything to this slide?  And sorry, you can
20  continue to refer to the other one if you want.
21      A    I believe that I -- I can probably answer that
22  even without looking, but yes:  In order to increase
23  engagement and collaboration.
24      Q    Then paging through to page 7, where there is an
25  identity wheel.
```

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                    Job Date:11/14/2024

```
 1   more you'd fill out on the wheel, the more privilege
 2   you have, correct?
 3       A   Yes.
 4       Q   Was it a goal then to make those -- make
 5   participants understand how much privilege they have?
 6       A   Sure.
 7       Q   Okay.  Did all the teachers that you oversaw take
 8   this presentation that we are talking about?
 9       A   I had no way to see how many of them were
10   actually doing it because it was on Zoom.  So I'm
11   assuming positive intentions that they did it.
12       Q   Was it expected that every teacher would?
13       A   Yes.
14               (Plaintiff's Exhibit TA17 marked for
15               identification.)
16   BY MR. HETHERINGTON:
17       Q   This is TA17, if you take a look.  Do you
18   recognize these emails?  Some are redacted at the top
19   and I don't think they relate to this case at all,
20   so...
21       A   Oh, okay.
22           Sure, yes.
23       Q   What are these emails?
24       A   These look like emails to the department team
25   about professional learning.
```

John Grande v. Hartford Board of Education, et al

1      Q    Okay.  And was it about the professional learning

2   that is the subject of this lawsuit?

3      A    Yes.

4      Q    Okay.  If you look at the first page of

5   Exhibit 17, at the bottom, it looks like some teachers

6   were excused from this presentation; is that correct?

7      A    Yes.

8      Q    So some teachers didn't take it and didn't

9   participate in the breakout groups?

10      A    Correct.

11      Q    Okay.  And is that only because these teachers,

12   they were, in other words, excused by you?

13      A    They were excused by me based on -- I believe

14   that their principals had reached out because they had

15   to proctor the PSAT the next day, so they had a

16   different training, yes.

17      Q    What if a teacher would have been sick that day

18   and off work, would they have had to take it?

19      A    They would have taken the day off as sick and

20   would have let me know.

21      Q    So they wouldn't have had to take this?  If a

22   teacher didn't work on 10/28 of 2020, they didn't have

23   to take this, right?

24      A    Yes.  Right.

25

John Grande v. Hartford Board of Education, et al

Tracy Avicolli                                                                    Job Date:11/14/2024

```
 1              C E R T I F I C A T E

 2       I hereby certify that I am a Notary Public in and for

 3   the State of Connecticut duly commissioned and

 4   qualified to administer oaths.

 5       I further certify that the deponent named in the

 6   foregoing deposition was by me duly sworn and thereupon

 7   testified as appears in the foregoing deposition; that

 8   said deposition was taken by me stenographically in the

 9   presence of counsel and transcribed by means of

10   computer-aided transcription by the undersigned, and

11   the foregoing is a true and accurate transcript of the

12   testimony.

13       I further certify that I am neither of counsel nor

14   attorney to either of the parties to said suit, nor of

15   either counsel in said suit, nor related to or employed

16   by any of the parties or counsel to said suit, nor am I

17   interested in the outcome of said cause.

18       Witness my hand and seal as Notary Public this

19   2nd of December, 2024.

20

21

22

23

24

25
```



```
                  Vicki S. McManus
                  NOTARY PUBLIC
```

My commission expires:  February 2027

# EXHIBIT D

John Grande v. Hartford Board of Education, et al

Leslie Torres-Rodriguez                                    Job Date:11/20/2024

```
 1    CASE NO: 3:24-CV-00010-JAM: UNITED STATES DISTRICT COURT

 2    - - - - - - - - - - - - - - -X

 3    JOHN GRANDE,                     ) FOR THE DISTRICT

 4          Plaintiff,                 )

 5                                     ) OF CONNECTICUT

 6    v.                               )

 7                                     )

 8    HARTFORD BOARD OF EDUCATION,     )

 9    ET AL,                           )

10          Defendants.                )

11    - - - - - - - - - - - - - - -X

12

13          DEPOSITION OF: LESLIE TORRES RODRIGUEZ

14          DATE:  NOVEMBER 20, 2024

15          HELD AT:   HILTON GARDEN INN

16          1181 BARNES ROAD

17          WALLINGFORD, CT 06492

18

19

20    Reporter:     NICHOLAS J. SANTOVASI, JD, CER

21                  BRANDON LEGAL TECH LLC

22                  37 Pinnacle Mountain Road

23                  Simsbury, Connecticut 06070

24

25
```

John Grande v. Hartford Board of Education, et al

Leslie Torres-Rodriguez

Job Date:11/20/2024

```
 1   Rattley is?

 2        A    Yes.

 3        Q    Okay.  And is it fair to say that she would have

 4   overseen the positions that flow out of the chart here on the

 5   third page?

 6        A    Correct.

 7        Q    Okay.  Do you know if administrators were ever

 8   trained while you were superintendent regarding teachers'

 9   freedom of speech rights?

10        A    I don't know.

11        Q    Did you ever lead any training on teachers' freedom

12   of speech rights?

13        A    No.

14        Q    Did your Deputy Superintendent ever lead any

15   training on teacher freedom of speech rights?

16        A    I don't know.

17        Q    What do you know about professional development for

18   teachers in Hartford Public Schools?

19        A    I know that our teachers have professional

20   development.

21        Q    And do you play any role in deciding what

22   professional development programs they're going to take?

23        A    No.

24        Q    Who would have -- who would make those decisions?

25        A    The department leads.
```

John Grande v. Hartford Board of Education, et al

Leslie Torres-Rodriguez

Job Date:11/20/2024

```
 1                  C E R T I F I C A T E
 2       I, NICHOLAS J. SANTOVASI, a Notary Public duly
 3   commissioned and qualified in and for the State of
 4   Connecticut, do hereby certify that pursuant to notice there
 5   came before me on the 20th day of November, 2024 the
 6   following—named person to wit: LESLIE TORRES RODRIGUEZ, who
 7   was by me duly sworn to testify to the truth and nothing but
 8   the truth; that he was thereupon carefully examined upon his
 9   oath and his examination reduced to writing by me; that this
10   deposition is a true record of the testimony given by the
11   witness.
12       I further certify that I am neither attorney nor counsel
13   for nor related to nor employed by any of the parties to the
14   action in which this deposition is taken, and further that I
15   am not a relative or employee of any attorney or counsel
16   employed by the parties hereto, or financially interested in
17   this action.
18       IN WITNESS THEREOF, I have hereunto set my
19   hand this 8th day of December, 2024.
20
21
22
23       Nicholas J. Santovasi, CER and Notary Public
24           My Commission Expires:
25             November 30, 2027
```

# EXHIBIT E

```
 1    CASE NO: 3:24-CV-00010-JAM: UNITED STATES DISTRICT COURT

 2       - - - - - - - - - - - - -X

 3    JOHN GRANDE,                    )  FOR THE DISTRICT

 4          Plaintiff,               )

 5                                   )  OF CONNECTICUT

 6    v.                             )

 7                                   )

