UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN GRANDE,<br><br>     Plaintiff,<br><br>v.<br><br>HARTFORD BOARD OF EDUCATION; LESLIE TORRES-RODRIGUEZ, in her individual capacity and her official capacity as Superintendent of Hartford Public Schools; EDWARD WILSON, JR., in his individual capacity and his official capacity as Staff Attorney/Executive Director of Internal Investigations and Security of Hartford Public Schools; and, TRACY AVICOLLI, in her individual capacity and her official capacity as Director of Arts and Wellness for Hartford Public Schools,<br><br>     Defendants. | Case No. 3:24-cv-00010-SFR<br><br>**PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT**<br><br>March 5, 2025 |

Pursuant to Local Rule 56(a)(2) of this Court, Plaintiff John Grande ("Mr. Grande") hereby submits the following Statement of Facts in Opposition to Summary Judgment filed by Defendants Hartford Board of Education ("Board"), Leslie Torres-Rodriguez ("Torres-Rodriguez"), Edward Wilson, Jr. ("Wilson"), and Tracy Avicolli ("Avicolli") (collectively "Defendants"):

**RESPONSES TO DEFENDANTS' RULE 56(a)(1) STATEMENT**

    1.     Admitted.

    2.     Admitted with clarification. Torres-Rodriguez serves as "CEO of the school system." (Torres-Rodriguez Dep. at 20.)[1]

    3.     Admitted.

---

[1] The cited portions of Torres-Rodriguez's deposition transcript are filed contemporaneously herewith as Exhibit A and referred to herein as "Torres-Rodriguez Dep. at ___."

4. Admitted in part, denied in part. Admitted only that the Board has policies concerning discrimination. Those policies speak for themselves and any characterization inconsistent therewith is denied.

5. Admitted.

6. Admitted. By way of further response, the referenced counseling letter is irrelevant to this matter and Mr. Grande disputed its characterization of his conduct, even providing a written response to the Board. (Grande Dep. at 213–14.)[2]

7. Admitted.

8. Admitted.

9. Admitted in part, denied in part. Admitted only that Plaintiff received the documented verbal warning. Mr. Grande denies any of the accusations therein. Specifically, Mr. Grande has always denied those allegations as fabrications, brought legal action to redress them, and again provided the Board with a written response. (Grande Dep. at 214–15.)

10. Admitted.

11. Admitted.

12. Admitted.

13. Denied. Mr. Grande's direct supervisor at all relevant times was his principal, not Avicolli. (Grande Dep. at 14.)

14. Admitted.

15. Admitted.

16. Admitted.

---

[2] The cited portions of Mr. Grande's deposition transcript are filed contemporaneously herewith as Exhibit B and referred to herein as "Grande Dep. at ___."

17. Admitted. By way of further response, ensuring that students attended remote classes was not Mr. Grande's responsibility.

18. Admitted.

19. Admitted.

20. Admitted.

21. Denied. Avicolli's self-serving explanation as to the intention of the professional development training was pretextual. According to the Board and Avicolli, the purpose of the training (the "Privilege Presentation") was to educate the participants on the issue of privilege (including racial, gender, religious, and other proposed forms of social privilege), so school personnel could "explore [their] own identity and privilege to better understand how [they] relate to [their] students in order to increase engagement and collaboration." (Defs.' Ex. K at 4.)[3] However, Avicolli admitted that a goal of the Privilege Presentation was to make the teachers understand how much privilege they had. (Avicolli Dep. at 105–06.)[4]

22. Denied. Avicolli did not create the "Privilege Presentation" as it came from another colleague. (Avicolli Dep. at 96.) She chose to present the Privilege Presentation because she "really liked the content." (Avicolli Dep. at 96.) She then inserted portions regarding remote learning and student engagement. (Avicolli Dep. at 97.)

23. Denied as stated. Avicolli stated that the Privilege Presentation, "came from my colleague, Khary Fletcher, who used to be our Director of Humanities, and our English/Language Arts Department had just done this exact training with our English teachers in our middle and high

---

[3] Citations to the Exhibits that Defendants submitted with their Statement of Undisputed Facts (ECF No. 43-1) are referred to herein as "Defs.' Ex. __."
[4] The cited portions of Avicolli's deposition transcript and cited exhibits are filed contemporaneously herewith as Exhibit C and referred to herein as "Avicolli Dep. at ___, Ex. TA__."

