Exhibit E

1     UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF CONNECTICUT

3

4

5     Case No. 3:24-cv-00010-JAM

6     -----------------------------------x

7     JOHN GRANDE,

8                  Plaintiff,

9        -versus-

10    HARTFORD BOARD OF EDUCATION, ET AL.,

11                 Defendants.

12    -----------------------------------x

13

14           DEPOSITION OF EDWARD WILSON JR.

15

16      Taken pursuant to the Federal Rules of Civil

17    Procedure, at the Hilton Garden Inn, 1181 Barnes Road,

18    Wallingford, Connecticut, before Vicki S. McManus, a

19    Licensed Shorthand Reporter and a Notary Public in and

20    for the State of Connecticut, on Wednesday,

21    November 13, 2024, at 9:05 a.m.

22

23

24

25

Edward Wilson, Jr.                                                                Job Date:11/13/2024

```
 1    BY MR. FISHBEIN:
 2        Q    And looking at EW4, is that a policy that was in
 3    place when you became employed by the district or is
 4    that something that was developed afterward?
 5        A    You know, I apologize.  I recognize this to be a
 6    document in our employee handbook.  I don't believe
 7    this is the policy.
 8        Q    Okay.  So why do you think that that's not the
 9    policy?  If it's in your handbook, why do you think
10    it's not your policy of the district?
11        A    Yeah.  So when you ask me about policy, policy
12    exists in our policies.  Our employee handbook, it
13    might create -- have information in it that has policy
14    references, but generally there is -- there are a lot
15    of things in our employee handbook that are not
16    necessarily policies.
17        Q    Okay.  So is there a Freedom of Speech policy
18    that is of the district?
19        A    I'd have to review the policies again.
20        Q    Okay.  But you do recognize that this what's been
21    marked as EW4 is a portion of the employee handbook?
22        A    It's not a complete document.  But as I'm looking
23    at the document, I believe this is a part of our
24    employee handbook.
25        Q    Okay.  Now, has the employee handbook been
```

Edward Wilson, Jr.                                                    Job Date:11/13/2024

```
 1   this case?

 2      A    I did not review this 2006 document before I

 3   issued my December the 10th letter.

 4      Q    That's fair.  The second letter from 2017 also

 5   predates your employment with the district.  So, once

 6   again, I would assume that you had nothing to do with

 7   this investigation or the issuance of this letter?

 8      A    That's correct.

 9      Q    And what role, if any, did this letter dated

10   March 8th, 2017, have in your determinations in this

11   case?

12      A    I did not review this letter prior to issuing the

13   discipline.

14      Q    Okay.  And you've already identified the

15   December 10, 2021, and we will get to that in a bit.

16         So is that the one that's marked?

17      A    Yes.

18      Q    We will just discard pile that.

19         Now, do you recall what brought to your attention

20   the complaint that underlies -- not the complaint that

21   was brought in this case, but the complaint that

22   underlied the disciplinary action by you?

23      A    How I became aware?

24      Q    Yes.

25      A    My recollection is that I was made aware via a
```

1      A    Okay.

2      Q    What led you to believe that Mr. Grande authored

3   the document that's been marked as EW10?

4      A    When I met with him, my recollection is that he

5   didn't dispute the contents of the document.

6      Q    Okay.  Did he ever say that he authored it?

7      A    He said he never signed it.

8      Q    Okay.

9      A    And I gave him more time to produce any

10  additional information that he wanted before any

11  predisciplinary decisions were made, based on his

12  statements that he didn't sign it.

13         Actually, I believe he said Suhail never followed

14  up with him.  And I was able to produce an email that

15  she actually did, and he didn't follow up with her.

16     Q    Do you recall when that exchange happened?

17     A    It would have been after the predisciplinary

18  meeting.

19     Q    But nonetheless, you utilized what's been marked

20  as EW10 in your determination in this case?

