UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x
JOHN GRANDE,                                                      :
                                                                 :
                          Plaintiff(s),                          :
                                                                 :
            v.                                                   :          3:24-CV-00010 (SFR)
                                                                 :
HARTFORD BOARD OF EDUCATION ET AL.,                              :
                                                                 :
                          Defendant(s).                          :
---------------------------------------------------------------- x

### MEMORANDUM & ORDER

Plaintiff John Grande, a former teacher, brings claims of retaliation and compelled speech in violation of the First Amendment against the Hartford Board of Education and school officials Leslie Torres-Rodriguez, Edward Wilson, Jr., and Tracy Avicolli. Defendants have moved for summary judgment on both claims.[1] For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

I.      **BACKGROUND**

A.      **Factual Background**

The following facts are drawn from the parties' Local Rule 56(a) Statements, deposition testimony, and exhibits.[2]

---

[1] Grande sues the school official Defendants in their individual and official capacities. Compl. 4, ECF No. 1. The Complaint seeks monetary damages as well as declaratory and injunctive relief. *Id.* at 19-20.

[2] When Grande admits a fact stated in Defendants' Local Rule 56(a)1 Statement ("Defs.' L.R. 56(a)1 St."), ECF No. 43, I cite only to the paragraph of Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 St."), ECF No. 45, admitting that fact as true. Citations to the Local Rule 56(a) Statements are by paragraph number. With respect to other documents, page citations are to the page number generated by the ECF system. Because the parties provide different portions of the various depositions, citations to the depositions include the docket entry where the cited pages can be found.

This case centers around the Hartford Board of Education's investigation and reprimand of Grande for comments he made during a Zoom training held on October 28, 2020. The Hartford Board of Education (the "District") oversees the Hartford Public Schools. Pl.'s L.R. 56(a)2 St. ¶ 2, ECF No. 45. Grande began working as a physical education teacher for the District in 1989 and continued in that role until he retired on October 1, 2024. *Id*. ¶¶ 1, 67.

As a result of the COVID-19 pandemic, the Hartford Public Schools stopped in-person instruction for a period of time beginning on March 17, 2020. *Id.* ¶ 11. In fall 2020, Grande was teaching remote physical education to his students. *Id.* ¶ 12. At that time, Tracy Avicolli was the Director of Arts and Wellness. *Id.* ¶ 13.[3] Avicolli sent a survey to teachers within her department regarding the level of student engagement during remote classes. *Id.* ¶ 14. Grande answered the survey reporting that not many students were showing up to his remote classes. *Id.* ¶ 15. This lower attendance reflected a national problem of student engagement during the pandemic. *See id.* ¶ 19. After Avicolli conducted the survey, she scheduled a professional development training for teachers in her department. *Id.* ¶ 21.

Defendants assert that attendance at the training was mandatory. Defs.' L.R. 56(a)1 St. ¶ 27. In his Statement of Additional Material Facts, Grande states that he signed up for the training on his own accord. Pls.' L.R. 56(a)2 St. Add'l Material Facts ¶ 3.[4] Grande says that

---

[3] The parties dispute whether Avicolli or Grande's principal was his direct supervisor at this time. Defs.' L.R. 56(a)1 St. ¶ 13; Pl.'s L.R. 56(a)2 St. ¶ 13.

[4] When asked at his deposition if he was required to attend the training, Grande said: "Yes, I signed up for it." Grande Dep., ECF No. 45-2, at 8. In this Complaint, he said he was required to attend. Compl. ¶ 22, ECF No. 1 ("During the coronavirus pandemic, on October 28, 2020, Mr. Grande and other Board personnel were required to participate in a 'Professional Development (PD) session focused on race and privilege' that took place via a Zoom presentation and meeting, facilitated by Avicolli.").

some teachers were excused from the training, and teachers who were not working that day did not have to do the training. *Id*. ¶ 4. According to Grande, the principal of the school could have permitted him not to participate in professional development sessions and he did not participate in any such sessions in 2021. *Id.* ¶¶ 5, 7. Although Grande states that he did not view professional development as part of his job as a teacher, *id.* ¶ 6, he acknowledged at his deposition that professional development was a requirement for teachers, Grande Dep., ECF No. 45-2, at 4.[5]

Avicolli facilitated the training, which was held via Zoom on October 28, 2020. Defs.' L.R. 56(a)1 St. ¶ 24; Grande Dep., ECF No. 45-2, at 9. Grande joined from his home through a personal device. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 8. The training included a PowerPoint presentation, which the parties have supplied. Pl.'s L.R. 56(a)(2) St. ¶ 31; Privilege Presentation Slides, ECF No. 43-1, at 88-109. At the start of the training, Avicolli shared the results of her survey about student engagement. Pl.'s L.R. 56(a)(2) St. ¶ 30; ECF No. 43-1, at 90. The PowerPoint identifies as the "learning target" of the session the following goal: "I can explore my own identity and privilege to better understand how I relate to my students in order to increase engagement and collaboration." *Id.* at 92. The agenda for the meeting shows that the session would include an "Identity and Privilege Activity" and "Break-Out Group Reflection Time" as well as "Closure in Whole Group." *Id.* at 93. The PowerPoint explains that participants will "explore our privilege as related to various social identities" and says

---

[5] When asked at his deposition whether he understood that it "was part of your job to engage in professional development" he replied: "I wouldn't say it was part of my job. I think it was just a requirement that teachers had to do." Grande Dep., ECF No. 45-2, at 4.

"[w]e believe it is critical for everyone to reflect on privilege in this way in order to use our individual and collective privilege(s) for equity and social justice." *Id.* at 96.

The PowerPoint includes an "Identity Wheel" with pie slices that are labelled with categories including race, gender/sex, sexuality, nationality/citizenship, other, religion, class, and ability. *Id.* at 95. Each pie slice is divided into eight sections. The instructions explain that slides for each social identity will be displayed with eight statements that describe examples of "privilege related to that category's system of oppression and privilege." *Id.* at 97. Participants are instructed to shade a section of the wheel if their answer is "basically yes" to the statement. *Id.* Grande asserts that the statements "were strategically worded in a way that would prompt a 'yes' response from someone like Mr. Grande, who identifies as a straight, white, Christian male, and required him to shade in particular sections of his 'identity wheel.'" Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 11. Avicolli acknowledged at her deposition that she would expect straight, white men to answer "yes" to all of the statements on the sexuality, race, and gender race slides. Avicolli Dep., ECF No. 45-3, at 29-31.

At her deposition, Avicolli said the training was intended to address student engagement and "how we can better relate to our students in an environment that was very challenging." Avicolli Dep., ECF No. 43-1, at 53. Avicolli explained that "when we can be reflective on what we all bring and recognize that everyone has some privilege and comes from different backgrounds, experiences, and we can empathize, we can better connect with our students so that they can feel that we care." Avicolli Dep., ECF 45-3, at 29. She continued: "And that way, they are able to better internalize the content, be better learners and yes, achieve the standards of learning." *Id.* Another department had recently done a similar training and Avicolli chose to use that same presentation. Avicolli Dep., ECF No. 43-1, at 52-54. Avicolli

agreed that a goal of the presentation was to make the teachers understand how much privilege they had. Avicolli Dep., ECF No. 45-3, at 33.