 8    HARTFORD BOARD OF EDUCATION,    )

 9    ET AL,                         )

10          Defendants.             )

11    - - - - - - - - - - - - - -X

12

13          DEPOSITION OF: SUHAIL APONTE

14          DATE:  DECEMBER 13, 2024

15          HELD AT:   HILTON GARDEN INN

16          1181 BARNES ROAD

17          WALLINGFORD, CT 06492

18

19

20    Reporter:     NICHOLAS J. SANTOVASI, JD, CER

21                  BRANDON LEGAL TECH LLC

22                  37 Pinnacle Mountain Road

23                  Simsbury, Connecticut 06070

24

25
```

John Grande v. Hartford Board of Education, et al

```
 1        Q    Okay.  So you didn't discuss with Mr. Wilson --
 2   there was no discussion of, like, off-boarding or leaving
 3   files behind or anything like that?
 4        A    No.
 5        Q    Did you ever talk to him about why you were leaving
 6   Hartford?
 7        A    No.
 8        Q    Why not?
 9        A    Well, it's my -- I didn't want to.  I just resigned
10   and left.
11        Q    Any, like, specific reason why you wouldn't want to
12   speak with him about your departure or discuss why you were
13   leaving?
14        A    No.
15             THE REPORTER:  Exhibit SA-2.
16        Q    (By Mr. Hetherington)  Does this look familiar at
17   all?
18        A    Yes.
19        Q    What is it?
20        A    It's an org chart.
21        Q    And it looks like you're not on this org chart.  But
22   when you worked at Hartford, where would you be in this org
23   chart?
24        A    Right here.
25        Q    And are you pointing where it says "Labor
```

John Grande v. Hartford Board of Education, et al

Suhail Aponte                                                                Job Date:12/13/2024

```
 1    Investigator/Information Specialist"?

 2         A    That's correct.

 3         Q    And it says, "Erin Wilson."  Is that -- well, you

 4    may not know, but do you think that's who took your position

 5    after you left?

 6         A    I wouldn't know that, but I'm going to assume.

 7    Yeah.

 8         Q    And you mentioned earlier that Ed Wilson was your

 9    boss, so was he your only boss?  Was he the only person that

10    you would have took direction from?

11         A    That's correct.

12         Q    And who is Milly Ramos?

13         A    She was one of my co-workers.

14         Q    And did she do essentially the same thing you did?

15         A    Somewhat, yeah.

16         Q    Where would Natasha Banks be on this chart when she

17    worked there?

18         A    She was the Executive Director of Human Resources.

19         Q    Was she a boss of yours or did you not work under

20    her at all?

21         A    I didn't work under her.

22         Q    Okay.  So tell me a little bit about what you did in

23    your role as Labor Investigator Information Specialist.

24         A    I did employee misconduct investigations, harassment

25    investigations, I did FOI discovery requests.  We did
```

John Grande v. Hartford Board of Education, et al

Suhail Aponte                                                                    Job Date:12/13/2024

```
 1         Q    Okay.  So if the witness requested it?

 2         A    It would be their responsibility to have them there

 3    on the date and time.

 4         Q    Got you.  Understood.  In regards to the statements

 5    themselves, what was your process for recording the

 6    statements?

 7         A    Well, we will ask questions.  I think this is around

 8    COVID, so it had to be on Zoom or Teams or something.  And

 9    then I would just type it up and send it to them.

10         Q    And you said, "This."  What are you -- are you

11    referring to Mr. Grande's investigation?

12         A    Yes.

13         Q    Did you, like, take video recordings or audio

14    recordings of statements at any time?

15         A    No.

16         Q    Okay.  So the statements are something that you

17    would then type up based on your conversation?

18         A    Yes.

19         Q    Once you obtain the statements, what's the next step

20    in the investigation process?

21         A    Once I obtain the statement, once I type it up, make

22    sure the grammar and the spelling and everything is correct,

23    I would send it to the employee for them to review it and for

24    them to okay the statement to be in the investigation.

25         Q    And did you always do that?
```

John Grande v. Hartford Board of Education, et al

Suhail Aponte                                                                    Job Date:12/13/2024

```
 1        A    Yes.

 2        Q    Once the employee reviews the statement, what's the

 3   next step?

 4        A    We would then go through the witness list.  So

 5   anything that we would need from the witnesses, any

 6   statements, any supporting documents.

 7        Q    And then once you have all that stuff, then what's

 8   next?

 9        A    Then we'll do an investigative report.  So pretty

10   much a summary.

11        Q    A summary based on the statements?

12        A    All the statements, put the documents in order.

13        Q    Okay.  And is that something that you would create?

14        A    Yeah.  So it would just be, like all the statements

15   on top of the file, and then we would submit it to Edward

16   Wilson.

17        Q    And once it gets submitted to Edward Wilson, what

18   role do you play after that?

19        A    None.

20        Q    So at that point, it's totally out of your hands?

21        A    Yes.

22        Q    Do you have an understanding of what this case is

23   about?

24        A    Yes.

25        Q    And what's your understanding?
```

Suhail Aponte                                                    Job Date:12/13/2024