3

schools and it had gone very well and so based on their feedback and experience with their teachers in Hartford Public Schools, I was intrigued and I really liked the content and so that was why I chose this." (Avicolli Dep. at 96.) The real goal of the Privilege Presentation was to make the teachers understand how much privilege they had. (Avicolli Dep. at 105–06.)

24. Admitted.

25. Denied. Torres-Rodriguez, as CEO of Hartford Public Schools implemented policies and oversaw Avicolli's department. (Torres-Rodriguez Dep. at 18–24.)

26. Admitted.

27. Denied. Although Mr. Grande acknowledged that he signed up for the Privilege Presentation and believed that he was therefore required to attend (Grande Dep. at 77), some teachers were excused from the Privilege Presentation and teachers who did not work on the day of the presentation did not have to take it. (Avicolli Dep. at 107.)

28. Denied. Mr. Grande's direct supervisor, the principal of his school, could permit him to not participate in professional development sessions. (Grande Dep. at 14.) Mr. Grande did not view professional development as part of his job as a teacher. (Grande Dep. at 19.) In fact, Mr. Grande did not participate in professional development sessions in 2021. (Grande Dep. at 88–89; Compl. ¶ 98.)

29. Admitted.

30. Admitted.

31. Denied as stated. The Privilege Presentation speaks for itself.

32. Denied. The Privilege Presentation did not "instruct" teachers to break up into smaller groups. Rather, it only noted a "break," and then provided some questions for breakout group discussion. (Defs.' Ex. K at 19–22.)

33. Admitted.

34. Admitted.

35. Admitted.

36. Admitted.

37. Denied. Mr. Grande only stated that he "did not believe all" of the teachers responded to the Privilege Presentation's discussion prompt of how the activity made them feel. (Grande Dep. at 107.)

38. Admitted in part, denied in part. Admitted that the discussion started off quietly. Denied that Mr. Grande made the quoted statement. Mr. Grande's deposition testimony reflects his response to a question and paraphrases his statement. As alleged in his Complaint, Mr. Grande's exact statement was: "I was just man-bashed and white-shamed. I'm gonna sit here quietly." (Compl. ¶ 31.)

39. Denied. Mr. Grande's statement is paraphrased in his deposition. As alleged in his Complaint, Mr. Grande stated: "I'm not buying into this white-bashing BS." (Compl. ¶ 35.)

40. Admitted with clarification. Mr. Grande confirmed that he did not use the word "bullshit." (Grande Dep. at 159.)

41. Admitted.

42. Admitted.

43. Admitted.

44. Admitted.

45. Admitted.

46. Admitted.

47. Admitted.

48. Admitted.

49. Denied. Avicolli provided the investigator, Suhail Aponte ("Aponte"), with a list of individuals in the breakout room. (Aponte Dep. at 25–26.)[5] Aponte never confirmed that the list included everyone that was in the breakout room. (Aponte Dep. at 26.) Mr. Grande identified another individual who was in the breakout room and never identified by Avicolli. (Grande Dep. at 91.)

50. Admitted.

51. Admitted.

52. Admitted in part, denied in part. Admitted only that the complaining teacher provided a statement which Aponte prepared. (Aponte Dep. at 19, 42.) The statement speaks for itself, and Mr. Grande denies any characterizations inconsistent therewith. Mr. Grande denied using the word "bullshit" and pointed out that factual inaccuracy in the teacher's statement. (Grande Dep. at 100–01, 159.)

53. Admitted in part, denied in part. Admitted only that the teacher provided a statement which Aponte prepared. (Aponte Dep. at 19, 42.) The statement speaks for itself, and Mr. Grande denies any characterizations inconsistent therewith. Mr. Grande denied using the word "bullshit." (Grande Dep. at 100–01.)

54. Admitted in part, denied in part. Admitted only that the teacher provided a statement which Aponte prepared. (Aponte Dep. at 19, 42.) The statement speaks for itself, and Mr. Grande denies any characterizations inconsistent therewith.

55. Denied. The remaining statements were purportedly provided to Aponte, not Avicolli. (Aponte Dep. at 19, 42.) Those statements speak for themselves, and Mr. Grande denies any characterizations inconsistent therewith.

---

[5] The cited portions of Aponte's deposition transcript are filed contemporaneously herewith as Exhibit D and referred to herein as "Aponte Dep. at ___."