21     A    It's part of the investigation file.  For some

22  reason, I recall there was an additional statement from

23  him.  I could be wrong.  But any statements that he

24  would produce as well as what he shared in the context

25  of the predisciplinary meeting, as well as the other

1    A    Can I review my letter?

2    Q    Sure.

3    A    I'm sorry, can you repeat question?

4    Q    Sure.  What determination did you make as to

5  Mr. Grande using improper language during the breakout

6  session?

7    A    So there was a concern that he used vulgarity

8  during the session.

9    Q    Okay.  What finding did you make as a result of

10  your review with regard to vulgarity?

11    A    I found that he used vulgarity.

12    Q    Okay.  What vulgarity did you specifically find

13  that he used?

14    A    I believe the term was "bullshit."

15    Q    Okay.  And what was the basis of that

16  determination?

17    A    It's contained in the statements.

18    Q    Okay.  How many statements?

19    A    Multiple statements.

20    Q    More than three?

21    A    Definitely two.

22    Q    Okay.  And why would you make that determination

23  when Suhail Aponte did not?

24    A    Suhail Aponte didn't make any determinations.

25    Q    Okay.  She made a summary as to her

 1  activity and questions were hypocritical.

 2         And I believe your note -- that's an arrow,

 3  that's not a D or anything, right there at the end of

 4  the --

 5     A   That's an arrow.

 6     Q   Okay.  And your note says "How so?"

 7         That's what it says, right?

 8     A   Correct.

 9     Q   Do you recall:  Did you ask Mr. Grande about that

10  during your meeting?

11     A   I'm pretty confident that I did.

12     Q   Do you recall how he responded?

13     A   I know generally he took issue with the exercise.

14     Q   In what manner?

15     A   I think very similar to his statement about

16  the -- how he interpreted it to be a bashing, and he

17  might have used the term "critical race theory" and

18  words like that to discuss the exercise.

19     Q   Okay.  And in your mind, what is critical race

20  theory?  When somebody says, you know, like Mr. Grande

21  says that to you, I'm sure they didn't describe it.  So

22  what is your understanding?

23     A   What is my understanding of it?

24     Q   Yes.

25     A   The way I would understand it is, instruction or

1  information presented regarding race.

2    Q   Okay.  So any instruction regarding race is

3  critical race theory?

4    A   I don't know.  I didn't define the term, I didn't

5  come up with the term, I can't tell you I've done a lot

6  of research about the term.  I'm just telling you

7  that's what he shared.

8    Q   Sure.  And that's the extent of your knowledge as

9  to the utilization of that term?

10   A   I haven't done a wealth of research on that, on

11  the term.

12   Q   Do you find the utilization of that term to be a

13  positive or a negative?

14   A   I don't have an opinion on it.

15   Q   Okay.  When somebody characterizes something as

16  being critical race theory, you are neutral as to

17  opinion as to what that means or the implications or

18  anything like that?

19   A   Correct.

20   Q   Okay.  Anything else you recall that Mr. Grande

21  would have said in response to your inquiry about

22  hypocritical?

23   A   My recollection is this led into -- it led to a

24  discussion as to the nature of the exercise.

25   Q   In what manner?

1  pretty confident that I shared out that I myself took

2  it.  I know we had a conversation about the intent.

3       At that -- at that particular time, we had

4  students either being taught remotely, based on COVID.

5  We had, I mean, a national issue with student

6  engagement and how to engage students in learning.  The

7  exercise explored privilege over a lot of different

8  areas, race only being one of them.  With, my

9  understanding, one of the intents there was recognizing

10 how we show up, with the hope that that makes us have

11 more insight to properly show up for students based on

12 things that they might be going through and exploring

13 or confronting in their lives.  So I would have high

14 level shared that or some form of that kind of

15 conversation with Mr. Grande, with the hope to have

16 kind of like an interaction with him about what his

17 thoughts on the exercise was in light of the climate

18 that we are in.

19      And I do recall Mr. Grande -- pretty confident he

20 shared it wasn't relevant to what he does.  I don't

21 think he had too much of a response to what -- to

22 anything I was sharing out about student engagement.