After doing the activity, teachers participating in the training moved into smaller breakout groups with fellow teachers. Pl.'s L.R. 56(a)2 St. ¶ 33. The PowerPoint instructions for the breakout group discussion ask, "How did it feel to engage in this activity?" ECF No. 43-1, at 107. The "Norms in Breakout Groups" are listed as: "Assume positive intentions"; "You don't have to share if you don't feel comfortable doing so"; "It's OK to feel discomfort. This isn't easy!"; and "Agree to disagree respectfully." *Id.* at 108. The discussion prompts listed are: "Why is it important for us to aware of privilege as an aspect of our identities/experience?"; "How did completing this activity affect my understanding of myself?"; "How did completing this activity affect my understanding of my students?"; and "How does my identity impact my relationship with my students?" *Id.* at 109. Avicolli acknowledged that the breakout groups could be uncomfortable and she expected participants to be uncomfortable. Avicolli Dep., ECF No. 45-3, at 31, 35. She said no one was required to speak in the breakout groups. *Id.* at 32.

According to Grande, he started out the discussion in his breakout group by saying to the other teachers: "I was just man-bashed and white-shamed. I'm gonna sit here quietly." Pl.'s L.R. 56(a)2 St. ¶ 38. He said he added: "I'm not buying into this white-bashing BS." *Id.* ¶ 39. Defendants' Local Rule 56(a)1 Statement contains slightly different phrasing of Grande's statements: "I just got man bashed and white shamed, but I'm going to sit there quietly" and

"I'm not buying into that white bashing BS." Defs.' L.R. 56(a)1 St. ¶ 38.[6] Grande asserts that his comments sparked no reaction or disruption during the breakout group meeting itself. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 23.

Grande says he made his comments to address what he viewed as discriminatory content of the presentation because he did not "think teachers should have to go through this and have their race and gender and their sexual preference, you know, targeted or pointed at." Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 20 (quoting Grande Dep., ECF No. 45-2, at 19). Grande viewed the presentation as an attempt to indoctrinate teachers and ultimately students, which he found objectionable. *Id.* ¶ 21 (citing Grande Dep., ECF No. 45-2, at 41). Based on the prompts, Grande believed that the presentation targeted a certain class of people, including him, and was an exercise in "critical race theory," rather than one aimed at improving the education of students. *Id.* ¶ 12 (citing Grande Dep., ECF No. 45-2, at 19, 31).

In response to a written survey asking teachers about the presentation, Grande questioned how the training related to "art, music, or PE/health" and stated he believed the training was "part of the Superintendent's agenda to advance her career." *Id.* ¶ 26 (citing Grande Dep., ECF No. 45-2, at 43-44).[7] According to Avicolli, Grande was the only person who spoke out to say the presentation was objectionable. Avicolli Dep., ECF No. 45-3, at 25.

---

[6] Defendants' Local Rule 56(a)1 Statement quotes from Grande's deposition, which Grande says was paraphrasing the statements he made during the training. Defs.' L.R. 56(a)1 St. ¶ 38; Pl.'s L.R. 56(a)2 St. ¶ 38; Grande Dep., ECF No. 45-2 at 17-18, 32.

[7] Avicolli provided information from the survey response as part of the District's investigation of Grande. Grande says that Avicolli "produced an incomplete and potentially altered survey response that she attributed to Mr. Grande during the investigation." Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 44.

Following the training, a teacher emailed Avicolli to complain about Grande's comments in the breakout session. Pl.'s L.R. 56(a)2 St. ¶ 42. The teacher began her email by thanking Avicolli for leading the session and noting: "I am looking forward to growing in the uncomfortable and seeing our department change because of it." ECF No. 43-1, at 113. The teacher went on to report that there "was a pretty terrible interaction right at the start of my breakout room's session." *Id.* According to the teacher, Grande said: "I'm not buying this white bashing bullshit. I've been teaching 33 years and never had to deal with this before, and don't plan to now." *Id.* The teacher acknowledged that some in the group "agreed that they didn't get why anyone should have guilt, and that you 'just live with the cards you are dealt with in life.'" *Id.* The teacher concluded by saying "I am hoping something can be done about this." *Id.*

At her deposition, Avicolli said that upon receiving the complaint by email from the teacher, she was upset and responded right away. Avicolli Dep., ECF No. 45-3, at 6, 10. Avicolli said she thought the teacher's "feelings and her perspective" were important, it was "important . . . that the behavior, the alleged behavior, be addressed," and "the context and the subject of the training" were important. *Id.* at 10. Avicolli agreed that upon receiving the teacher complaint she had decided right away that something had to be done about what Grande had said. *Id.* at 10-11. Avicolli said she wanted to prevent behavior like Grande's from being "brought into our learning space again." *Id.* at 14. Avicolli explained she found the use of the word "bullshit" in a professional learning session at school "inappropriate" and "unprofessional." *Id.* at 7. She said she also found Grande's comment inappropriate and unprofessional because it showed "resistance in having a growth mindset or an open perspective," which she found concerning to her as an educator. *Id.*

Upon receiving the email from the complaining teacher, Avicolli immediately forwarded the email to Madeline Negron, her supervisor. *Id.* at 11, 25. Avicolli said she did not reach out to Grande to ask him what he said or talk to anyone else about what happened. *Id.* at 12. This was the only time Avicolli had referred someone for an investigation regarding behavior at a professional development session and the only investigation she has ever participated in at the Hartford Public Schools. *Id.* at 15, 36. Avicolli acknowledged at her deposition that teachers had behaved in a "disrespectful," "unprofessional," and "unacceptable" manner at a previous training by "coming late, leaving early without permission, playing with the PE equipment, talking loudly during presentations, and refusing to work with colleagues." *Id.* at 36-37. However, she did not refer these teachers for investigation because their behavior was not "as aggressive and egregious" as Grande's. *Id.* at 37. In particular, "these behaviors would not lead to a situation in which other colleagues would either be in a position to not share their own feelings or opinions or have impact." *Id.*

The District commenced an investigation following the teacher's complaint. Pl.'s L.R. 56(a)2 St. ¶ 45. Edward Wilson, the District's Executive Director of Internal Investigations and Security, appointed Suhail Aponte, the Labor Investigator/Information Specialist for the District, to investigate the complaint against Grande. *Id.* ¶¶ 46, 48. Aponte confirmed at his deposition that Grande's comments at the training prompted the investigation. Aponte Dep., ECF No. 45-4, at 8.

On November 10, 2020, Avicolli wrote to the other teachers who were in the breakout room saying that it had come to her attention that "a fellow teacher was making inappropriate and aggressive comments in your breakout room." ECF No. 45-3, at 43. She said she was "extremely upset and saddened by this behavior, not only about the comments themselves, but

because that teacher created an unsafe and hostile environment for you to be able to participate in our session." *Id.* Avicolli let the teachers know that the incident was being investigated and they might be contacted by Aponte. *Id.* She ended by saying: "I am so sorry you had this experience during our dept. professional learning session and please know this behavior is unacceptable." *Id.* In explaining the email at her deposition, Avicolli said that by using the word "unsafe" she meant that Grande's comments "could have created an environment in which somebody felt uncomfortable." Avicolli Dep., ECF 45-3, at 13.