```
 1              C E R T I F I C A T E
 2       I, NICHOLAS J. SANTOVASI, a Notary Public duly
 3   commissioned and qualified in and for the State of
 4   Connecticut, do hereby certify that pursuant to notice there
 5   came before me on the 13th day of December, 2024 the
 6   following—named person to wit: SUHAIL APONTE, who was by me
 7   duly sworn to testify to the truth and nothing but the truth;
 8   that he was thereupon carefully examined upon his oath and
 9   his examination reduced to writing by me; that this
10   deposition is a true record of the testimony given by the
11   witness.
12       I further certify that I am neither attorney nor counsel
13   for nor related to nor employed by any of the parties to the
14   action in which this deposition is taken, and further that I
15   am not a relative or employee of any attorney or counsel
16   employed by the parties hereto, or financially interested in
17   this action.
18       IN WITNESS THEREOF, I have hereunto set my
19   hand this 5th day of JANUARY, 2025.
20
21
22
23   Nicholas J. Santovasi, CER and Notary Public
24              My Commission Expires:
25              November 30, 2027
```



EXHIBIT F

EW-3

4111.1

Personnel -- Certified/Non-Certified

Affirmative Action: Equal Employment Opportunity

The Board of Education will provide equal employment opportunities for all persons without regard to race, gender, color, religious creed, national origin, religion, age, veteran status, sex, sexual orientation, gender identity or expression, disability, marital status, present or past history of mental disorder, mental retardation, learning disability or physical disability, or abilities unrelated to the performance of the duties of the position. The Board of Education directs the Administration to set as a goal the recruitment, selection and employment of qualified people among all racial and ethnic groups.

The Board of Education requests an annual report from the Superintendent concerning the extent to which the above-mentioned Affirmative Action Program goals are being achieved.

No advertisement of employment opportunities may by intent or design restrict employment based upon discrimination as defined by law.

Legal Reference:

Connecticut General Statutes 46a-60 Discriminatory employment practices prohibited
10-153 Discrimination on account of marital status.
46a-60 Discriminatory employment practices prohibited.
46a-81a Discrimination on the basis of sexual orientation: Definitions
Connecticut General Statutes § 46a-81c Sexual orientation discrimination: Employment.
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.
Title VII, Civil Rights Act U.S.C. 2000e, et. seq.
Title IX of the Education Amendments of 1972, 20 USCS § 1681, et seq.
Age Discrimination in Employment Act, 29 U.S.C. § 621
Americans with Disabilities Act, 42 U.S.C. § 12101
Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794
The Uniformed Services Employment and Reemployment Rights Act, 20 CFR 1002.18
Title II of the Genetic Information Nondiscrimination Act of 2008
Public Act 11-55, An Act Concerning Discrimination.


Policy adopted: July 6, 1999
Policy updated: November 1, 2005
Policy revised: May 21, 2013
Policy updated: July 28, 2015

1

HARTFORD000039

4118.1

Personnel – Certified/Non-Certified

Nondiscrimination

It is the policy of the Board of Education that any form of discrimination or harassment on the basis of race, religion, color, national origin, sex, sexual orientation, marital status, age, disability, pregnancy, veteran status, gender identity or expression, genetic information, or any other basis prohibited by state or federal law is prohibited, whether by students, Board employees or third parties subject to the control of the Board. The Board's prohibition of discrimination or harassment in its educational programs or activities expressly extends to academic, nonacademic and extracurricular activities, including athletics. It is also the policy of the Board of Education to provide for the prompt and equitable resolution of complaints alleging any discrimination on the basis of protected characteristics.

The Board of Education seeks to extend the advantages of public education with full equality of educational opportunity to all students and personnel. The Board, any employee or any other person may not aid or compel the performance of an unfair labor practice as defined by law.

The Board will not make any employment decisions related to hiring, assignment, compensation, promotion, demotion, disciplinary action and terminations on the basis of race, religion, color, national origin, sex, sexual orientation, marital status, age, disability, pregnancy, veteran status, gender identity or expression, genetic information, or any other basis prohibited by state or federal law except in the case of a bona fide occupational qualification.

For the purposes of this policy, "genetic information" means the information about genes, gene products, or inherited characteristics that may derive from an individual or family member. "Genetic information" may also include an individuals' family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

For the purposes of this policy, "gender identity or expression" means a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth, consistent with State law.

Legal Reference:
Connecticut General Statutes:    10-153 Discrimination on basis of marital status.
 46a-60 Connecticut Fair Employment Practices Act.
 46a-81a Discrimination on the basis of sexual orientation: Definitions
 46a-81c Sexual orientation discrimination:  Employment
Public Act 11-55, An Act Concerning Discrimination.
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

2

HARTFORD000040

Title VII, Civil Rights Act U.S.C. 2000e, et. seq.

Title IX of the Education Amendments of 1972, 20 USCS § 1681, et seq.

Age Discrimination in Employment Act, 29 U.S.C. § 621

Americans with Disabilities Act, 42 U.S.C. § 12101

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

The Uniformed Services Employment and Reemployment Rights Act, 20 CFR 1002.18

Title II of the Genetic Information Nondiscrimination Act of 2008

Policy adopted: July 6, 1999

Policy updated: November 1, 2005

Policy revised: May 21, 2013

Policy updated: July 28, 2015

Policy revised: January 23, 2018

HARTFORD000041

# EXHIBIT G

EW-4

### Complaints/Concerns Regarding In-district Activities

Complaints and/or concerns regarding any HPS in-district activities, including but not limited to professional learning, should be submitted or forwarded to the Assistant Superintendent for Talent Management for review. Follow up will include sharing complaints and/or concerns with the appropriate staff for action, as needed.

### Freedom of Speech

Employees have the same guarantees of freedom of speech as provided under the First Amendment of the United States Constitution and applicable case law. In accordance with these principles, all employees of the Hartford Public Schools have the right to speak out on matters of public concern before the Hartford Board of Education or to speak out on such matters in any other forum. No employee of the Hartford Public Schools will be subject of disciplinary action or retaliatory action of any kind as a result of the exercise of his or her free speech rights.

### Record

The Hartford Public Schools will abide by the requirements of the Freedom of Information Act.

Employees may make an appointment to review their personnel file and may obtain copies of any material entered into the file. Employees will be charged $.50 a page for photocopying.

22

HARTFORD000136

# EXHIBIT H



**Robert Henry**
*Superintendent of Schools*

**Gail P. Johnson**
*Executive Director for Human Resources*

**Department** *of* **Human Resources**
**960 Main Street**
**Hartford, CT 06103**

Phone: (860) 695-8485  ◆  Fax: (860) 722-8083
Email Address: gjohn001@hartfordschools.org



May 3, 2006

Mr. John Grande
80 Davenport Road
West Hartford, CT 06110

Dear Mr. Grande:

Recently, our office concluded an investigation into your alleged poor judgment in restraining a student and escalating a situation with the student on or about December 16, 2005.

After a thorough investigation, a pre-disciplinary meeting was held on April 28, 2006, in the presence of Jill Cutler-Hodgman, Labor Relations Manager; Harriet Marek, Manager for Certified Operations; Merril Bowman, your Union Representative; and yourself. During that meeting, you reaffirmed the accuracy of the statement you made through the investigatory process. You were also given the opportunity to provide any other information to the Administration you felt relevant before any disciplinary decisions were made.

By way of this letter, we are counseling you to take great care in the future to facilitate social development and to be sensitive to the needs of emotionally fragile students. Please consult your principal regarding guidance regarding the therapeutic environment and regarding training opportunities related to positive reinforcement techniques useful for the students of HTLA.