56. Admitted.

57. Admitted.

58. Admitted with the clarification that Aponte prepared the statements. (Aponte Dep. at 19, 42.)

59. Admitted in part, denied in part. Admitted only that Wilson testified that he reviewed the file and scheduled a pre-disciplinary meeting with Mr. Grande. Denied that Wilson had not decided on discipline at that time. Mr. Grande testified that at an arbitration proceeding, Wilson stated that "the decision, the investigation was completed in March." (Grande Dep. at 192.)

60. Admitted.

61. Denied as stated. Wilson stated that he recalled Mr. Grande sharing that "it" was not relevant to what he does but did not explain what "it" meant. (Wilson Dep. at 84.)[6]

62. Denied. Mr. Grande testified that at an arbitration proceeding, Wilson stated that "the decision, the investigation was completed in March." (Grande Dep. at 192.)

63. Denied. Wilson did not provide a direct answer when asked if he still would have disciplined Mr. Grande but-for Wilson's determination that Mr. Grande used the word "bullshit." (Wilson Dep. at 102–03.) To the contrary, Wilson's testimony suggested that Mr. Grande was disciplined because of his speech. Wilson explained, "absent what Mr. Grande said, we wouldn't have this investigation[.]" (Wilson Dep. at 97.) The written reprimand issued by Wilson ("Letter" or "Letter of Reprimand") cited "inappropriate and unprofessional comments." (Defs.' Ex. N.)

64. Admitted in part, denied in part. Admitted that Wilson provided testimony that he did not consult with any superiors prior to issuing the Letter of Reprimand and was not directed by anyone. Denied that he was the sole decisionmaker in Plaintiff's disciplinary action. Specifically,

---

[6] The cited portions of Wilson's deposition transcript are filed contemporaneously herewith as Exhibit E and referred to herein as "Wilson Dep. at ___."

7

Avicolli decided that something had to be done about Mr. Grande's speech as soon as she saw the email from Ms. Barr. (Avicolli Dep. at 48–49.) The Board's Letter of Reprimand included Torres-Rodriguez' letterhead. (Defs.' Ex. N.) And, when determining Mr. Grande's grievance related to the Letter, Torres-Rodriguez's direct designee had the ability and opportunity to overturn the discipline and chose not to. (Banks Dep. at 53, 64–65.)

65. Admitted.

66. Admitted.

67. Admitted.

## ADDITIONAL MATERIAL FACTS

1. During his long career, Mr. Grande taught and interacted with a diverse body of students and never had any issues with teaching or working with students that identify as any race, ethnicity, nationality, gender, sexuality, or religion different than his own. (Compl. ¶¶ 20–21.)

2. During the coronavirus pandemic, on October 28, 2020, Mr. Grande and other Board personnel participated in a "Professional Development (PD) session focused on race and privilege" that took place via a Zoom presentation and meeting, facilitated by Avicolli (the "Privilege Presentation"). (Compl. ¶ 22; Defs.' Ex. K (Compl. Ex. A).)

3. Mr. Grande signed up for the Privilege Presentation on his own accord. (Grande Dep. at 77.)

4. Some teachers were excused from the Privilege Presentation and teachers who did not work on the day of the presentation did not have to take it. (Avicolli Dep. at 107.)

5. Mr. Grande's direct supervisor, the principal of his school, could permit him to not participate in professional development sessions. (Grande Dep. at 14.)

6. Mr. Grande did not view professional development as part of his job as a teacher. (Grande Dep. at 19.)

7. Mr. Grande did not participate in professional development sessions in 2021. (Grande Dep. at 88–89; Compl. ¶ 98.)

8. Mr. Grande chose to participate in the Privilege Presentation from his home via a personal device. (Grande Dep. at 78.)

9. According to the Board and Avicolli, the purpose of the Privilege Presentation was to educate the participants on the issue of privilege (including racial, gender, religious, and other proposed forms of social privilege), so school personnel could "explore [their] own identity and privilege to better understand how [they] relate to [their] students in order to increase engagement and collaboration." (Defs.' Ex. K at 4.)

10. Avicolli admitted that a goal of the Privilege Presentation was to make the teachers understand how much privilege they had. (Avicolli Dep. at 105–06.)

11. The statements posed in the Privilege Presentation related to supposed "examples of privilege" and were strategically worded in a way that would prompt a "yes" response from someone like Mr. Grande, who identifies as a straight, white, Christian male, and required him to shade in particular sections of his "identity wheel." (Avicolli Dep. at 103–04; Defs.' Ex. K at 7.)