23 Just not something that he thought he should have to

24 partake in.  And then I would say the conversation kind

25 of graduated into how he expressed himself among his

Edward Wilson, Jr.                                                                      Job Date:11/13/2024

```
 1    in our department.
 2          What is she referring to?
 3    A    You'd have to ask her.
 4    Q    Okay.  So you have no -- in the course of the
 5    investigation, because this is the second time she said
 6    something like this, you have no idea what she is
 7    talking about?
 8    A    I do not.
 9    Q    In the next one -- well, let me --
10          Eric Soucy.  What race is Mr. Soucy?
11    A    I believe he's a white man.
12    Q    And Catherine Barr is what race?
13    A    I believe she is a white teacher.  A white
14    female, sorry.
15    Q    Erin Dugan is the next one.  And she says:  Me
16    and this other female were the only ones talking and
17    participating in the conversation.
18          Where -- does she say that he used the term
19    "bullshit"?
20    A    If you keep reading.
21    Q    Yes.
22    A    Do you want me to read it?
23    Q    No, I see it.
24          But then she goes on to say:  He was very
25    dismissive and muted the whole time, and super
```

 1   dismissive.

 2         What weight did you give Erin Dugan's statement

 3   in making your determination of rendering discipline in

 4   the Grande matter?

 5   A    I gave both Miss Barr and Miss Dugan's statements

 6   significant weight.

 7   Q    Over and above the others?

 8   A    I gave them the most weight.

 9   Q    Okay.  And Miss Dugan, what race is she?

10   A    I believe she is a white female.

11   Q    The next would be Abigail Sutcliffe.  What race

12   is Abigail?

13   A    I believe she is also white.

14   Q    Now, in her statement also taken by Zoom, she

15   says at the end of the second paragraph:  I did not

16   take offense to it.  It was clear that he missed the

17   point.  I did not feel comfortable sharing my activity.

18         Is there a portion of her statement,

19   Abigail Sutcliffe's, that you found to be negative

20   against Mr. Grande?

21   A    There is a theme that's running through these

22   statements, whether or not the statement indicates that

23   there is vulgarities or how it landed for current staff

24   members.  If I look at Miss Sutcliffe's statement, this

25   statement is now talking from how this landed for her,

```
 1      Q   Okay.  Did you at any point think about the

 2   Freedom of Information or the -- the First Amendment

 3   right to speak by Mr. Grande in the course of his

 4   statements?

 5      A   I thought about it.

 6      Q   And what did that thought process look like?

 7      A   My review of the -- well, can you repeat your

 8   question one more time?  I'm sorry.

 9      Q   Sure.  What did the thought process around the

10   First Amendment right to speak look like in your mind?

11      A   So I would have reviewed this before I issued

12   discipline, and my thought would have been that there

13   was no violation on Mr. Grande's rights based on the

14   discipline.

15      Q   Is race an uncomfortable topic?

16      A   Depends who you are asking.

17      Q   Well, when you viewed the professional

18   development materials, did you think about if you were

19   a white female, how your impression of the content

20   would make you feel?

21      A   I'm sorry, I don't -- can you repeat that again?

22   I'm sorry.

23      Q   Sure.  I mean you said that discussions of

24   race -- I asked you whether or not it was an

25   uncomfortable topic, and you said it depends.  So I
```

```
 1   to, I think it was Eric's -- Abigail's.

 2          You said upon your review of her statement,

 3   although there was nothing negative against Mr. Grande,

 4   that it was your impression that something changed in

 5   the breakout room.  That's what you testified to.

 6                MS. STRANGE:  Objection.

 7   BY MR. FISHBEIN:

 8     Q   Was that your testimony?

 9     A   I could read you the sentence that says that.

10     Q   Sure.  Why don't you point us to that one.

11     A   The second paragraph.  So, mind you, the first

12   paragraph she is talking about a statement that

13   Mr. Grande made.

14          Second paragraph, second sentence:  This shifted

15   the mood and tone in the breakout room.

16     Q   Okay.  And you took that as being a bad thing?

17     A   I recall your questioning to be asking me what

18   weight I gave the statements.

19          Your question is whether or not there was

20   anything negative in this statement.  So my response

21   was, there was not anything negative in the statement,

22   but I was highlighting the theme in the statements as

23   to the credibility assessment that I was making.

24     Q   And the impression that there was

25   uncomfortability in the breakout room?
```

```
 1      A   Something occurred that caused staff members in

 2   that breakout room to feel uncomfortable and not fully

 3   engage in that training session.

 4      Q   So it's your impression that absent Mr. Grande's

 5   saying whatever he said, that there would have been

 6   more interaction in the breakout room?

 7      A   My interpretation is, absent what he said, we

 8   wouldn't have this investigation or these statements or

 9   staff members that are using terms like they are

10   disturbed, frozen, and felt honest rage in response to

11   stuff that Mr. Grande is saying in a breakout session.

12      Q   Okay.  And you are, once again, referring to

13   Catherine Barr, her statement?

14      A   Correct.

15      Q   Looking at the last page of the packet,

16   Timothy Keane, is there any portion of Mr. Keane's

17   statement that you found to be negative against

18   Mr. Grande?

19      A   No.

20      Q   And what race is Timothy Keane?

21      A   I think he's a white man.  But I will tell you

22   this:  I think everyone in this breakout group was

23   white except one person, and I'm not sure who the one

24   person was as I'm testifying to you today.  So this was

25   an all-white breakout room except for one individual.
```