Avicolli participated in a meeting with Grande and Aponte on January 29, 2021. *Id.* at 17. As a part of the investigation, Aponte interviewed teachers who had participated in the small group discussion with Grande. Defs.' L.R. 56(a)1 St. ¶¶ 49-55. Teachers provided statements that Aponte typed up and then had the teachers review and approve. Grande Dep., ECF No. 45-4, at 3-4; ECF No. 43-1, at 116-19; Defs.' L.R. 56(a)1 St. ¶¶ 52-55. The statement from the teacher who had complained by email says that Grande said "I am not buying into this white-bashing bullshit." ECF No. 43-1, at 117. The teacher's statement says: "The comment was very disturbing. At the time, I felt frozen and felt honest rage for not saying something to him. It makes me very uncomfortable. That statement deeply affects the community I serve. I cannot stand for a statement that is against my moral beliefs. His comment demonstrate[s] privilege. And it was disrespectful to the work that we are trying to start in our department." *Id.* The teacher's statement said she "could not let this slide by" and, following the session, she "immediately texted my friends because I needed some support." *Id.*

Another teacher's statement says Grande said: "I am not buying into this white bashing bullshit." *Id.* at 118. The statement says the "breakroom was very uncomfortable" and Grande was "super dismissive" and "kept rolling his eyes." *Id.* at 118. Other teachers interviewed did

not indicate in their statements that they were distressed or offended by Grande's comments. One teacher's statement says Grande was "trying to be lighthearted by getting the conversation started." ECF No. 43-1, at 116. The statement says: "I do not remember hearing swear words" and "no one said anything offensive." *Id*. Another teacher's statement says that he thought Grande "missed the point of the activity," and Grande's comments "shifted the mood and tone in the breakout room," but he did not take offense to the comments. *Id.* at 119. Three other teachers provided statements. Their comments include "[n]o one made a comment in the breakout room," "[n]othing really struck me as odd during the meeting," and "[n]othing hostile, nothing that I took offense." *Id.* at 120.[8]

Grande was contacted as a part of the investigation and made a statement to Aponte. Pl.'s L.R. 56(a)2 St. ¶¶ 56, 57; ECF No. 43-1, at 115.[9] Grande disputes that he said "bullshit." Pl.'s L.R. 56(a)2 St. ¶ 40; Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 22. The parties have agreed, however, that "BS" may be commonly understood as a synonym for bullshit. *Id.*

After conducting the investigation, Aponte forwarded the investigation materials to Edward Wilson, who reviewed the investigation file. Pl.'s L.R. 56(a)2 St. ¶¶ 58-59. Several times in February and March 2021, Avicolli checked in with Aponte on the status of the investigation, stating that she did not want Aponte's "recommendation to Ed for John Grande to be forgotten." ECF No. 45-3, at 49.

---

[8] Grande acknowledges that the teachers gave statements that Aponte prepared. Pl.'s L.R. 56(a)(2) St. ¶¶ 52-55.

[9] Grande's Rule 56(a)2 Statement says that he did not approve or sign the statement attributed to him. However, he cites only to his unverified complaint as support. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 47.

Wilson decided to schedule a pre-disciplinary meeting with Grande, which occurred in October 2021. Pl.'s L.R. 56(a)(2) St. ¶ 60. Grande says that at the meeting, Wilson informed Grande that he was accused of using "vulgarities" during the breakout session. Grande Dep., ECF No. 45-2, at 36-37. At his deposition, Wilson explained that he thought one of the intents of the privilege exercise was to help teachers "have more insight to properly show up for students based on things that they might be going through and exploring or confronting in their lives." Wilson Dep., ECF No. 45-5, at 9. Wilson thinks he would have "high level shared that or some form of that kind of conversation with Mr. Grande" when he met with him for the pre-disciplinary meeting. *Id.* Wilson says that at the meeting, Grande shared his opinion that the content of the training was not relevant to his work as a teacher. *Id.* Wilson understood that Grande took issue with the exercise because "he interpreted it to be a bashing." Wilson said Grande might have used the term "'critical race theory' and words like that to discuss the exercise." *Id.* at 7.

According to Defendants, following the pre-disciplinary meeting, Wilson determined that Grande used inappropriate language during the breakout session. Defs.' L.R. 56(a)1 St. ¶ 62. Defendants say that Wilson "made the decision to discipline Grande because of what he said and 'how he communicated out in the breakout room, which impacted the training session.'" *Id.* ¶ 63.[10] At his deposition, Wilson said he concluded that "absent what [Grande] said, we wouldn't have this investigation or these statements or staff members that are using terms like they are disturbed, frozen, and felt honest rage in response to stuff that Mr. Grande

---

[10] Defendants slightly misquotes Wilson, who said in his deposition that he disciplined Grande for "how he communicated out during that breakout session, which impacted the training session." Wilson Dep., ECF No. 43-1, at 44.

is saying in a breakout room." Wilson Dep., ECF No. 45-5, at 14. Wilson said he determined that Grande had used "vulgarity" during the breakout session, and he believed the term Grande used was "bullshit." *Id.* at 6. Grande asserts that Wilson did not provide a direct answer when asked if he still would have initiated discipline but for the accusation that Grande said the word "bullshit." Pl.'s L.R. 56(a)(2) St. ¶ 63 (citing Wilson Dep., ECF No. 45-5, at 20).

Grande maintains that he was disciplined based on his speech. *Id.* At his deposition, Wilson acknowledged that he considered Grande's First Amendment rights prior to issuing discipline. Wilson Dep., ECF No. 45-5, at 12. Wilson was aware of the District's employee handbook provision regarding freedom of speech. *Id.* at 3. The provision provides that employees "have the same guarantees of freedom of speech as provided under the First Amendment of the United States Constitution and applicable case law" and "[n]o employee of the Hartford Public Schools will be subject of disciplinary action or retaliatory action of any kind as a result of the exercise of his or her free speech rights." ECF No. 43-1, at 76. The policy also says that "employees of the Hartford Public Schools have the right to speak out on matters of public concern before the Hartford Board of Education or to speak out on such matters in any other forum." *Id.*

On December 10, 2021, Grande received a written letter of reprimand "for making inappropriate and unprofessional comments" in the breakout session at the training. Pl.'s L.R. 56(a)(2) St. ¶ 65; ECF No. 43-1, at 124. The letter states that "[e]mployee behavior that does not reflect positive social values will have a negative influence on students and fellow employees and is unacceptable." ECF No. 43-1, at 124. The letter observes that some staff members alleged Grande used "foul language" and noted Grande denied using inappropriate or profane language. *Id.* at 123. The letter stresses: "To be clear, this finding is not based on

your opinions or feeling regarding the training; it is based solely on the way you expressed those sentiments which was inappropriate, unprofessional, and made several staff members uncomfortable." *Id*. at 124. The letter informs Grande that the violations of District policy in which he engaged are "unacceptable," "any future failure to follow expected standards of conduct will not be tolerated," and future misconduct could lead to disciplinary action, including termination of employment. *Id.* In addition to the formal reprimand being placed in Grande's file, he was required to take a "Sensitivity Awareness" training. *Id.* at 124. The letter is signed by Wilson and lists on the letterhead the District, Torres-Rodriguez, and Wilson. *Id.* at 123, 125.