We expect you to avoid antagonizing students and to instead reward positive behaviors and create a sense of inclusion. While we are not disciplining you for your conduct on or about December 16, 2005, we do find that your choice to exclude the student from the gym the day after his behavioral concerns and your choice to block the doorway after the student had already become quite upset aided in escalating the child's volatility instead of creating a therapeutic environment.

Please understand that future misconduct shall subject you to disciplinary action, up to and including termination.

Sincerely,

Gail P. Johnson

GPJ/vm

cc:    J. Cutler-Hodgman, D. Fleming, B. Coker, H. Marek, C. Carpino, Investigation File

*"Growing the Future of Hartford Through Quality Education for All Students"* HARTFORD000112

# EXHIBIT I





SCANNED
904020

VERNICE DUKE
ASSISTANT PRINCIPAL

JAY MIHALKO
PRINCIPAL

RICHARD SKOWRONSKI
ASSISTANT PRINCIPAL



DEFENDANT'S
EXHIBIT
21
7-30-24/B

March 8, 2017

John Grande
90 Burnham Drive
West Hartford, CT 06110

Dear Mr. Grande,

This letter summarizes a pre-disciplinary meeting held with you on March 3, 2017 as it relates to an incident that occurred on or about February 24, 2017. Present at the March 3, 2017 pre-disciplinary meeting were Jay Mihalko, Richard Skowronski, and John Grande.

Specifically, during our meeting on February 24, 2017, you put your face within inches of my face as we were exiting the office stating, and I quote, "I know what you are doing, and you know what, I'm not the one that needs to be worried. You are the one that needs to be worried. I am going to be just fine." During the pre-disciplinary meeting on March 3, 2017, you were reminded that you were informed prior to the meeting that the meeting may lead to discipline and you were afforded union representation. You stated that you would stop the meeting if you wanted representation. You were afforded union representation several times during the meeting. You declined each time. You were also given an opportunity to provide information to the Administration you felt was relevant to this concern.

You confirmed during the pre-disciplinary meeting that on February 24, 2017 you stated to me "I am not worried". You denied during the pre-disciplinary meeting that on February 24, 2017, you were threatening or intimidating towards me. You further denied that put your face close to my face, or that you stated that I was the one that needed to be worried and that you were going to be just fine.

Based on our discussion and the information you provided, I find that you were threatening and intimidating when you met with me on February 24, 2017. Further, you twice refused to acknowledge during the pre-disciplinary meeting on March 3, 2017 that you were aware that threatening or intimidating a student or staff member was not appropriate. After refusing to acknowledge this, I said, "Then let me state that threatening or intimidating a student or staff member is not appropriate."

Please consider this document a confirmation of a verbal warning. In addition, I am also recommending that you complete harassment training. Your conduct was wholly inappropriate and unacceptable. HPS policy states, *The Hartford Public Schools has the responsibility to maintain a safe school environment for everyone. To ensure that no person ever feels threatened or intimidated by others, the school district expressly forbids any form of bullying behavior.* (P-4118.8). Information concerning how to complete harassment training will be provided to you by the Office of Talent Management.

Please be aware that future misconduct shall subject you to further disciplinary action, up to and including termination.

Sincerely,

Jay Mihalko

Jay Mihalko

cc:  Office of Labor and Legal Services, P. Dart, N. Banks, S. Diggs, H.R. Staffing Specialist, HFT

HARTFORD
PUBLIC SCHOOLS

*'The Hartford Public Schools is the State Capital's Portfolio District of Excellence'*

5 Cone Street Hartford CT  06105 • www.nwmms.org  HARTFORD060815

# EXHIBIT J

**STATE OF CONNECTICUT**

**BY HIS EXCELLENCY**

**NED LAMONT**

**EXECUTIVE ORDER NO. 7C**

**PROTECTION OF PUBLIC HEALTH AND SAFETY DURING COVID-19 PANDEMIC AND RESPONSE – FURTHER SUSPENSION OR MODIFICATION OF STATUTES**

**WHEREAS,** on March 10, 2020, I issued declarations of public health and civil preparedness emergencies, proclaiming a state of emergency throughout the State of Connecticut as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed spread in Connecticut; and

**WHEREAS,** my Executive Order No. 7, dated March 12, 2020, prohibited gatherings of 250 people or more for social and recreational activities, including but not limited to, community, civic, leisure, and sporting events; parades; concerts; festivals; movie screenings; plays or performances; conventions; and similar activities, and suspended various statutes and regulations to protect public health and safety; and

**WHEREAS,** my Executive Order No.7A, dated March 13, 2020, authorized the Commissioner of Public Health to restrict entrance into nursing homes and similar facilities to protect people who are most vulnerable to COVID-19; and

**WHEREAS,** my Executive Order No. 7B, dated March 14, 2020, among other things, modified in-person open meetings requirements, waived certain rules to mitigate the critical shortage of hand sanitizer and personal protective equipment (PPE), maintain and increase the availability of childcare, and provide for increased healthcare resources and facilities; and

**WHEREAS,** COVID-19 is a respiratory disease that spreads easily from person to person and may result in serious illness or death; and

**WHEREAS,** the World Health Organization has declared the COVID-19 outbreak a pandemic; and

**WHEREAS,** the risk of severe illness and death from COVID-19 appears to be higher for individuals who are 60 years of age or older and for those who have chronic health conditions; and

**WHEREAS,** to reduce spread of COVID-19, the United States Centers for Disease Control and Prevention and the Connecticut Department of Public Health recommend implementation of community mitigation strategies to increase containment of the virus and to slow transmission of

the virus, including cancellation of large gatherings and social distancing in smaller gatherings; and

**WHEREAS,** attendance at public meetings and proceedings is likely to increase the risk of transmission of COVID-19; and

**WHEREAS,** there is an increased risk of rapid spread of COVID-19 among persons residing in congregate settings, such as inpatient or outpatient hospitals, clinics or other facilities for the diagnosis, observation or treatment of persons with psychiatric and intellectual disabilities; and

**WHEREAS,** there exists a compelling state interest in collecting health information pertaining to COVID-19 and its spread throughout the state; and

**WHEREAS,** the Commissioner of the Department of Public Health has added COVID-19 to the list of reportable diseases under Section 19a-215 of the Connecticut General Statutes; and

**WHEREAS,** Section 17a-547 of the Connecticut General Statutes governs the rights of patients to receive visitors at regular visiting hours at inpatient or outpatient hospitals, clinics or other facilities for the diagnosis, observation or treatment of persons with psychiatric and intellectual disabilities; and

**WHEREAS,** Section 17a-238 of the Connecticut General Statutes governs the rights of persons under the supervision of the Commissioner of Developmental Services to communicate freely and privately with any person; and

**WHEREAS,** Section 52-146e of the Connecticut General Statutes limits the disclosure of information that identifies a patient to any person, corporation or governmental agency without the consent of the patient or the patient's authorized representative; and

**WHEREAS,** Section 52-146f of the Connecticut General Statues provides exceptions to Section 52-146e of the Connecticut General Statutes;

**NOW, THEREFORE, I, NED LAMONT,** Governor of the State of Connecticut, by virtue of the authority vested in me by the Constitution and the laws of the State of Connecticut, do hereby **ORDER AND DIRECT:**

1. **Cancellation of School Classes.** To promote and secure the safety and protection of children in schools related to the risks of COVID-19, all public school classes will be cancelled for all students effective Tuesday, March 17, 2020 until March 31, 2020, unless extended beyond that date. Private schools and other non-public schools are encouraged to follow the same schedule. The Connecticut State Department of Education, the Connecticut Department of Public Health, the Department of Children and Families, and the Connecticut Office of Early Childhood, are directed to immediately work together to implement measures to provide for the health, nutrition, safety, educational needs and well-being of children during the class cancelation period.

2. **Flexibility of Graduation Requirements, and Prescribed Courses of Study.** The provisions of Sections 10-16b and 10-221a, and any associated regulations, rules, and policies regarding prescribed courses of study and graduation requirements are modified to authorize the Commissioner of Education to temporarily waive any requirements contained therein as he deems necessary to address the impact of COVID-19 and school class cancelations.