12. Based on those prompts, Mr. Grande believed that the Privilege Presentation targeted a certain class of people, including him, and was an exercise in critical race theory, rather than one aimed at improving the education of students. (Grande Dep. at 98, 117.)

13. Mr. Grande did not participate in all aspects of the Privilege Presentation, specifically the identity wheel shading activity. (Grande Dep. at 80–81, 87.)

14. The Privilege Presentation's discussion slides informed the participants that it is "OK to feel discomfort," "[y]ou do not have to share[,]" and to be prepared to "[a]gree to disagree respectfully." (Defs.' Ex. K at 20.)

15.     Avicolli acknowledged that the discussion in breakout groups could be uncomfortable and expected participants to be uncomfortable. (Avicolli Dep. at 104, 115.)

16.     She also confirmed that no one was required to speak in the breakout room and suggested that participation would include just listening to others' views on the topic. (Avicolli Dep. at 105.)

17.     Mr. Grande and other participants acknowledged that the breakout session was quiet and awkward from the start, with little participation. (Defs.' 56(a)(1) Stmt. ¶ 38; Defs.' Ex. M.)

18.     To break the awkward silence, and in response to a question of how the Privilege Presentation made the participants feel, Mr. Grande said, "I was just man-bashed and white-shamed. I'm gonna sit here quietly." (Defs.' 56(a)(1) Stmt. ¶ 38; Compl. ¶ 31; Grande Dep. at 91–92.)

19.     In further discussion towards the end of the breakout discussion, Mr. Grande also stated: "I'm not buying into this white-bashing BS." (Grande Dep. at 101; Compl. ¶ 35.)

20.     Mr. Grande voluntarily spoke in the breakout room to address what he viewed as discriminatory content of the Privilege Presentation because he did not "think teachers should have to go through this and have their race and gender and their sexual preference, you know, targeted or pointed at." (Grande Dep. at 98, 107.)

21.     Mr. Grande further found the Privilege Presentation to be an attempt at indoctrination of teachers, to then ultimately indoctrinate students, which he found objectionable. (Grande Dep. at 218.)

22.     At no point did Mr. Grande use any explicit, vulgar, or profane words. (Grande Dep. at 101; Compl. ¶ 36.)

23.     His comments sparked no reaction, and no disruption during the breakout group meeting itself. (Defs.' Ex. M.)

24. Multiple individuals from the group could not even remember what Mr. Grande had said. (Defs.' Ex. M (Stmts. of Eric Soucy, Timothy Keane, Michal Pontecorvo).)

25. Following the Privilege Presentation and breakout group discussion, Mr. Grande completed a survey. (Grande Dep. at 110–11.)

26. In response to the question of what Mr. Grande found enjoyable or valuable, he submitted a response that questioned how the training related to "art, music, or PE/health" and stated that he believed the training was "part of the Superintendent's agenda to advance her career." (Grande Dep. at 227–28.)

27. Mr. Grande's reference to the Superintendent's agenda related to what he deemed to be the advancement and support of critical race theory in Hartford Public Schools. (Grande Dep. at 218–19; Compl. ¶ 41.)

28. Mr. Grande also believed that Superintendent Torres-Rodriguez would exploit acts of violence and link them to issues of race and identity to bolster her career. (Grande Dep. at 55–57.)

29. The Board's own policies require that: "Professional development programs should be developed to assist and alert participants to issues related to the impact of racial, ethnic, and gender bias in the classroom, in the schools, and in the broader community." (Compl. Ex. B.)

30. Avicolli decided to present the Privilege Presentation, with the approval of her supervisor, Chief of Academics Madeline Negron, because Defendants "believe it is critical for everyone to reflect on privilege in this way in order to use our individual and collective privilege(s) for equity and social justice." (Avicolli Dep. at 98; Defs.' Ex. K at 8.)

31. Avicolli believes that white people, including Mr. Grande, have racial privilege and knew that only individuals of Mr. Grande's race and gender would answer affirmatively to the questions posed in the Privilege Presentation. (Avicolli Dep. at 101, 103–104.)

11

32. The Investigation of Mr. Grande began almost immediately after the Privilege Presentation, when Avicolli responded to an email from another teacher, Catherine Barr, expressing her personal concerns with the breakout session. (Avicolli Dep. at 42, Ex. TA3.)

33. Avicolli found the email disturbing because the teacher was upset and alleged that Mr. Grande used the word "bullshit." (Avicolli Dep. at 44–45.)