1    Q   Claudia Portal is the next one.  And is there any

2    portion of Ms. Portal's statement that you found to be

3    negative against Mr. Grande?

4    A   No.

5    Q   Now, in fact -- well, I think you -- you have no

6    idea the process to create the statements, because it

7    appeared, like in the second sentence -- the third

8    sentence of her statement, it appears to be an

9    incomplete sentence:  Did not make me feel...

10        Right?

11   A   I didn't say I didn't know the process to do the

12   statement, but...

13   Q   Well, no, do you?  Because I thought -- it says

14   taken by Zoom, and I thought we talked about this.  So

15   what was the process to take these statements?

16   A   The investigator would meet with them and ask

17   them questions.  I told you I did not know what she

18   asked them.

19   Q   Okay.  So -- and then asked them questions, and

20   then the investigator would draft the statement?

21   A   Correct.  And send it back over.

22   Q   Okay.  It's your understanding that there is

23   somewhere some email that corroborates that this is

24   their statement?  That's what they are supposed to do?

25   A   Yeah, there should be.

1    Q   Okay.  She also goes on to say, two sentences

2    later:  I did not hear anything that was wrong.

3        Do you see that?

4    A   Where are you at?

5    Q   I'm in Claudia Portal, I'm in the third line at

6    the end, it starts --

7    A   I see it.

8    Q   Okay.  What weight did you give Claudia Portal's

9    statement in your determination to render discipline

10   against Mr. Grande?

11   A   I balanced that with that very last sentence:  I

12   was not paying attention, I was multitasking.

13       So I gave this statement pretty little weight.

14   Q   Okay.  Michael Pontecorvo, in the second line, he

15   says:  Don't think everyone was comfortable with the

16   topic.  Nothing hostile, nothing that I took offense.

17       Is there any portion of his statement that you

18   took as being negative against Mr. Grande?

19   A   No.

20   Q   What weight did Mr. Pontecorvo's statement take

21   in your determination whether or not to render

22   discipline against Mr. Grande?

23   A   I didn't give it a lot of weight.  I mean I would

24   note that that sentence starts with there is a

25   conversation that occurred, he leads with:  Nothing

1   hostile that he took offense to, which is an

2   interesting sentence structure.  Implication is

3   something might have occurred, but nothing hostile,

4   which is a pretty weighty term to utilize.

5       Q   Or it could be the implication that he's asked

6   whether or not anything hostile happened.

7       A   Okay.

8               MR. FISHBEIN:  Do you want to do a

9           bathroom break?  Take five?

10              (Brief recess taken.)

11  BY MR. FISHBEIN:

12      Q   Mr. Wilson, I just want to stick with EW13 for a

13  moment.  If you flip to the front page again, there was

14  something else that you circled.