Defendants say Wilson was the sole decisionmaker on Grande's discipline. Defs.' L.R. 56(a)1 St. ¶ 64. Grande denies that Wilson was the sole decisionmaker in the disciplinary decision and says Avicolli and Torres-Rodriguez also had involvement. Pl.'s L.R. 56(a)2 St. ¶ 64. Grande asserts that Avicolli determined that something had to be done based on Grande's speech as soon as she saw the email from the complaining teacher. *Id.*; Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 36. Avicolli referred Grande for an investigation, contacted teachers who had been in the breakout room to express that Grande engaged in inappropriate conduct, and repeatedly checked on the status of the discipline process. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶¶ 38, 41-42; ECF No. 45-3, at 43, 48-50. Regarding Torres-Rodriguez's involvement, Grande states that as Superintendent of the Hartford Public Schools, Torres-Rodriguez directed designees to handle teacher grievances and discipline. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 71; *see also* Torres-Rodriguez Dep., ECF No. 45-1, at 10-13. Grande also asserts Torres-Rodriguez's direct designee could have overturned Grande's discipline. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 72. Grande asserts that Torres-Rodriguez was not

aware of any training for District employees regarding the free speech rights of teachers nor did she provide any training to her designees on how to handle grievances. Pl.'s L.R. 56(a)2 St., Add'l Material Facts ¶ 73; Torres-Rodriguez Dep., ECF No. 45-1, at 8, 11.

Grande continued to work for the District until his retirement on October 1, 2024.  Pl.'s L.R. 56(a)2 St. ¶ 67.

### B.  Procedural History

Grande filed his complaint on January 3, 2024. Compl., ECF No. 1. This case was transferred to me on January 27, 2025. ECF No. 39. On February 5, 2025, Defendants moved for summary judgment on all claims. Defs.' Mot. Summ. J., ECF No. 41. Grande filed a memorandum opposing summary judgment on March 5, 2025. Pl.'s Mem., ECF No. 44. Defendants replied on March 19, 2025. Defs.' Reply, ECF No. 47.

## II.  LEGAL STANDARD

The Court will grant a motion for summary judgment only if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-CV-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-CV-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

When deciding a motion for summary judgment, the Court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier*, 2007 WL 685181, at *4. In reviewing the record, the Court

must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

On summary judgment, the Court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). When reviewing the record on a motion for summary judgment, the Court must "assess the record in the light most favorable to the non-movant" and "draw all reasonable inferences in the non-movant's favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (quoting *Anderson,* 477 U.S. at 249).

## III.   **DISCUSSION**

### A.      **Retaliation in Violation of the First Amendment**

Grande brings a claim for retaliation in violation of the First Amendment. To establish a claim for First Amendment retaliation, Grande must demonstrate that: (1) his speech or conduct was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection between the protected activity and adverse employment action. *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).

Defendants do not appear to dispute that Grande meets the second and third requirements for purposes of surviving summary judgment.[11] Grande received a "letter of reprimand" following the conclusion of the investigation. Pl.'s L.R. 56(a)(2) St. ¶ 65. Reprimanding an employee is an adverse employment action for purposes of First Amendment retaliation claims. *Montero v. City of Yonkers*, 890 F.3d 386, 401 (2d Cir. 2018). Moreover, Grande has provided sufficient evidence at this stage of the case to establish a causal connection between his speech and the reprimand. *Mago v. Finnucan*, No. 3:20-CV-1466 (MPS), 2021 WL 1617188, at *5 (D. Conn. Apr. 26, 2021) (stating that to establish causal connection plaintiff must "show that 'the protected conduct was a substantial or motivating factor' for the defendant's action") (quoting *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)). Accordingly, Grande has established these two requirements for purposes of surviving summary judgment.

Defendants argue that Grande has failed to show a genuine issue of material fact regarding the first requirement—i.e., that Grande engaged in speech or conduct protected by the First Amendment. Public employees "do not automatically surrender all their rights of free expression at the office door." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 395 (2d Cir. 2018). Rather an "employee may be protected from retaliation even when speaking in the workplace when he or she is speaking 'as a citizen . . . upon matters of public concern.'" *Id.* at 395 (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)). "[T]he First Amendment

---

[11] Defendants note that not all of Plaintiff's statements and characterizations are factually accurate, but they are "proximate enough for the purposes of this motion and therefore are accepted as true and used by Defendants for purposes of this motion only." Defs.'s Mem. 6 n.1, ECF No. 42. Defendants state that they "reserve the right to dispute such testimony and to correct same should further litigation be necessary." *Id.*

inquiry must proceed in two parts. 'The first [component] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "If the first component is present, an employer must then show that it 'had an adequate justification for treating the employee differently [based on his or her speech] from any other member of the general public.'" *Id.* (quoting *Garcetti*, 547 U.S. at 418).

### 1.    Private Citizen

Defendants argue that Grande's speech was unprotected because he was speaking pursuant to his official duties rather than as a private citizen. According to Defendants, Grande's speech was "related to his job duties because attending professional development was mandatory for all District teachers" and his speech "specifically pertained to content of the training that Plaintiff participated in as part of his job duties." Defs.' Reply 8-9. Grande argues that his comments were not pursuant to his official duties as a teacher because the comments were not required by his job or in furtherance of his duties as a physical education teacher. Pl.'s Mem. 25-30. Resolving all factual issues and drawing all inferences in Grande's favor as I must at this stage of the case, I conclude that Grande's comments in the breakout group were not made pursuant to his official duties.

The Second Circuit has "identified two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue exist[s]." *Montero*, 890 F.3d at 397 (internal quotation marks omitted). However, a lack of a civilian analogue is "not critical to a decision as to whether [an employee] spoke as a private citizen." *Id.* at 398.

As the Second Circuit has stressed, the relevant question is whether the speech was *pursuant* to the employee's official job duties not whether it *related* to the duties. *Id.*; *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) (stating that the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties"). Speech in a private setting at work may still be protected. *Garcetti*, 547 U.S. at 420 (stating "[t]hat [the plaintiff] expressed his views inside his office, rather than publicly, is not dispositive" as "[e]mployees in some cases may receive First Amendment protection for expressions made at work").

A teacher's duties may extend beyond those involving direct interactions with students. The Second Circuit stated in *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010), that "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Id.* at 203. In *Weintraub*, the court concluded that a teacher's speech in the form of a union grievance challenging the school administration's decision not to discipline a student for throwing a book at him in class was pursuant to official duties as "it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203 (citations omitted); *id.* at 198 (concluding that "filing of the grievance was in furtherance of one of [plaintiff's] core duties as a public school teacher, maintaining class discipline").

*Weintraub* distinguished the Supreme Court's decision in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979), where an English teacher had expressed concern to the school principal about the impression that the "respective roles" of white and

black employees in different positions at the school would leave on black students. The Second Circuit explained that in *Givhan*, "the grievance [the teacher] aired was not in furtherance of the execution of one of her core duties as an English teacher." *Weintraub*, 593 F.3d at 203. Rather, "Givhan's grievance concerned the general impression that black[] students might take away from the staffing of non-teaching positions; Weintraub's grievance, in contrast, concerns the administration's refusal to discipline a student who threw books at Weintraub during class." *Id.*

In *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015), the Second Circuit concluded that a police officer engaged in protected speech when he spoke to his commanding officers about an arrest quota policy at his precinct of the New York City Police Department. The court observed that "[s]uch policy-oriented speech was neither part of [the plaintiff's] job description nor part of the practical reality of his everyday work." *Id.* at 174. Accordingly, the court concluded the plaintiff's speech was as a citizen and not as an employee because his "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders." *Id.*

Defendants argue that Grande's speech addressed topics "related" to his effective job performance as a teacher because the training explored "poor student engagement." Defs.' Mem. 22. But the critical question is not whether the topic of the speech *relates* to a person's job duties but rather whether comments are made *pursuant* to the person's job duties. *Montero*, 890 F.3d at 398 (holding that district court erred in ruling that employee's speech was not protected because it was "tangentially *related* to his official duties" when the relevant question is whether the speech "was made *pursuant* to [the employee's] employment duties") (emphasis in original).