3. **Flexibility for Educator Prep Programs.** The provisions of Section 10-145a, and any associated regulations, rules, and policies regarding educator preparation programs are modified to authorize the Commissioner of Education to temporarily waive any requirements, contained therein as he deems necessary to address the repercussions of college, university, and school class cancellations on students pursuing secondary education programs. The Commissioner may issue any order that he deems necessary to implement this order.

4. **Flexibility for Educator Certification Timelines, Educator Evaluations, and School In-Services.** The provisions of Sections 10-145, 10-145b, 10-145d, 10-151b, 10-151 and 10-220a, and any associated regulations, rules, and policies regarding educator certification timelines, evaluations, and professional development requirements are modified to authorize the Commissioner of Education to temporarily waive any requirements contained therein as he deems necessary to address the impact the school class cancelations and COVID-19 risks when classes resume and students return. The Commissioner may issue any order that he deems necessary to implement this order.

5. **Extension of Municipal Budget Adoption Deadlines.** Notwithstanding any provision of the Connecticut General Statutes, including Title 7, or any special act, municipal charter or ordinance, that conflicts with this order, all municipal budget deadlines for the preparation of the municipal budget for the fiscal year ending June 30, 2021 that fall on any date prior to and including May 15, 2020 are extended by thirty (30) days. The legislative body of the municipality, or in a municipality where the legislative body is a town meeting, the board of selectmen, may alter or modify the schedules and deadlines pertaining to the preparation and submission of a proposed budget and the deliberation or actions on said budget by the legislative body or other fiscal authority, including any required public hearing(s), publication, referendum or final budget adoption. All submission dates may be postponed until such time as the legislative body approves said modified schedule and deadline, consistent with the thirty (30) day extension.

6. **Extension of Regional Board of Education Budget Adoption Deadlines.** Notwithstanding any provision of the Connecticut General Statutes, including Title 10, or any special act, municipal charter or ordinance, that conflicts with this order, all budget deadlines for the preparation of regional school district budgets for the fiscal year ending June 30, 2021 that fall on any date prior to and including May 15, 2020 may be extended by thirty (30) days. Any regional board of education may alter or modify the schedules and deadlines pertaining to the preparation and submission of a proposed budget and the

deliberation or actions on said budget by the legislative body or other fiscal authority, including any required public hearing(s), publication, referendum or final budget adoption.

7. **Remote Conduct of DMV Operations.** To protect public health and safety, particularly the risk of transmission of COVID-19, by reducing in-person interactions, Title 14 of the Connecticut General Statutes is hereby modified to authorize the Commissioner of Motor Vehicles to issue any and all orders she deems necessary to close any DMV branch to transaction of business by the public, facilitate the conduct of business remotely using online methods or any other feasible means, including provision of any notice or conduct of any hearing required pursuant to that Title, waive the suspension of licenses and other credentials as required, and waive, modify or suspend related requirements in Title 14 that result from closure of DMV branch offices to the public. The Commissioner may suspend any timeline or deadline for any notice or hearing required by this Title or by the Uniform Administrative Procedure Act for up to 90 days. The Department of Motor Vehicles shall post a plan on its website to instruct customers how to conduct business remotely and provide updated information on services conducted by its partners. The DMV shall implement its plan as soon as feasible, and shall review the plan weekly to determine whether any modifications are necessary.

8. **Limits on Visitors to Facilities That Treat Persons with Psychiatric Disabilities.** For the duration of the aforementioned public health and civil preparedness emergencies, or until such time as I repeal or modify this executive order, notwithstanding Section 17a-547 of the Connecticut General Statutes or any other statute, regulation, local rule or ordinance or provision of law, the Commissioners of the Department of Mental Health and Addiction Services and the Department of Public Health are authorized to issue any and all orders restricting entrance into facilities, as defined in Section 17a-540(1) of the Connecticut General Statutes, including Whiting Forensic Hospital, that the Commissioners deem necessary to protect the health and welfare of patients, residents and staff.

9. **Limits on Visitors to the Southbury Training School.** For the duration of the aforementioned public health and civil preparedness emergencies, or until such time as I repeal or modify this executive order, notwithstanding Section 17a-238 of the of the Connecticut General Statutes or any other statute, regulation, local rule or ordinance or provision of law, the Commissioners of the Department of Developmental Services and the Department of Public Health are authorized to issue any and all orders restricting entrance into facilities, as referenced in Section 17a-231(1), the Southbury Training School and any other facility operated by the Department of Developmental Services that the Commissioners deem necessary to protect the health and welfare of patients, residents and staff.

10. **COVID-19 Information Sharing Between Facilities That Treat Persons with Psychiatric Disabilities, DPH, and Local Health Directors.** For the duration of the aforementioned public health and civil preparedness emergencies, or until such time as I

repeal or modify this executive order, Section 52-146f of the Connecticut General Statutes is amended to permit the Commissioner of Public Health and Local Health Directors to disclose communications or records to report cases of COVID-19 as required under Section 19a-215 of the Connecticut General Statutes and as they may deem necessary to limit the further spread of COVID-19 or respond to this public health and civil preparedness emergency.

Unless specified herein, each provision of this order shall take effect immediately and shall remain in effect for the duration of the public health and civil preparedness emergency, unless earlier modified or terminated by me.

Dated at Hartford, Connecticut, this 15th day of March, 2020.

Ned Lamont
Governor

By His Excellency's Command

Denise W. Merrill
Secretary of the State

# EXHIBIT K



DEFENDANT'S
EXHIBIT
3
7.30-24 rB

# Exhibit A

## Privilege Presentation Slides

Case 3:24-cv-00010-JAM    Document 1-1    Filed 01/03/24    Page 2 of 22





Case 3:24-cv-00010-JAM     Document 1-1     Filed 01/03/24     Page 4 of 22



# Learning Target

- I can explore my own identity and privilege to better understand how I relate to my students in order to increase engagement and collaboration.

4







## Exploring Privilege Introduction

- We're going to explore our privilege as related to various social identities. Privilege refers to ways that individuals or groups can enjoy advantages based on their real or perceived membership in identity categories (race, gender, sexuality, etc.)

- This exercise is not meant to make anyone feel guilty or ashamed of having or not having privilege, but rather to explore how we ALL have SOME privilege, and therefore to also explore how to engage that aspect of our life.

- We believe it is critical for everyone to reflect on privilege in this way in order to use our individual and collective privilege(s) for equity and social justice.

8

## Exploring Privilege - Instructions

I will display 8 slides. Each slide includes a list of 8 statements related to a specific social identity. Each statement describes one possible example of privilege related to that category's system of oppression and privilege.

Note that the statements are not meant to be exhaustive or comprehensive; these are meant to be a sampling, and a starting point for reflection. You might think of other categories that could be included, or you might contest some of the items. Please do not over-analyze the statements: the goal is to begin reflection.

If you can quickly answer "basically yes," to a statement, shade in 1 section within that portion of your identity wheel. If your answer is "basically no," do not. Note that each list is meant to focus on your current status in life, which may mean that you haven't always enjoyed the privileges that you can identify today, or that you may have less privilege in a category than you once did.

9

## Sexuality Privilege

1. I can be pretty sure that my boss and coworkers will be comfortable with my sexual orientation.