34. Avicolli never heard Mr. Grande use the word "bullshit" and did not confirm with anyone else in the breakout room that Mr. Grande had used that word. (Avicolli Dep. at 46, 64.)

35. Avicolli also took issue with what she perceived as Mr. Grande's "resistance in having a growth mindset or an open perspective" when it came to the Privilege Presentation. (Avicolli Dep. at 45.)

36. Avicolli decided that something had to be done about Mr. Grande's speech as soon as she saw the email from Ms. Barr. (Avicolli Dep. at 48–49.)

37. Avicolli expressed that her motivation to act was to prevent speech like Mr. Grande's from occurring again. (Avicolli Dep. at 77.)

38. Avicolli labelled Mr. Grande's alleged speech as "inappropriate and aggressive" and "unacceptable" when describing it to other teachers, because it "could have created an environment in which somebody felt uncomfortable." (Avicolli Dep. at 64–65, Ex. TA6.)

39. Mr. Grande did not work with, know, or have prior contact with the teacher that made the complaint about his speech. (Grande Dep. at 162.)

40. Avicolli admitted that Mr. Grande was the only individual to speak out against the content of the Privilege Presentation. (Avicolli Dep. at 98.)

41. The ensuing investigation of Mr. Grande was the only investigation Avicolli has ever participated in at Hartford Public Schools. (Avicolli Dep. at 80.)

42. It was also the only instance where Avicolli referred someone for an investigation regarding behavior at a professional development session, and the only time that she sought updates from an investigator regarding a teacher. (Avicolli Dep. at 89, 116, Ex. TA13.)

43. Avicolli did recall other instances of alleged unprofessional and unacceptable behavior at professional development sessions that she did not refer for investigations. (Avicolli Dep. at 116–17.)

44. Avicolli also produced an incomplete and possibly altered survey response that she attributed to Mr. Grande during the investigation. (Avicolli Dep. at 81–86.)

45. Avicolli even referred to Mr. Grande as an "asshole" in conversations with colleagues, but simultaneously acknowledged that he believed the Privilege Presentation targeted white men. (Avicolli Dep. at 118, Ex. TA21.)

46. The assigned investigator, Aponte, personally prepared the statements she attributed to the breakout room participants. (Aponte Dep. at 19, 42.)

47. Mr. Grande did not review or attest to the statement she credited to him. (Compl. ¶¶ 54–55.)

48. While Avicolli provided Aponte with an incomplete survey response attributed to Mr. Grande, Aponte did not recall ever seeing or receiving the original survey response. (Aponte Dep. at 31; Avicolli Dep. at Ex. TA9.)

49. Mr. Grande contends that the survey response Avicolli provided to Aponte was fabricated in part. (Grande Dep. at 113–14.)

50. Aponte also did not recall any other Board investigation regarding comments made by a teacher at a PD session. (Aponte Dep. at 30.)

51. Aponte did admit Mr. Grande's speech prompted the investigation. (Aponte Dep. at 37.)

13

52. At a pre-disciplinary meeting, Wilson informed Mr. Grande that he was accused of using vulgar language, and that the only reason the investigation had evolved to that point was because others felt uncomfortable due to Mr. Grande's comments during the breakout group discussion. (Grande Dep. at 205–06.)

53. When Mr. Grande cited the Board's employee handbook provision affirming his rights and guarantees to "freedom of speech as provided under the First Amendment of the United States Constitution and applicable case law" and assurance that "[n]o employee of the Hartford Public Schools will be subject of disciplinary action or retaliatory action of any kind as a result of the exercise of his or her free speech rights[,]" Wilson only quipped that vulgarities are not part of free speech. (Compl. ¶ 78; Defs.' Ex. G ("Freedom of Speech Policy").)

54. Wilson knew that the Board's Freedom of Speech Policy existed as part of the employee handbook. (Wilson Dep. at 21.)

55. The Policy also unequivocally stated that "employees of the Hartford Public Schools have the right to speak out on matters of public concern before the Hartford Board of Education or to speak out on such matters in any other forum." (Defs.' Ex. G.)

56. On December 10, 2021, over 13 months after the investigation had been initiated (Avicolli Dep. at TA3), the Board issued Mr. Grande the Letter of Reprimand which accused him of engaging in "inappropriate and unprofessional conduct" and making "inappropriate and unprofessional comments." (Defs.' Ex. N (Compl. Ex. F).)

57. The Letter stated that, "Employee behavior that does not reflect positive social values will have a negative influence on students and fellow employees and is unacceptable." (Defs.' Ex. N.)