15          Well, first of all, before we get to the circle,

16  the second note that you made, what does that say?

17      A   Denied swearing, question mark.

18      Q   Okay.  And the third note, so to speak, the

19  circling of "apologize," do you recall why you circled

20  that?

21      A   I don't recall why I circled it.

22      Q   Okay.  Do you know if or do you recall, when you

23  met with Mr. Grande, if you discussed him possibly

24  apologizing?

25      A   I did not discuss that with him.  And I believe

Edward Wilson, Jr.                                                        Job Date:11/13/2024

1   the statement seems like it's attributed to someone

2   else.  Someone else stated.

3       Q   Okay.  Do you know if Suhail Aponte interviewed

4   everyone that was in the breakout room?

5       A   I don't have any reason to believe that she did

6   not.

7       Q   Okay.  Do you know how she got the names of the

8   individuals that were allegedly in the breakout room?

9       A   I don't recall.

10      Q   Okay.  So if she didn't interview everyone that

11  was in the breakout room, would that be of concern to

12  you?

13      A   I'd want to know why.

14      Q   Okay.  And you indicated that one of the

15  individuals, to your recollection, was

16  African-American.  I don't know if you used that term.

17      A   I did not.

18      Q   Okay.  Everybody was white except for one person,

19  I think is what you said.

20      A   Correct.

21      Q   Do you know the race of the other individual?

22      A   I do not.

23      Q   Okay.  Do you know -- and I know these people

24  work at different schools; you don't necessarily know

25  all of them very well.

```
 1          Do you know if that individual that you believe
 2    was not white was one of the ones that we have a
 3    statement from?
 4       A    That we have a statement from?
 5       Q    Yes.
 6       A    I do not.
 7       Q    Okay.  Did any of the people who gave statements
 8    testify at the predisciplinary hearing?
 9       A    No.
10       Q    Did you invite them?
11       A    No.
12       Q    Is there a reason why you didn't?
13       A    That would not be the practice of the district.
14    I've never had a predisciplinary where we invited
15    individuals that gave statements.  That's why we ask
16    them to give statements.
17          It's not like a court trial.  You give statements
18    as part of the investigation and they're reviewed.
19       Q    Assuming that no -- well, I'll ask you anyway.
20    Assuming that nobody had said or claimed that
21    Mr. Grande had used the word "bullshit" during the
22    breakout session, would you still have disciplined --
23    rendered discipline?
24       A    Can you repeat the question?
25       Q    Sure.  Assuming that nobody had claimed that
```

```
 1   Mr. Grande used the word "bullshit" during the breakout

 2   session in their statements, would you still have

 3   rendered discipline?

 4       A   So there is also the component of this as to not

 5   necessarily what he said, but how he communicated out

 6   during that breakout session, which impacted the

 7   training session.

 8       Q   So I take it that your answer is that you would

 9   have rendered discipline anyway?

10           MS. STRANGE:  Objection.

11   BY MR. FISHBEIN:

12       Q   You can answer.

13           MS. STRANGE:  He did answer.  You want

14       him to answer the same question?

15           MR. FISHBEIN:  Well, he didn't answer it

16       yes or no.  That's the --

17           MS. STRANGE:  He doesn't have to.

18           MR. FISHBEIN:  Understood.

19   BY MR. FISHBEIN:

20       Q   Are you the sole person that made the

21   determination whether or not to discipline Mr. Grande?

22       A   Yes.

23       Q   You were not directed by any individual?

24       A   That's correct.

25
```

```
 1              (Plaintiff's Exhibit EW14 marked for

 2              identification.)

 3    BY MR. FISHBEIN:

 4       Q   Mr. Grande, I'm showing you a series of emails

 5    which culminates with you on, it looks like,

 6    October 18, 2021.  Can you -- you indicate:  Please

 7    edit as appropriate and submit signed statements by

 8    10/25.  I would assume 2021.

 9            What are you talking about there?

10       A   So Mr. Grande made the -- he indicated at the

11    predisciplinary that he never produced a signed

12    statement.  So I wanted to give him the opportunity to

13    provide me any additional information in the context of

14    whether or not he wanted to add any more detail to his

15    statement, etcetera.

16            He also had indicated that, I believe, Suhail

17    never followed up with him.  So what you'll see below

18    is I'm actually -- I believe I'm forwarding

19    communication from Suhail to Mr. Grande, and then I'm

20    also simultaneously giving him the opportunity to

21    submit anything additional he wants to submit before a

22    disciplinary decision is made.

23       Q   So going to the second page, January 29, 2021,

24    appears to be an email from Suhail to John, and it

25    says:  Good afternoon.  Attached is the statement you
```