20

The parties dispute whether Grande was required to attend the training but it is undisputed that Grande was not required by his employer to speak during the breakout session. Although Grande spoke at a professional development training session purportedly related to student engagement, Grande's comments were not directed at how to engage students in his class. Rather, Grande voiced his opinion that an exercise at the training targeted teachers in a discriminatory manner based on their race and gender. Grande's criticism of a social identity exercise as discriminatory is not "'part-and-parcel of his concerns' about his ability to 'properly execute his duties'" as a teacher—and thus unlike the teacher's complaint in *Weintraub* that a student had not been disciplined for throwing a book at him in class. Instead, Grande's speech is like the police officer's policy-related speech in *Matthews*, as Grande's "actual, functional job responsibilities did not include reporting his opinions" that a social identity exercise was discriminatory. *See Matthews*, 779 F.3d at 174; *see also Burns v. Dep't of Pub. Safety*, 973 F. Supp. 2d 141, 152 (D. Conn. 2013) (denying summary judgment to defendants where they failed "to identify any official duty of [a police detective] pursuant to which he was acting when speaking about" the Department of Public Safety's efforts to collect DNA from detectives, noting that detective's speech "did not clearly concern his ability to properly execute his official duties"); *Gusler v. City of Long Beach*, No. 10 Civ. 2077 (AMD) (AKT), 2016 WL 11493644, at *19 (E.D.N.Y. Aug. 4, 2016) (concluding that when fire department lieutenant wrote to the City Manager questioning decisions by the chief, he was speaking as a citizen, because record evidence did not suggest that "the plaintiff's duties included complaining about his supervisors, accusing them of misconduct, or sharing his views on fire department policy").

Defendants argue that there is no relevant civilian analog to Grande's speech because he spoke during a teachers-only training. Defs.' Mem. 20; Defs.' Reply 9-10. In contrast, Grande asserts that the speech was akin to a "discussion of politics with a co-worker," which *Garcetti* recognizes as an example of speech with a citizen analogue. Pl.'s Mem. 29. Grande states that the speech occurred during an "optional discussion" with fellow teachers about race and privilege—inherently political topics. *Id.* at 29-30. As noted, the presence of a civilian analog is not dispositive but rather a factor to consider in ultimately determining if the speech is itself ordinally within the scope of employee's duties. *Montero*, 890 F.3d at 395 (stating that "[a]lthough the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, '[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties'") (quoting *Lane*, 573 U.S. at 240).

Here, even accepting Defendants' view that there is no relevant civilian analog, Defendants have failed to establish based on undisputed facts that Grande's comments were made pursuant to his job duties as a physical education teacher. Instead, resolving all disputes and drawing all inferences in Grande's favor, the practical reality of Grande's everyday work as a physical education teacher did not include critiquing social identity exercises as targeting participants in a discriminatory manner.

### 2.      Public Concern

Defendants assert that when Grande spoke in the breakout session he was airing personal grievances to other teachers rather than speaking on a matter of public concern. Defs.' Mem. 20. Grande asserts that his comments that the training exercise was "white bashing BS" and he felt "man bashed and white shamed" were directed at what he perceived as gender and

race-based discrimination in the workplace and therefore matters of public concern. Pl.s' Mem. 22.

"Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021). To identify matters of public concern, courts consider "the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large." *Id.* (internal quotation marks and alteration omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

In *Connick*, the Supreme Court referred to the "right to protest racial discrimination" as "a matter inherently of public concern" regardless of whether the protest is communicated in a public or private forum. *Id.* at 148 n.8. The Second Circuit has noted that it has "held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern." *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005); *see also Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d Cir. 2013) ("Whether or not Garcia held the press conference solely out of a desire to protect his reputation, he spoke about a matter of public concern, namely, whether the police department was discriminating against Hispanics.").

Defendants say that Grande calling the training "BS" makes clear he was airing his own personal grievance with the training and, even had the comments been made publicly, they

"would convey no information to the public other than the fact that Plaintiff disagreed with the content of the training." Defs.' Mem. 21. However, Grande did not merely call the training exercise "BS." Rather, drawing all inferences in Grande's favor, his comments that the exercise was "white-shaming BS" and that he was just "man-bashed and white-shamed" communicated his belief that the exercise discriminated against certain groups of individuals based on race and gender. Although Grande's motive in speaking out is not dispositive, he has stated that he was concerned not only about his own experience but with the experience of other teachers. In particular, Grande explained in his deposition that his motivation for the comments was that he didn't think "teachers should have to go through this and have their race and gender and their sexual preference, you know, targeted or pointed at." Grande Dep., ECF No. 45-2, at 19; *see also id.* ("I viewed this training as targeting a certain group."). Wilson said that Grande raised a concern at the pre-disciplinary meeting that the exercise was "a bashing" and Grande might have used the term "'critical race theory' and words like that to discuss the exercise" with Wilson in the meeting. Wilson Dep. 45-5, at 7. Accordingly, resolving all factual disputes and drawing all inferences in Grande's favor, Grande's comments were not simply personal grievances and instead related to broader issues of social and political concern.

### 3. Balancing of Interests

Defendants assert that even if Grande was speaking as a private citizen on a matter of public concern, the District had a legitimate interest in "the effective administration of its professional development that outweighed Plaintiff's interest to engage in his speech." Defs.' Mem. 22. According to Defendants, Grande's "comments had the potential for disruption and indeed were disruptive as evidenced by the fact that an employee complained about" Grande's speech. *Id.* at 23. Grande responds that his speech did not disrupt the breakout session as the

session was quiet before Grande spoke and, according to the teacher who complained, no one in the "group entertained Grande's comment" after he spoke. Pl.'s Mem. 32. In addition, Grande asserts that he had no prior contact or continuing interactions with the teacher who complained and, given the comments were in a teacher-only session, there was no potential for disruption based on any reactions from parents or students. *Id.* Finally, Grande stresses that Defendants have failed to show anything more than a desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint—which cannot by itself be reason to curtail speech. *Id.* at 31-32.

"So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419. Pursuant to the *Pickering* balancing test, the court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968). "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011) (internal quotation marks omitted).

In cases where a government employer cites a concern about disruption as the justification for taking adverse action against a public employee for speech on matters of public concern, *Pickering* analysis permits the adverse action if "(1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in

retaliation for the employee's speech, but because of the potential for disruption." *Castine v. Zurlo*, 756 F.3d 171, 175 (2d Cir. 2014); *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995). The burden of demonstrating these elements is on the defendant. *See Castine*, 756 F.3d at 177. In assessing disruption, courts consider whether the statement "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

"As a general rule, the application of the [*Pickering*] balancing test is a question of law which is properly performed by the district court." *Gorman-Bakos v. Cornell Co-op Extension*, 252 F.3d 545, 557 (2d Cir. 2001). But when, "[a]mong other items, the parties disagree as to . . . whether the . . . speech disrupted, or had the potential to disrupt, the [employer's] functioning" and whether "plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech," then those questions are "to be answered by the jury prior to the court's application of the *Pickering* balancing test." *Id.* (citation omitted). "[A]fter these underlying factual disputes are decided by a factfinder, the district court should consider the factual findings to come to its own legal conclusions about whether the employer's interest in efficiency or the employee's interest in free speech is paramount." *Id.* at 558; *accord Persaud v. City of New York*, No. 22-CV-2919 (AS), 2024 WL 2159852, at *6 (S.D.N.Y. May 14, 2024); *see also Gusler v. City of Long Beach*, 715 F. App'x 68, 70 (2d Cir. 2018) (summary order) ("In some cases the 'question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation is properly

regarded as a question of fact to be answered by the fact finder before application of the *Pickering* balancing test.'") (quoting *Johnson v. Ganim*, 342 F.3d 105, 114 (2d Cir. 2003)).