2. When I mention my sexuality (such as in a joke or talking about my relationship), I will not be accused of pushing my sexual orientation onto others.

3. I can go home from meetings, classes, and conversations without feeling excluded, fearful, attacked, isolated, outnumbered, unheard, held at a distance, stereotyped or feared because of my sexual orientation.

4. People don't debate the validity of my sexuality or my civil rights because of my sexuality.

5. No one will ever question whether or not it is appropriate for me to have children or get married because of my sexual orientation.

6. I can easily find a religious community that will not exclude me for my sexuality.

7. I can walk in public with my significant other and not have people double-take or stare or worry about our physical safety.

8. Businesses can't refuse to serve me based on my sexuality.

10

## Ability Privilege

1. I have never been taunted, teased, or ostracized due to a disability.

2. I have never been accused of faking or imagining a disability.

3. I do not have to worry where the curb cuts are located or if I do not know what a curb cut is.

4. I can assume that I will easily have access to any building.

5. I can perform daily tasks and not have people ask me how I complete those tasks with my ability status.

6. I can sit anywhere I want in a room and still be able to see and hear comfortably.

7. I never have to worry about having an interpreter present in events that I attend.

8. I do not have to worry about the cost of medication or maintaining my job for health insurance to manage a disability.

11

## Gender/Sex Privilege

1. I do not worry about walking alone at night.

2. If I choose not to have children, my gender will not be called into question.

3. I do not have to consider my physical safety when I accept a date.

4. I can complain about something without being told I am too emotional or asked if it is that time of the month.

5. I can have multiple sexual experiences and be patted on the back and not called derogatory names.

6. If I have children and a career, no one will think I'm selfish for not staying home.

7. My elected representatives are mostly people of my own sex.

8. When I ask to see "the person in charge," odds are I will face a person of my own sex.

12

## Race Privilege

1. I can choose blemish cover or bandages in "flesh" color and have them more or less match my skin.

2. I do not fear increased mortality from COVID-19 or standard medical procedures such as giving birth.

3. I can be sure that if I ask to see 'the person in charge," I will be facing a person of my race.

4. If a police officer pulls me over, I can be sure I haven't been singled out because of my race.

5. I can choose public accommodations without fearing that people of my race cannot get in or will be mistreated in the places I have chosen.

6. When I am told about our national heritage in the U.S. or about 'civilization,' I am shown that people of my color made it what it is.

7. My words and actions are not used as representations of my entire race.

8. I can easily buy posters, picture books, greeting cards, dolls, toys, and magazines featuring people of my race.

13

1.  My school is closed on my major religious holidays.

2.  I can openly talk about my religious practices without concern for how it will be received by others.

3.  When people find out my faith beliefs, I am not bombarded with questions about why I subscribe to that religion.

4.  I probably do not need to learn the religious or spiritual customs of others, and I am likely not penalized for not knowing them.

5.  I can travel without others assuming that I put them at risk because of my religion; nor will my religion put me at risk from others when I travel.

6.  My citizenship and immigration status will likely not be questioned, and my background will likely not be investigated because of my religion.

7.  I can openly display religious symbols on my body (dress, accessories, etc.) without people staring or asking questions.

8.  I can easily find a place of worship in my town that aligns with my beliefs.

14

## Class Privilege

1. Where I went to college was not dependent on my financial aid package.

2. I have health insurance.

3. My family owned a home that I grew up in.

4. I am reasonably sure that I will not have to skip meals because I can't afford to eat.

5. I have taken a vacation within the past three years.

6. I did not lose my job due to the pandemic.

7. During the pandemic, if I wanted to, I was easily able to access outdoor spaces for recreation for me and/or my family.

8. The neighborhood I live in is relatively free of obvious drug use, prostitution, and violent crime.

15

16

1. If I apply for a job, my legal right to work in this country probably will not be questioned.

2. I will never be denied housing in the U.S. due to my citizenship.

3. I can go into any bank and set up a checking account without fear of discrimination.

4. I can be reasonably sure that if I need legal or medical assistance, my citizenship status will not matter.

5. I do not fear that my employer will threaten me with deportation.

6. If I wanted to, I could travel freely to almost any country and be admitted back into the U.S.

7. If I were a victim of a crime, I wouldn't think twice about seeking police assistance due to my citizenship status.

8. I am not afraid of my family or friends being deported or arrested due to their immigration status.

## Other Privilege

1. I did not have to "come out" to my family, friends, and/or others.

2. My dietary needs are met at most public locations.

3. My first language is spoken in most places I go.

4. I do not have to worry if there will be enough room for me in a car, airplane, amusement park ride, or theater seats.

5. Both of my parents are still alive.

6. I can find clothes that fit my body type in most department stores.

7. Members of my family have never been incarcerated.

8. When I was growing up family members told me they loved me and encouraged me.

17

Case 3:24-cv-00010-JAM   Document 1-1   Filed 01/03/24   Page 19 of 22



18

Case 3:24-cv-00010-JAM    Document 1-1    Filed 01/03/24    Page 20 of 22



# Norms in Breakout Groups:

1: Assume positive intentions.

2: You do not have to share if you don't feel comfortable doing so.

3. It's OK to feel discomfort. This isn't easy!

4: Agree to disagree respectfully.

20

## Reflection

Discussion prompts:

- Why is it important for us to be aware of privilege as an aspect of our identities/experience?

- How did completing this activity affect my understanding of myself?

- How did completing this activity affect my understanding of my students?

- How does my identity impact my relationship with my students?

21

# EXHIBIT L

**To:** Aponte, Suhail[APONS001@hartfordschools.org]
**Cc:** Negron, Madeline[Madeline.Negron@hartfordschools.org]
**Sent:** Tue 11/10/2020 6:40:37 PM (UTC)
**Subject:** RE: Serious Issue in Breakout Room

TA- 3

Good Afternoon Suhail,

Thank you for following up on this; it's very concerning.

1. Catherine Barr <u>Catherine.Barr@hartfordschoools</u> was the teacher who reported the concerns.
2. Below are the teachers who were in the breakout room and their emails:

Erin Dugan
Abbey Sutcliffe
Mike Pontecorvo


**Tracy Avicolli**
Director of Arts and Wellness
<u>Hartford Public Schools</u>
330 Wethersfield Ave.
Hartford, CT 06114
860-695-8818
<u>tracy.avicolli@hartfordschools.org</u>

**From:** Aponte, Suhail
**Sent:** Tuesday, November 10, 2020 12:58 PM
**To:** Avicolli, Tracy <Tracy.Avicolli@hartfordschools.org>
**Cc:** Negron, Madeline <Madeline.Negron@hartfordschools.org>
**Subject:** FW: Serious Issue in Breakout Room

Good afternoon, Ms. Avicolli.

I have been assigned to investigation the incident below. In order for me to commence the investigation I need more information.

1. Who is the teacher that reported the concerns?
2. Names of all teachers that were in the break room?


Do not hesitate to contact me if you have any questions/concerns.

Thank you,

Suhail Aponte

**From:** <u>Wilson, Edward</u>
**Sent:** Thursday, October 29, 2020 8:58 PM
**To:** <u>Aponte, Suhail</u>
**Subject:** FW: Serious Issue in Breakout Room

See below- is this the same teacher we were recently talking about?

**From:** Negron, Madeline
**Sent:** Thursday, October 29, 2020 3:51 PM
**To:** Wilson, Edward <<u>WilsE002@hartfordschools.org</u>>
**Subject:** FW: Serious Issue in Breakout Room

Hi Ed,

Teachers across the district engaged in Professional Learning with their respective content directors yesterday afternoon. Tracy Avicolli, Director of Arts and Wellness, facilitated a session on Identity and Privilege, a copy of the slide deck is below. One of the teachers in one of the breakout rooms later emailed Tracy to share a "serious issue in Breakout Room". The teacher's email to Tracy is below.

As always, teachers are expected to complete a PL exit slip at the end of the sessions. The following questions were on the exit slip: 1) "What did you enjoy and/or find valuable today? (PLUS)" and 2) "What would you want to change for our next session?" Upon review of the PL exit slips, Tracy located the exit slip completed by John G to which he responded as follows: 1) "Absolutely nothing. That activity had nothing to do with art, music or PE/health. Talking about white privilege is part of the superintendent's personal agenda and I find it absolutely disgusting that this is the focus."