58. The Letter ultimately threatened Mr. Grande with potential future punishment for similar incidents, warning that "any future failure to follow expected standards of conduct will not

be tolerated. Please be aware that any future misconduct may subject you to further disciplinary action, up to and including termination." (Defs.' Ex. N.)

59.  In addition to the Letter's formal reprimand placed in Mr. Grande's file for future reference, the Board forced Mr. Grande to take "Sensitivity Awareness" training, which he promptly completed and found to be a reprogramming tool, telling him what and how to think. (Defs.' Ex. N; Grande Dep. at 196.)

60.  Notably, the Board issued the Letter on its own letterhead, as well as the letterheads of the Superintendent and Wilson. (Defs.' Ex. N.)

61.  In his consideration of the Letter and discipline of Mr. Grande, Wilson did not review or consider any prior discipline or counseling letters directed to Mr. Grande's. (Wilson Dep. at 36.)

62.  Wilson did consider and rely upon the unsigned statement attributed to Mr. Grande although Mr. Grande never approved or agreed to its contents. (Wilson Dep. at 65.)

63.  Wilson ultimately determined that Mr. Grande did use the vulgarity "bullshit" based only on the alleged statements of two of the breakout room participants. (Wilson Dep. at 74.)

64.  In so doing, Wilson gave the most weight to those two statements over all the other statements, including Mr. Grande's, that denied any use of vulgarity. (Wilson Dep. at 91, 99.)

65.  Wilson's office investigated other speech related incidents—including those with teachers calling students "fucking annoying" in class—that did not result in discipline. (Wilson Dep. at 135.)

66.  When rendering the discipline, Wilson knew that Mr. Grande believed the Privilege Presentation was discriminatory and related to critical race theory and racial issues. (Wilson Dep. at 79–80.)

67. Wilson further claims that he did consider and was aware of Mr. Grande's First Amendment rights prior to issuing discipline. (Wilson Dep. at 93.)

68. Wilson knew that the only reason for the investigation was Mr. Grande's speech. (Wilson Dep. at 97.)

69. Another Board administrator, Natasha Banks, did not recall any conversation regarding how the discipline would impact Mr. Grande's free speech rights. (Banks Dep. at 44–45.)[7]

70. Wilson's assistant, a law student, drafted the disciplinary letter, not Attorney Wilson. (Wilson Dep. at 113–18.)

71. As CEO of Hartford Public Schools, Superintendent Torres-Rodriguez would direct designees to handle teacher grievances and discipline. (Torres-Rodriguez Dep. at 38–41.)

72. When determining Mr. Grande's grievance related to the Letter, Torres-Rodriguez's direct designee had the ability and opportunity to overturn the discipline and chose not to. (Banks Dep. at 53, 64–65.)

73. Torres-Rodriguez stated in her deposition that she did not oversee and is not aware of any training for Board employees regarding the freedom of speech rights of teachers, nor did she ever provide any training to her designees on how to handle grievances. (Torres-Rodriguez Dep. at 23, 39.)

74. Hartford Public Schools' former human resources director, and the designee that handled Mr. Grande's grievance, testified that the mere expression of an opinion could be considered inappropriate or unprofessional at Hartford Public Schools. (Banks Dep. at 12–13.)

---

[7] The cited portions of Banks' deposition transcript are filed contemporaneously herewith as Exhibit F and referred to herein as "Banks Dep. at ___."

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: March 5, 2025 | /s/ Logan M. Hetherington |
|  | Logan M. Hetherington (phv207668) |
|  | Email: lmhetherington@fairnesscenter.org |
|  | Nathan J. McGrath (phv09816) |
|  | Email: njmcgrath@fairnesscenter.org |
|  | THE FAIRNESS CENTER |
|  | 500 North Third Street, Suite 600 |
|  | Harrisburg, Pennsylvania 17101 |
|  | Telephone: 844.293.1001 |
|  | Facsimile: 717.307.3424 |
|  |  |
|  | Craig C. Fishbein (ct25142) |
|  | Email: ccf@fishbeinlaw.com |
|  | Fishbein Law Firm, LLC |
|  | 100 South Main Street |
|  | P.O. Box 363 |
|  | Wallingford, Connecticut 06492 |
|  | Telephone: 203.265.2895 |
|  | Facsimile: 203.294.1396 |
|  |  |
|  | *Counsel for Plaintiff John Grande* |