1   Mr. Grande spoke.

2        Q    And Mr. Moses, do you recall what he said?

3        A    I don't recall everything he said.  I'm pretty

4   confident he advocated for Mr. Grande.

5        Q    At the time of the predisciplinary hearing, did

6   you give Mr. Grande and/or the union the ability to

7   bring anybody to testify on his behalf?

8        A    I mean we don't take testimony in a

9   predisciplinary meeting.

10       Q    You do take statements.  You allowed the

11  principal to speak.

12       A    Correct.

13       Q    So the question is:  Did you allow Mr. Grande

14  and/or the union to bring individuals, invite them to

15  bring individuals to speak on Mr. Grande's behalf?

16       A    I can tell you the union never requested that.

17       Q    At the time of the predisciplinary hearing, did

18  Mr. Grande -- was he in possession of the statements

19  that made up your file?

20       A    I don't know.

21       Q    Who writes the disciplinary letters?

22       A    I do.

23       Q    From beginning to end?

24       A    I'm not sure I understand your question.

25       Q    Do you write every portion of a disciplinary

```
 1   letter?

 2          Let me ask you more specifically.  In this case,

 3   did you write every portion of the Grande disciplinary

 4   letter?

 5      A   I believe I did.

 6      Q   Who's Robert Granoth?

 7      A   He was my labor manager.

 8      Q   And what does the labor manager do for you?

 9      A   So I don't currently have a labor manager, but --

10   so he can draft a letter.

11      Q   Draft what letter?

12      A   He could potentially draft a letter like this.

13      Q   I thought you just said that you draft the

14   letters.

15      A   I largely draft these letters.

16      Q   That's not what you just testified to.  I asked

17   you --

18      A   Okay.

19      Q   So --

20              MS. STRANGE:  Objection.

21              MR. FISHBEIN:  Let's mark this as EW15.

22              (Plaintiff's Exhibit EW15 marked for

23              identification.)

24   BY MR. FISHBEIN:

25      Q   And that appears to be a letter in the Grande
```

1   matter with an email from Robert Granoth to you,

2   Mr. Wilson, and it says "draft attached."  So how did

3   that come to be?

4       A    So I would have met with Mr. Granoth, who was my

5   direct report at the time.  I would have spoken to him

6   about the file.  I would have spoken to him about

7   where -- what the discipline's going to be on the file.

8   I would have shared out a working document that I've

9   created, and he would plug in like who was present at

10  it, those kind of things.  I would have told him the

11  training for this one, that I'm going to require

12  Mr. Grande to do, etcetera.

13          So I would have met with him about it and then I

14  would ask him to produce the document.

15      Q    When you say you would have, is that what you did

16  in this case?

17      A    Correct.

18      Q    So you didn't draft the Grande disciplinary

19  letter.

20      A    I apologize.  It was four years ago.  But from

21  reviewing this particular document --

22      Q    What's been marked as EW15.  It shows that you

23  did not draft the letter, correct?