Other than pointing to a single teacher's complaint, Defendants provide no argument for how Grande's speech was disruptive or potentially disruptive. Defendants' only argument about disruption in its memoranda is: "Plaintiff's comments had the potential for disruption and indeed were disruptive as evidenced by the fact that an employee complained about Plaintiff's speech." Defs.' Mem. 23. The complaining teacher said that Grande's comment made her "very uncomfortable," and was "very disturbing," "deeply affects the community" served by the Hartford Public Schools, against her "moral beliefs," and "disrespectful to the work that we are trying to start in our department." ECF No. 43-1, at 117. There is no question that the complaining teacher disagreed with Grande's viewpoint and was upset when she heard his comments. But "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969); *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782-83 (9th Cir. 2022) (denying summary judgment noting that "while some of the training attendees may have been outraged or offended by [the teacher's] political expression, no evidence of actual or tangible disruption to school operations has been presented" and "[s]peech that outrages or upsets co-workers without evidence of 'any actual injury' to school operations does not constitute a disruption").

Defendants rely on *Grillo v. New York City Transit Authority*, 291 F.3d 231 (2d Cir. 2002), where the Second Circuit held that an employee had not engaged in protected speech

when he said at a training that certain management techniques were "women's stuff," and "women who dress like that [like the women in the building where the class was being held] should expect to be grabbed and pulled on." *Id.* at 233. The Second Circuit reasoned that "even if this comment raised matters of public concern, Grillo's employer was justified in restricting his speech given the mildness of the sanction (a rebuke), the comment's tenuous connection to matters of public concern, and its significant potential for disruption." *Id.* at 236. The court reasoned that "[i]n addition to its obvious provocativeness, we note that this statement advocated to future NYCTA supervisors behavior that could have subjected them and their employer to liability for violating various laws." *Id.* Here, in contrast, Defendants have posited no such concerns about liability regarding Grande's comments.

Grande shared his comments in a breakout room that specifically encouraged teachers to share their thoughts and agree to disagree. ECF No. 43-1, at 107-08. The exercise appears to have been designed with the expectation that participants might feel uncomfortable, as the instructions informed participants: "It's OK to feel discomfort. This isn't easy!" *Id.* Indeed, the teacher who complained about Grande appears to have anticipated discomfort about the topic of the training as she thanked Avicolli for holding the session and said she was looking forward to growing in "the uncomfortable" and seeing change in the department as a result. *See* ECF No. 45-3, at 41. Accordingly, the only evidence of disruption pointed to by Defendants is the fact that a teacher felt uncomfortable at a session designed with the expectation that participants would feel uncomfortable.

Grande's comments were not made to students or parents at the school. Instead, Grande spoke via Zoom to a small group of teachers who worked at different schools. ECF No. 43-1, at 115-20. Grande had never had previous contact with the teacher who complained about him.

Grande Dep., ECF No. 45-2, at 33. Defendants have not provided evidence that it was anticipated that Grande would work with anyone in the breakout room in the future. Accordingly, Defendants have not established based on undisputed facts that Grande's comments could be expected to disrupt his relationships with coworkers at his school or the operation of the District. Drawing all inferences and resolving all factual disputes in Grande's favor, as is required at this stage of the case, these circumstances raise questions about the reasonableness of assessing Grande's comments as disruptive to school operations.

Moreover, there is a disputed issue of fact regarding whether Grande was reprimanded based on a determination that his comments were disruptive or based on his speech itself. In *Sheppard v. Beerman*, 94 F.3d 823 (2d Cir. 1996), the Second Circuit explained that "even if the potential disruption to the office outweighs the value of the speech, the employer may fire the employee only *because of* the potential disruption, and *not because of* the speech." *Id.* at 827. "That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such 'retaliatory' discharge is always unconstitutional." *Id.*; *accord Persaud v. City of New York*, No. 22-CV-2919 (AS), 2024 WL 2159852, at *8 (S.D.N.Y. May 14, 2024) (denying summary judgment because defendants "have not shown that [employee] was fired 'only *because of* the potential disruption, and *not because of* the speech'").

The record suggests a range of possible reasons for Grande's discipline. It appears that Avicolli may have taken issue with the comments at least in part based on the viewpoint Grande expressed. At her deposition, Avicolli said she found Grande's comments "inappropriate" and "unprofessional" because they showed "resistance in having a growth mindset or an open perspective." Avicolli Dep., ECF No. 45-3, at 7. After learning of the

teacher's complaint, Avicolli wrote to other teachers who had participated in the breakout room that Grande had made "inappropriate and aggressive comments" that were "unacceptable," "saddened" her, and created an "unsafe and hostile environment." ECF No. 45-3, at 43. Defendants say that Wilson "made the decision to discipline Plaintiff because of what he said and 'how he communicated out in the breakout room, which impacted the training session.'" Defs.' L.R. 56(a)1 St. ¶ 63; *see also* Wilson Dep., ECF No. 43-1, at 44 (stating he disciplined Grande for "how he communicated out during that breakout session, which impacted the training session"). At his deposition, Wilson said that he concluded Grande used "vulgarity" in the breakout room. *Id.* at 42. The reprimand letter signed by Wilson said that Grande had violated a provision of the Hartford Public School Employe Handbook by making "inappropriate and unprofessional comments." ECF No. 43-1, at 124. The Handbook provision referenced provides that "[e]mployee behavior that does not reflect *positive social values* will have a negative influence on students and fellow employees and is unacceptable." *Id.* (emphasis added). The letter stated that the misconduct finding was not based on Grande's "opinions or feelings regarding the training" but solely on the way Grande "expressed these sentiments which was inappropriate, unprofessional, and made several staff members uncomfortable." *Id.* Notably, the complaining teacher did not express discomfort over Grande saying "BS" or "bullshit." Rather, the discomfort appeared to be at least in part related to the opinion that Grande expressed. ECF No. 43-1, at 117 ("That statement deeply affects the community I serve. I cannot stand for a statement that is against my moral beliefs.").[12]

---

[12] Although Defendants point to the complaint of only one teacher as showing disruption, another teacher expressed feeling upset after the meeting. This teacher also appeared to be upset at least in part based on the viewpoint Grande expressed. ECF No. 43-1, at 118 ("He was dismissing what I

Accordingly, there are disputed factual questions as to whether Grande was reprimanded for using "vulgarity," speaking "aggressively," or expressing an opinion that others disagreed with.

In sum, there are genuine disputes of material fact bearing on whether the assessment of the disruption caused by Grande's speech was reasonable and whether Grande was reprimanded because of a disagreement with the opinion Grande expressed rather than the disruption. *See Rankin*, 483 U.S. at 384 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse . . . simply because superiors disagree with the content of employees' speech"); *Ganim*, 342 F.3d at 115 (holding that "factual disputes pertaining to the potential for disruption and defendants' motivations in suspending and terminating plaintiff preclude summary judgment"); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 557 (2d Cir. 2001) (holding that summary judgment was improper where "the parties disagree as to the manner in which the [the employee's] speech was delivered; whether the [employee's] speech disrupted, or had the potential to disrupt, the Cooperative's functioning; and whether even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech"). Accordingly, factfinding is required and I will not engage in *Pickering* balancing on this motion.