The teacher's name is John Grande. He is a PE teacher assigned to ELAM. ELAM will be kicking off their book study, So You Want to Talk About Race, next Tuesday during their school level PL. Tracy has shared the information with Christine McCarthy, building principal.

Please advise on how we should address this matter.

Best,

Madeline


**From:** Avicolli, Tracy <Tracy.Avicolli@hartfordschools.org>
**Sent:** Thursday, October 29, 2020 3:26 PM
**To:** Negron, Madeline <Madeline.Negron@hartfordschools.org>
**Cc:** Avila, Evette <Evette.Avila@hartfordschools.org>
**Subject:** RE: Serious Issue in Breakout Room

Madeline and Evette,

Here is the slide deck from our session yesterday which resulted in the issue below: <u>Identity and Privilege</u>

**Tracy Avicolli**
Director of Arts and Wellness
Hartford Public Schools
330 Wethersfield Ave.
Hartford, CT 06114
860-695-8818
tracy.avicolli@hartfordschools.org


On Oct 28, 2020, at 6:10 PM, Avicolli, Tracy <Tracy.Avicolli@hartfordschools.org> wrote:

Madeline,

Please see below and advise on any next steps?

I noticed this breakout group was very quiet and this was why...

Tracy Avicolli
Director of Arts and Wellness
Hartford Public Schools
Begin forwarded message:

From: "Avicolli, Tracy" <Tracy.Avicolli@hartfordschools.org>

HARTFORD000640

**Date:** October 28, 2020 at 6:09:23 PM EDT
**To:** "Barr, Catherine" <Catherine.Barr@hartfordschools.org>
**Subject: Re:  Serious Issue in Breakout Room**

Cat,

Thank you so much for bringing this to my attention. I appreciate your participation and your perspective always. This is very important.

Tracy Avicolli
Director of Arts and Wellness
Hartford Public Schools

> On Oct 28, 2020, at 3:10 PM, Barr, Catherine
> <Catherine.Barr@hartfordschools.org> wrote:
>
> Hey Tracy,
>
> Thank you again for leading a really important PD session. I am looking forward to growing in the uncomfortable and seeing our department change because of it.
>
> Unfortunately, there was a pretty terrible interaction right at the start of my breakout room's session. One of the men in our group, John G. (can't remember the last name) said "I'm not buying this white bashing bullshit. I've been teaching 33 years and never had to deal with this before, and don't plan to now."
> Some of the other people in the group agreed that they didn't get why anyone should have guilt, and that you "just live with the cards you are dealt with in life." I tried to get a conversation going and had a short interaction with Erin Dugan. No other words were really said on the subject, and people just checked in with how people were doing in quarantine.
> I don't know if you still have the list of who was in which breakout room, but this was in breakout room 3. I was hoping either you or I could send a message directly to John; I would have said more in the zoom call, but I didn't feel that I would be supported in pushing him further into the conversation.
>
> I am hoping something can be done about this and thank you for being a person that I feel I can talk to about these matters.
>
> Have a good evening,
> Cat
>
>
> Catherine Barr
> PK-8 Music
> Environmental Sciences Magnet School at Mary Hooker
> *Serving students Pre-Kindergarten through Grade 8*
> 440 Broadview Terrace Hartford, CT 06106
> Office: 860-695-3761
> barrc001@hartfordschools.org
> www.environmentalsciencesmagnet.org
> <Outlook-Horizontal.png>

# EXHIBIT M

EW 13

John Grande, PE Teacher at Moylan
January 29, 2021
Corey Moses, Union Rep
Stuart Beckford, Union Rep
Re: Breakout Room Investigation

I went back to look at the pie chart where section was labeled with titles during PD. We were asked short-ended questions. If you answer yes, a block was shaded. After the activity we were separated into small groups to discuss the activity.

I notice that the questions were phrased that to fit the narrated. In my opinion, the questions were gaslighting. The activity and questions were hypocritical. I had issues with my disability in the past. I have asked for assistant and Central Office hasn't done anything. They are a bunch a hypocrite.

When we were separated into groups, I made a comment light heartedly for being man-bashed, white shamed, sit here quietly. I explained to them why I felt this way and how it made me feel when completing the activity. I did not use any profanity in the PD. It was quiet in that room then Tracy came in. Tracy spoke and another female said something. Tracy left and the breakroom became quiet again.

Someone else stated, "I don't have anything to apologize for and I worked hard for everything that I have". This is the first time in 32 years that I was asked questions about privilege. The questions were target a certain people. People from a certain background would respond yes to those questions.

I sat with my arm folded all the time. No one should feel offense to that. I did not roll my eyes when people were talking in the breakroom. This was someone's subjective opinion, and I can't control that. Are they body expert, or body language experts?

This whole investigation is harassment. I have PTSD. They have been extensive documents which shows that my employer is the main cause. My employer triggers my PTSD. This is the violation of ADA. I have a current to lawsuit, where I was falsely accused of making threats. This is another way to taint my characters.

I was honest in the evaluation and now I am being investigated.

Eric Soucy, PE Teacher
Taken via Zoom
January 22, 2021
Present: Suhail Aponte, Labor Relations
RE: PD Investigation

I was present in the district wide PD on November. I remember discussing the PD on race and privilege. I remember the pie chart activity. I recall being broken up into small group to have an open dialogue about the pie chart activity.

The break room was quiet. No one wanted to speak on the topic. No one shared anything out of the norm. I did not feel uncomfortable during the session. We all spoke in general, and no one said anything offensive. There were not any comments specifically on white privilege. Nor did anyone bring up race in the conversation.

Grande open the discussion, but I do not remember the comments specifically. He was trying to be lighthearted by trying to get the conversation started. I do not remember hearing swear words. I did not recall hearing anyone say they were comfortable. It is a tough topic. As time went by the conversation got a lot easier. I did not feel targeted or uncomfortable with my race or topic.

HARTFORD001526

Catherine Barr, Teacher Hooker
Taken via zoom
Distinct wide PD.

We have gotten into the afternoon session. We were being introduce the new initiative of reading. We started to talk about Race and measuring one's privilege. We then took 5-minute break after completing the chart. After that, we were broken into breakout room. We were to engage in a conversation about our privilege over our own colleagues and students. The groups were random.

Grande stated, "I don't know about you guys, but I am not buying into this white bashing bullshit". He made it very clear that he did not want to speak about this. This was so shocking. He did not believe that the work we were doing was pertinent to him. He felt like he did not have to participate or listen to it as it was targeting him as a white teacher.

I started to talk about my experience about my feelings on completing the chart. The discussion was slow pace and awkward. There was a lot of silence in the breakroom. Claudia started to speak about privilege but to look at things as blessings. Two other gentlemen agreed. The had the mindset of you just deal with the cards you are dealt with in life. Tracy popped in not long after this. It was totally silent. She mentioned her experience. No one responded to Tracy. I thanked her for sharing her opinion.

We were brought back to the whole room. I immediately texted my friends because I needed some support. Thankfully, no one else had an experience like mine. I could not let this slide by.

One of three members of the group were white male. I think one person of color. Three were white woman. No one in the group entertained Grande's comment.

The comment was very disturbing. At the time, I felt frozen and felt honest rage for not saying something to him. It makes me very uncomfortable. That statement deeply affects the community I serve. I cannot stand for a statement that is against my moral beliefs. His comment demonstrate privilege. And it was disrespectful to the work that we are trying to start in our department.

Erin Dugan, Teacher at
Taken via Zoom
January 21, 2021
Present: Suhail Aponte, Labor Relations
Re: Breakout Room Investigation

I remember the day of the PD. We were using color wheel. Me and this other female were the only ones talking and participating in the conversation. There is a gentleman who stated, "this was a waste of time", "we don't need to talk about privilege", "don't want to be guilt trip about being white." "I don't know about you guys, but I am not buying into this white bashing bullshit." He was very dismissive and muted the whole time and super dismissive. The breakroom was very uncomfortable. I ignored what he said and try to get the conversation started. He just kept rolling his eyes.