24      A    Correct.

25      Q    And how often is it that someone else drafts a

Edward Wilson, Jr.                                                                    Job Date:11/13/2024

```
 1   disciplinary letter for you?

 2      A   It largely depends on what I might have going on

 3   at the time.

 4          I could tell you that I largely draft these

 5   letters, but based on the issues of the day, I need my

 6   direct report to support me in the work that we are

 7   doing as a department, that I might ask him to start

 8   the draft of a letter.  But I would thoroughly review

 9   the file with him and speak to him about where it's

10   going to land and what should be in the letter.  And so

11   that's kind of how that would happen.

12      Q   And when do you -- when did Mr. Granoth start to

13   draft the letter regarding Mr. Grande?

14      A   I don't recall.

15      Q   Well, isn't it possible that he started it before

16   even the disciplinary hearing started?

17      A   I do not recall.

18      Q   What time of the day did the disciplinary hearing

19   start?

20      A   I do not recall.

21      Q   What time of day did it end?

22      A   They are an hour long.

23      Q   Okay.  What time of day -- was it the afternoon,

24   was it the morning?

25      A   I cannot tell you what time a meeting started in
```

1    2021, sir.

2        Q    Okay.  You'd acknowledge that later the very same

3    day of the disciplinary hearing, Mr. Granoth sends you

4    a draft of the letter, correct?

5        A    That's correct.

6        Q    So what is Mr. Granoth's involvement with

7    investigations?

8             I think you said his title; he was your labor

9    representative, something like that?

10       A    He's a labor manager.

11       Q    Okay.  Labor manager.  What does that mean?

12       A    So he supports our labor operation.  His role at

13   that point, he's a law student -- he was a law student

14   then, he's now a lawyer.  He would support how we do

15   FOIs in the district.  He'd largely lean into making

16   sure our processes were as efficient as they could be.

17   He supported me with legal research and writing and

18   other spaces.  And if I needed support in situations

19   like this, he's someone that I could say, Hey, listen,

20   this is the file that we have, let's talk about it, and

21   can you produce a draft.

22       Q    Was he a full-time employee?

23       A    Correct.  Yes, he was.

24       Q    Was he going to law school at the same time?

25       A    He was in law school at night.

Edward Wilson, Jr.

```
 1      Q    And who hired Mr. Granoth?

 2      A    He was hired either by the deputy superintendent

 3   or by the superintendent.

 4      Q    Was he hired after you were?

 5      A    I think he was, shortly after I was.

 6      Q    And you were his supervisor?

 7      A    He later transferred to -- I had an opening.  I

 8   believe I interviewed for him -- him for the position,

 9   and I hired him.  He was in a position that was going

10   to be no longer in the superintendent's unit.

11      Q    Okay.  So when you say no longer in the

12   superintendent's unit, on December 10 of 2021 who was

13   his supervisor?

14      A    I would have been his supervisor.

15      Q    Okay.  But you said he transferred out of the

16   superintendent's unit.  Is that considered to be your

17   unit?

18      A    No.  He was -- he was initially hired, my

19   recollection is, as a -- like a legislative affairs

20   type individual.  That position subsequently got cut or

21   was about to be cut.  I had an opening.

22      Q    I got it.  Okay.

23      A    And I had worked previously with Mr. Granoth

24   because he also supported our communications for the

25   district.  And I was very impressed with his skill set,
```

1   recall the date offhand.  But I think it's fair to say

2   the cases starting October the 15th, I absolutely would

3   have been in the district.

4   BY MR. FISHBEIN:

5       Q   So as we go through these, in addition to the

6   information that's on the spreadsheet, do you have

7   additional information on these cases?  Do you have a

8   recollection of these cases?

9       A   I could try to answer any questions you ask.

10  These are back in 2019-2021.  I'll do the best I can.

11      Q   Okay.  So looking at -- and I guess we are going

12  to have to count down.  1, 2, 3, 4, 5.  The fifth one

13  down.  In that case, it appears it appeared at Fox.

14  And the teacher was alleged to have sworn in class,

15  saying:  They are fucking annoying and I hate this

16  fucking class.

17          That's the allegation.  Do you see that?

18      A   I do.

19      Q   And in that particular case, no discipline was

20  rendered.  Do you recall why?

21      A   I don't.

22      Q   And did you get involved in that case?

23      A   I do not recall.  I started in September of 2019.

24  I do not know the date that I started in September of

25  2019.