---

was saying. I was upset after the meeting. These are important developments to further understand the discrepancy amongst us to be better educators. I felt like [] my opinion was shut down.").

### 4.    Claim Against Torres-Rodriguez

Defendants argue that Superintendent Torres-Rodriguez is entitled to summary judgment because she was not personally involved in any deprivation of Grande's rights. Defs.' Mem. 10 n.5.[13] Grande responds that Torres-Rodriguez's designee could have reversed Grande's reprimand and Torres-Rodriguez failed to ensure her designee had training about freedom of speech rights of teachers. Pl.'s Mem. 41.

I agree with Defendants that Torres-Rodriguez is entitled to summary judgment in her individual capacity on Count One as Grande has not presented any facts suggesting that Torres-Rodriguez was personally involved in the alleged deprivation of his First Amendment rights. To show personal involvement, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Grande has not presented any evidence that Torres-Rodriguez herself had any personal knowledge of Grande's speech or his discipline. Grande asserts that a supervisor can be liable if a defendant exhibits "deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." Pl.'s Mem. 32 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015)). This quote from *Littlejohn* relies on *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), which had identified five categories of conduct that would establish liability of supervisors for constitutional violations. Following *Ashcroft v. Iqbal*, however, the Second Circuit made clear in *Tangreti* that "there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618; *see also*

---

[13] Defendants raise no such argument with respect to the other individual Defendants.

*Gibson v. Rodriguez*, No. 3:20-CV-953 (KAD), 2021 WL 327526, at *2 (D. Conn. Feb. 1, 2021) (stating at "[i]n *Iqbal* . . . the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be 'held liable based on a lesser showing of culpability than the constitutional violation requires'") (quoting *Iqbal*, 556 U.S. at 677). Grande points to a recent Second Circuit case stating that "deliberate indifference" satisfies the state-of-mind requirement for a First Amendment free exercise claim. Pl.'s Mem. 41-42 (citing *Wiggins v. Griffin*, 86 F.4th 987, 997 (2d Cir. 2023)). However, with respect to a First Amendment retaliation claim, "[s]pecific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *accord Abujayyab v. City of New York*, No. 15 Civ. 10080 (NRB), 2018 WL 3978122, at *11 (S.D.N.Y. Aug. 20, 2018). Grande has asserted no facts demonstrating improper motivation on the part of Torres-Rodriguez as she had no knowledge of Grande's speech or discipline.[14]

### 5.    Qualified Immunity

Defendants assert that the individual defendants are entitled to qualified immunity because they did not violate any clearly established right. Defs.' Mem. 15-17. Defendants cite cases holding defendants were entitled to qualified immunity where it was not clear whether the plaintiff was speaking as a private citizen on a matter of public concern. *Id.* at 16-17. Grande argues that it is clearly established that speech about discrimination relates to a matter

---

[14] Moreover, even if a First Amendment retaliation claim could be based on deliberate indifference, Grande has failed to provide sufficient evidence that Torres-Rodriguez acted with deliberate indifference for these purposes. *See Wiggins*, 86 F.4th at 998 (stating, in a case involving a free exercise claim, that deliberate indifference arises when an actor is culpably reckless or when an official's act or failure to act reveals "a conscious disregard of a substantial risk of serious harm") (internal quotation marks omitted).

of public concern and Second Circuit cases clearly delineate the difference between an employee voluntarily speaking to coworkers and criticizing employer stances on matters of public concern and employees airing grievances pursuant to their job duties. Pl.'s Mem. 37. Grande also asserts that the District's Freedom of Speech Policy is evidence that the District and its officials knew they were bound by clearly established law, as is Grande's letter of reprimand, which stated he was not being disciplined based on his "opinions or feelings regarding the training." *Id.* at 38-39.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (citations omitted). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012). To overcome qualified immunity, a plaintiff must show that (1) the defendant officials violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *Eaton v. Estabrook*, 144 F.4th 80, 93 (2d Cir. 2025) (internal quotation marks omitted). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Id.* (internal quotation marks omitted). "This does not mean that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing

law the unlawfulness must be apparent.'" *Bangs v. Smith*, 84 F.4th 87, 96 (2d Cir. 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In *Eaton*, an excessive force case, the Second Circuit recently held that summary judgment was improper on qualified immunity grounds. The court explained, "[h]aving concluded that a reasonable jury could find that [the defendant's] force was objectively unreasonable, [the defendant] is entitled to qualified immunity only if, at the time of his conduct, binding case law had not articulated with sufficient specificity that such conduct was unconstitutional, either because of the novelty of the type of force or its application in a novel context." *Eaton*, 144 F.4th at 94. The court concluded in that case: "We do not think that [the defendant's] conduct—construing all factual disputes in [the plaintiff's] favor—was materially novel in either respect." *Id.*

As described above, drawing all inferences and resolving all factual disputes in Grande's favor, his comments expressed that the social identity exercise was targeting teachers based on race and gender in an unfair and discriminatory manner. It is clearly established by Second Circuit and Supreme Court cases that raising concerns about gender or race discrimination the workplace is speech about a matter of public concern, particularly when the concern extends beyond an individual plaintiff's situation. *See, e.g.*, *Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (referring to the "right to protest racial discrimination" as "a matter inherently of public concern"); *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) (stating that the Second Circuit has "held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern"); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d Cir. 2013) (holding that plaintiff "spoke about a matter of public concern, namely, whether the police

department was discriminating against Hispanics" and noting that *Connick* stated that the

"'right to protest racial discrimination [is] a matter inherently of public concern'") (quoting

*Connick*, 461 U.S. at 148 n.8).

Defendants argue that in *Colvin v. Keen*, 900 F.3d 63 (2d Cir. 2018), the Second Circuit

"recognized that there is no 'clearly established' law that all speech regarding discrimination

is a matter of public concern and protected under the First Amendment." Defs.' Reply 13. But

at issue in *Colvin* was whether a college admission counselor's advice to a co-worker who was

being arrested by campus police was protected speech. The Second Circuit determined that the

defendants were entitled to qualified immunity because the plaintiff simply gave legal advice

to a co-worker and her "speech was not addressed to police misconduct at all." *Colvin*, 900

F.3d at 76. The Second Circuit distinguished that situation from other cases where it had found

that "that speech debating issues of discrimination, speech seeking relief from 'pervasive or

systemic misconduct' by public officials, and speech that is 'part of an overall effort to correct

allegedly unlawful practices or bring them to public attention' all go to matters of public

concern." *Id.* at 75. Thus, *Colvin* supports Grande's position that it is clearly established that

speech about issues of discrimination is a matter of public concern. Drawing all inferences and

resolving all factual disputes in Grande's favor for purposes of this summary judgment motion,

Grande was raising concerns about teachers being targeted based on gender and race in a

discriminatory manner in the workplace and a reasonable official would understand as much.

In addition, Supreme Court and Second Circuit cases clearly delineate when employees

speak as private citizens rather than as employees pursuant to their job duties. There is nothing

novel about the application of this precedent to Grande's situation. The relevant question is

whether Grande's speech was part of his "actual, functional job responsibilities" as a physical

education teacher. *See Matthews*, 779 F.3d at 174. Drawing all inferences and resolving all factual disputes in Grande's favor, his "actual, functional job responsibilities" did not include expressing his opinion that a social identity exercise was discriminatory, and thus a reasonable official would understand Grande was speaking as a private citizen when he made those comments. Indeed, the letter of reprimand issued to Grande stressed that he was *not* being disciplined based on the opinions that he voiced, suggesting awareness that basing discipline on Grande's opinions would be unlawful.