He stated that he is not going to feel guilty being privileged when he worked for it. He emphasized that he worked hard to get to where they were at in life, and they should not feel bad about it. This was in response to me saying, along with being white, I feel guilty on the disparity of having privilege. He was dismissing what I was saying. I was upset after the meeting. These are important development to further understand the discrepancy amongst us to be better educators. I felt like it my opinion was shut down.

I recognize his face but have not spoken to him previously to that. I do not recall his name, but I have been in PD with him before. We were in the group for about 15 minutes/20 minutes. He was not kind at all during the breakroom.

I have been teaching about 29 years and he knows how to talk to troubled youth because they fear him. He used a negative term to describe the students. He was implying that the students are intimated by him. I was so turned off by the conversation.

HARTFORD001528

Abigail Sutcliffe, Teacher at Webster
Taken via Zoom
January 25, 2021
Present: Tracy Avicolli, Principal
Suhail Aponte, Labor Relations
Re: John Grande Investigation/Breakout room

We were working on doing the circle on privilege. The very first comment when we went into the breakout room was, "I don't understand, no one is going to make me feel bad for being a white male". I understood his point, but he missed the point of the activity.

The comment was not further discussed. This shifted the mood and tone in the breakout room. No one wanted to speak about the topic. I did not take offense to it. It was clear that he missed the point. I did not feel comfortable sharing my activity.

I do remember hearing the word bashing. There was another male, PE teacher, if I recall saying, "agreeing with anyone about making him bad for being a white male".

HARTFORD001529

**Timothy Keane, Teacher at Maria Sanchez**
Taken via Zoom

I believe Tracy presented about race and privilege. We did a pizza type game as an activity. From there we went into breakout room. No one made a comment in the breakout room. People were quiet. The music teacher started talking. I don't remember what she said. I don't remember anyone saying much about what privilege. I did not say anything. The topic is difficult. I did not speak and just listen to the other staff members. Not much was said in the breakout room.

**Claudia Portal, PE Health teacher at SMSA**
Taken via Zoom

I remember to complete the pie. I recall coming into the breakout room and share your thoughts on privilege. I remember talking about one's privilege. Did not make me feel. I don't even know when I was. We were learned to respect people's quietness. I did not hear anything that was wrong. We were asked to share our results. We were in a free and space to share. I don't recall anything happening in the breakroom. The topic itself did not make me feel uncomfortable. People did share their opinions. Nothing really struck me as odd during the meeting. I was not paying attention and was multitasking.

**Michael Pontecorvo, Music Teacher at Kennelly**
Taken via Zoom
January 26, 2021
Present: Suhail Aponte, Labor Relations
Re: Breakroom Investigation

I do recall the PD back in October. I recall being in a breakout room. From what I recall from the discussion that was a little strange. Breaking the ice. Don't think everyone was comfortable with the topic. Nothing hostile, nothing that I took offense. I don't know the gentleman's name. I don't recall what he said to break the ice. I remember speaking and telling him that I am surprise that we didn't speak. It is hard to recall the specifics.

# EXHIBIT N



# Exhibit F

Letter of Reprimand

# HARTFORD
## PUBLIC SCHOOLS
### Where the future is present.

Leslie Torres-Rodriguez, Ed.D.
Superintendent

Edward Wilson, Jr., Esq.
Staff Attorney/Executive Director of Internal
Investigations and Security

December 10, 2021

Mr. John Grande
████████████

Dear Mr. Grande:

Our office has concluded an investigation into claims that you engaged in inappropriate and unprofessional conduct. Specifically, it is alleged that you made inappropriate and unprofessional comments in a group discussion during a Professional Development (PD) session focused on race and privilege[1]. Multiple staff members reported hearing you make these comments, which some allege included foul language, and reported that the comments made them uncomfortable.

A pre-disciplinary meeting was held on October 26, 2021, in the presence of Principal Christine McCarthy, Senior Executive Director of Talent Management Natasha Banks, Staffing Specialist Janet Serrano, and your union representative Corey Moses. You were present for this meeting; I conducted the meeting. Prior to the meeting, you were given the opportunity to provide a statement to a Hartford Public Schools (HPS) Investigator, which you did. In your statement, you admitted to stating, "I was just man-bashed and white-shamed. I'm gonna sit here quietly," during the group discussion. However, you denied the allegation that you used any inappropriate or profane language. During the pre-disciplinary meeting, you were given the opportunity to provide an oral statement and any other information you felt may be relevant before any disciplinary decisions were made.

---

[1] In this PD session, privilege was explored in multiple areas to include sexuality, ability, gender/sex, race, religion, class, and nationality/citizenship. The learning target was for staff members to be able to explore their own identity and privilege to better understand how they relate to students in order to increase collaboration and engagement.

Office of Talent Management and Labor Relations
Phone: (860) 695-8688 · Fax: (860) 722-8083
300 Wethersfield Avenue Fourth Floor Hartford CT 06114 ∞ www.hartfordschools.org

# HARTFORD
## PUBLIC SCHOOLS
### Where the future is present.

The HPS Employee Handbook outlines the expected standards of conduct for all employees and identifies "any inappropriate or unprofessional conduct" as behavior that may result in corrective action, up to and including termination.[2]

All Hartford Public School employees are expected to conduct themselves in a professional manner. As an educational institution, Hartford Public Schools and its employees establish behavioral standards that influence the development of students. Employee behavior is expected to model rational and constructive adult conduct. Employee behavior that does not reflect positive social values will have a negative influence on students and fellow employees and is unacceptable.[3]

Based on our investigation, the District finds that you violated the provision of the HPS Employee Handbook referenced above by making inappropriate and unprofessional comments in a group discussion with other HPS staff members.

To be clear, this finding is not based on your opinions or feelings regarding the training; it is based solely on the way you expressed these sentiments which was inappropriate, unprofessional, and made several staff members uncomfortable. You had the ability and obligation to express yourself in a professional manner, which is the expectation of all HPS employees in all situations. Additionally, the presentation that was given during the PD in question specifically stated in the breakout group instructions that, "you do not have to share if you don't feel comfortable doing so," and instructed all participants to, "agree to disagree respectfully."

As a result of these findings, **you are hereby subject to a written reprimand. This letter serves as your written reprimand and will be placed in your personnel file.** Additionally, **you are required to take the following training in Vector** (formerly SafeSchools):

- Sensitivity Awareness (available at: https://hartford-ct.safeschools.com/courses/details/COURSE-SENSITIVITY_AWARENESS)

**Please provide evidence of successful completion by January 14, 2022.**

The violations of District policy in which you engaged are unacceptable, and any future failure to follow expected standards of conduct will not be tolerated. Please be aware that any future misconduct may subject you to further disciplinary action, up to and including termination.

---

[2] Hartford Public Schools Employee Handbook, p. 14-15.
[3] Hartford Public School Employee Handbook, p. 16.

Office of Talent Management and Labor Relations
Phone: (860) 695-8688 · Fax: (860) 722-8083
300 Wethersfield Avenue Fourth Floor Hartford CT 06114 ∞ www.hartfordschools.org

**HARTFORD**
PUBLIC SCHOOLS
Where the future is present.

Sincerely,

_____/s/_____
Edward Wilson, Jr., Esq.
Staff Attorney/Executive Director of Internal Investigations and Security

cc: C. McCarthy, C. Moses, C. Gale, N. Banks, J. Serrano, R. Granoth

Office of Talent Management and Labor Relations
Phone: (860) 695-8688 · Fax: (860) 722-8083
300 Wethersfield Avenue Fourth Floor Hartford CT 06114 ∞ www.hartfordschools.org