Moreover, there are disputed issues of fact regarding the motivation for investigating and disciplining Grande. In the First Amendment retaliation context, "qualified immunity does not apply where there is evidence that the defendants' actual motive was to retaliate against the employee's speech rather than due to a concern about disruption." *Davi v. Guinn*, No. 16-CV-5060 (ERK) (PK), 2024 WL 2746940, at *11 (E.D.N.Y. May 29, 2024). Thus, qualified immunity is unavailable to the extent the plaintiff shows "particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive." *Sheppard*, 94 F.3d at 828 (internal quotation marks and citation omitted). Here, Grande has made such a showing for purposes of surviving summary judgment on the qualified immunity defense. As discussed above, Grande has demonstrated issues of fact as to whether the investigation and discipline were based on concerns about disruption or instead based on the viewpoint he expressed. Under these circumstances, qualified immunity at this stage of the proceeding is denied as to Avicolli and Wilson.

Accordingly, summary judgment as to Count One is **DENIED** with respect to Defendants Avicolli and Wilson in their individual capacities and **GRANTED** with respect to Defendant Torres-Rodriguez in her individual capacity.

**B.      Compelled Speech in Violation of the First Amendment**

In Count Two of the Complaint, Grande asserts a claim for compelled speech in violation of the First Amendment. Grande asserts that both the initial training held on October 28, 2020 and the "sensitivity training" he was required to take following the reprimand letter were forms of compelled speech. Pl.'s Mem. 34-35. Defendants argue that Grande was not compelled to speak and mandatory attendance, without an expectation of participation, does not constitute compelled speech. Defs.' Mem. 24; Defs.' Reply 12. Grande responds that the government may not compel speech or silence from people or mandate support for a particular belief, and the trainings were efforts to force him to adopt the Defendants' view on identity and privilege. Pl.'s Mem. at 35. Grande asserts that Defendants left him with a "Hobson's choice: either adopt Defendants' views on identity and privilege and be allowed to speak without consequence or remain silent if he disagreed in order to avoid punishment for a non-conforming opinion." Defs.' Mem. 35-36.

The First Amendment "includes both the right to speak freely and the right to refrain to refrain from speaking." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (internal quotation marks omitted). The "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006). The forced adoption of a belief system whether related to politics, diversity, or other matters of public concern constitutes compelled speech. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("No official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein"). The "government may not make

38

public employment subject to the express condition of political beliefs or prescribed expression." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996).

Here, it is undisputed that Grande was not required to speak during the breakout session. In addition, although the parties agree that Grande was required to complete a sensitivity training, there is no evidence in the record that Grande was required to speak at this training. The only information Grande provides about the sensitivity training is his statement in his deposition that the training was not helpful because it was a "reprogramming training" where "they pretty much tell you what to think and how to think." Grande Dep., ECF No. 45-2, at 35.

This case differs from cases where the government requires individuals to engage in speech or other expression. *See Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977) (holding that New Hampshire could not compel its citizens to advertise the slogan "Live Free or Die" on their vehicle license plates); *Barnette*, 319 U.S. at 642 (holding that school could not compel students to salute and recite the Pledge of Allegiance); *Burns v. Martuscello*, 890 F.3d 77, 88 (2d Cir. 2018) (holding that prisoner "held a strong First Amendment interest in refusing the demands of the guards that he provide both false information, and truthful information on an ongoing basis"). This case also differs from *Kilborn v. Amiridis*, No. 22 C 475, 2023 WL 2058061, at *5-6 (N.D. Ill. Feb. 15, 2023), where the court denied a motion to dismiss a compelled speech claim. There, the complaint alleged that the plaintiff was required to attend an eight-week diversity training before returning to his job teaching where, as part of the course, the plaintiff had to meet with a trainer who would provide feedback regarding his engagement with and commitment to the program. *Id.* at *3. The complaint in that case specifically alleged that the program "compels [the plaintiff] to express his commitment to the

goals of the program in order to be released back to teaching, even if he disagrees with the content and purpose of this diversity training." *Id.* at *5. Here, in contrast, there is no evidence that Grande was required to make a statement at either training. Accordingly, he has failed to establish a claim for compelled speech in violation of the First Amendment.

Summary Judgment as to Count Two is **GRANTED** as to all Defendants.

### C.    Claims against the District and Official Capacity Claims

Defendants argue that Grande's claims against the individual Defendants in their official capacities should be dismissed as duplicative. Defs.' Mem. 14. Grande responds that "[t]o the extent that summary judgment is proper to dismiss duplicative claims against Individual Defendants in their official capacities, the claims against them in their individual capacities remain proper." Pl.'s Mem. 43. Because Grande has named the District as a Defendant, I dismiss the claims against Avicolli, Wilson, and Torres-Rodriguez in their official capacities as duplicative. *See, e.g.*, *Demski v. Town of Enfield*, No. 3:14-CV-01568-VAB, 2015 WL 4478401, at *3 (D. Conn. July 22, 2015) (noting that "the district courts within the Second Circuit consistently dismiss as duplicative claims asserted against officials in their official capacities where the plaintiff has named the municipal entity as a defendant"); *Larsen v. Berlin Bd. of Educ.*, 588 F. Supp. 3d 247, 256 (D. Conn. 2022) (stating that in "'a suit against a public entity, naming officials of the public entity in their official capacities adds nothing to the suit'") (quoting *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010)).

Although Defendants have moved for summary judgment on behalf of all Defendants as to both counts in the Complaint, they do not specifically address in their memoranda Grande's claims against the District or Grande's claims for declaratory or injunctive relief. Neither party discusses the District's liability under *Monell v. Dep't of Soc. Servs. of City of*

*New York*, 436 U.S. 658 (1978). In addition, Grande's memorandum does not provide any argument regarding entitlement to injunctive or declaratory relief—perhaps because Grande retired from the District after this lawsuit was filed.

In the absence of briefing by the parties regarding the District's liability under *Monell* and Grande's entitlement to injunctive and declaratory relief, I deny without prejudice Defendants' Motion for Summary Judgment as to Count One against the District. *See* Fed. R. Civ. P. 56(e)(1); *see also Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."); *Parks v. Blanchette*, No. 3:09-CV-604 VAB, 2015 WL 1970526, at *1 (D. Conn. May 1, 2015) (stating that "where a motion for summary judgment is improperly supported, Rule 56(e)(1) allows the Court to provide the moving party with an opportunity to provide proper support"). I will convene a status conference to determine next steps with respect to Count One against the District.

## IV.   CONCLUSION

For the reasons described above, Defendants' Motion for Summary Judgment is **DENIED** with respect to Count One as to Wilson and Avicolli in their individual capacities and **GRANTED** as to Wilson and Avicolli in their official capacities and as to Torres-Rodriguez in her official and individual capacity. The Motion is **DENIED WITHOUT PREJUDICE** with respect to Count One as to the District. The Motion is **GRANTED** with respect to Count Two as to all Defendants.

**SO ORDERED.**

New Haven, Connecticut
September 9, 2025

                                        /s/*Sarah F. Russell*
                                        SARAH F. RUSSELL
                                        United States District Judge